UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
Caption in Compliance with D.N.J. LBR 9004-1

Dale E. Barney, Esq.
David N. Crapo, Esq.
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
E-mail: dbarney@gibbonslaw.com
          dcrapo@gibbonslaw.com
Counsel for Discover Growth Fund, LLC

In re:

IMMUNE PHARMACEUTICALS, INC., *et al.*,1

Debtors.

---

IMMUNE PHARMACEUTICALS, INC.; IMMUNE
PHARMACEUTICALS, LTD.; CYTOVIA, INC.;
IMMUNE ONCOLOGY PHARMACEUTICALS,
INC.; MAXIM PHARMACEUTICALS, INC.;
IMMUNE PHARMACEUTICALS USA CORP.; and
THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF IMMUNE
PHARMACEUTICALS, INC., *et al.*,

                                    Plaintiffs,

          vs.

DISCOVER GROWTH FUND, LLC,

                                    Defendant.

**Chapter 11**

**Case No. 19-13273 (VFP)**

**(Jointly Administered)**

**Adv. Proc. No. 19-02033**

**MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT
AGAINST DEFENDANT
DISCOVER GROWTH FUND,
LLC**

---

1 The Debtors in these chapter 11 cases and the last four digits their of each Debtor's taxpayer identification number are as follows: Immune Pharmaceutical, Inc. (1431); Immune Pharmaceuticals, Ltd.; Cytovia, Inc. (7805); Immune Oncology Pharmaceuticals, Inc.; Maxim Pharmaceuticals, Inc. (9983); and Immune Pharmaceuticals USA Corp. (9630).

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................... ii

PRELIMINARY STATEMENT ................................................................... 1

COUNTER-STATEMENT OF MATERIAL FACTS ................................. 2

    A.    Introduction............................................................................ 2

    B.    The Origin Of The Contract Phrases Now At Issue ............... 4

    C.    2018 Loan To Debtor............................................................ 7

    D.    The Loan And Defaults......................................................... 11

    E.    Debtor's Factual Misrepresentations In Support Of Motion ... 14

    F.    The Agreement Was Jointly Drafted ...................................... 14

    G.    The Debenture Is A Debt Instrument...................................... 16

    H.    There Was No Subordination Agreement................................ 19

    I.    Liquidation........................................................................... 19

    J.    Debtor's Recent Admissions Against Interest ....................... 25

LEGAL ARGUMENT................................................................................. 26

    1.    The Debenture Does Not Subordinate Discover's Claims. ....... 28

    2.    Discover Did Not Limit the Amount of Its Lien to $250,000. ... 33

    3.    Immune Expressly Waived Application of the Rule That
        Contractual Ambiguities Must Be Interpreted Against the Drafter. .......... 36

    4.    To the Extent the Agreement or the Debenture Contain
        Ambiguities, the Court Must Consider Extrinsic Evidence to
        Resolve Those Ambiguities ...................................................... 38

CONCLUSION............................................................................................ 41

2780273.1 115785-100485

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aman v. Cort Furniture Rental Corp.*,
    85 F.3d 1074 (3d Cir. 1996)......................................................................................................27

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).........................................................................................................27, 28

*Betts v. New Castle Youth Dev. Ctr.*,
    621 F.3d 249 (3d Cir. 2010)..................................................................................................26

*Matter of Carpe Diem 1969 LLC*,
    2019 WL 3413841 (D.V.I. 2019)............................................................................................28

*Coakley Bay Condo. Ass'n v. Cont'l Ins. Co.*,
    770 F. Supp. 1046 (D.V.I. 1991) ...........................................................................................28

*County of Dauphin v. Fidelity & Deposit Co.*,
    770 F. Supp. 248 (M.D.Pa.), *aff'd*, 937 F.2d 596 (3d Cir. 1991) ...........................................38

*Delponte v. Coral World Virgin Islands, Inc.*,
    48 V.I. 386 (D.V.I. Aug. 14, 2006), aff'd, 233 F. App'x 178 (3d Cir. 2007)..............28, 29, 30

*Doe v. Abington Friends Sch.*,
    480 F.3d 252 (3d Cir.2007).....................................................................................................28

*Dowling v. City of Philadelphia*,
    855 F.2d 136 (3d Cir.1988).....................................................................................................28

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    602 F.3d 237 (3d Cir. 2010)...................................................................................................26

*Hullett v. Towers, Perrin, Forster & Crosby, Inc.*,
    38 F.3d 107 (3d Cir.1994)...............................................................................................38, 39

*Mellon Bank, N.A. v. Aetna Business Credit, Inc.*,
    619 F.2d 1001 (3d Cir.1980)..................................................................................................39

*Phillips v. Andrews*,
    322 F.Supp.2d 797 (D.V.I. 2004) ..........................................................................................29

*Santini v. Fuentes*,
    795 F.3d 410 (3d Cir. 2015)...................................................................................................27

2780273.1 115785-100485

*Sunshine Shopping Center v. Kmart Corp.*,
   85 F. Supp. 2d 537,540 (D.V.I. 2000) ...............................................................................38, 39

*Tamarind Resort Associates v. Government of the Virgin Islands*,
   138 F.3d 107 (3d Cir. 1998)..........................................................................................29

*Zavala v. Wal-Mart Stores Inc.*,
   691 F.3d 527 (3d Cir. 2012).........................................................................................27

**Statutes**

11 U.S.C. § 510(a) .........................................................................................................1, 41

**Rules**

Fed. R. Bankr. P. 2004.............................................................................................16, 39, 40

Fed.R.Civ.P. 56(c) ............................................................................................................28

Fed. R. Civ. P. 56(e)(2).....................................................................................................26

**Treatises**

Restatement (Second) of Contracts § 202(2) ....................................................................29

Restatement (Second) of Contracts § 212(2) ....................................................................29

Restatement (Second) of Contracts § 212, cmt. b.............................................................29

Motion, particularly where discovery remains open.    Against the possibility that the Court might find material ambiguities in the agreements and in an effort to divert the Court's attention from extrinsic evidence that would compel the resolution of those ambiguities in Discover's favor, the Plaintiffs contend that Discover was the sole drafter of those agreements, while ignoring entirely a clear provision to the contrary.    They then urge the Court to apply the standard rule of contract construction to construe any such ambiguities in those agreements against Discover, apparently hoping that Discover will go along with the ruse and not bring to the Court's attention Immune's express agreement that the documents were mutually drafted and waiver of the application of that rule of construction.    Under the circumstances, and for the reasons set forth below, the Motion must be denied.

## COUNTER/SUPPLEMENTAL-STATEMENT OF MATERIAL FACTS

The pleadings the Plaintiffs submit in support of the Motion are replete with material misstatements and omissions of fact.    Indeed, those papers are light on relevant and material facts and heavy on invective.    As set forth below, the Declaration of Anthony Fiorino in Support of Plaintiffs' Motion for Partial Summary Judgment Against Defendant Discover Growth Fund, LLC ("**Fiorino Dec.**") [Dkt. No. 8-3] and the Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment against Defendant Discover Growth Fund, LLC [Dkt. No. 8-2] which cites to the Fiorino Dec., are replete with misrepresentations and errors which are belied by the plain language of the "Debt Documents" identified below.    Discover sets forth the following Counter/Supplemental-Statement of Material Facts pursuant to D.N.J. LBR 7056-1(a) to provide the Court with a complete and accurate statement of the facts.

### A.    Introduction

1.    John C. Kirkland ("**Kirkland**") is the Fund Manager and President of Discover Fund Management, Inc., the general partner of Discover Fund Management, LLLP ("**DFM**"),

2

Defendant Discover Growth Fund, LLC ("**Discover**"), by and through its undersigned counsel, submits this memorandum of law in opposition to the Plaintiffs' Motion for Partial Summary Judgment Against Discover Growth Fund, LLC, which was filed in this Adversary Proceeding on January 29, 2020 ("**Motion**"). [Dkt. No. 8]

## PRELIMINARY STATEMENT

The Motion constitutes the Plaintiffs' latest volley their ongoing campaign to frustrate Discover's legitimate rights as the secured creditor of Debtor Immune Pharmaceuticals Inc. ("**Immune**" or "**Debtor**").  Without establishing the existence of a subordination agreement, they seek to subordinate Discover's claims pursuant to 11 U.S.C. § 510(a).  Instead, the Plaintiffs take one clause of one provision of a debenture, the so-called "Liquidation Priority Provision", out of context to concoct an interpretation  that defies logic and completely ignores the extensive security scheme set forth in the agreements memorializing a complex financing transaction between Discover and Immune.  Those agreements must be read together and, when so examined, overwhelmingly establish that Discover is Immune's senior secured creditor, and is not subordinate to general creditors.

The Plaintiffs further distort one of Immune's  representations and warranties to Discover to fabricate what they call a "Lien Limitation Provision".  The result is thin attempt to convince this Court that Discover, which the Plaintiffs acknowledge is led by a financially sophisticated John C. Kirkland, agreed to limit to $250,000 the lien that would secure Immune's obligations under a multi-million dollar financing transaction with Discover, which included a $2 million loan the Plaintiffs admit that Discover actually made.

Finally, the Plaintiffs insist that a plain language reading of the documents supports their position.  Far from doing so, the provisions cited by the Plaintiffs, when read fully and fairly, establish, at minimum, a multitude of material factual disputes that cannot be resolved on the

1

which is the investment advisor to and managing member of Discover Growth Fund, LLC

("**Discover**"). *Declaration of John C. Kirkland in Support of Discover Growth Fund, LLC's Opposition to Plaintiffs' Motion for Partial Summary Judgment against Discover Growth Fund, LLC* ("**Kirkland Dec**."), filed contemporaneously herewith at ¶ 1.

2.      Discover is the senior secured lender of lead debtor Immune Pharmaceuticals Inc. ("**Immune**" or "**Debtor**") in the captioned chapter 11 cases ("**Chapter 11 Case**"). Immune and Discover are parties to that certain $5.5 million face amount Senior Secured Redeemable Convertible Debenture ("**Debenture**"), which was issued pursuant to a Securities Purchase Agreement ("**Agreement**"), a Grant of Security Interest Agreement in United States Patents and Trademarks ("**IP Security Agreement**" or "**IPSA**"), and related documents and instruments (collectively, the "**Debt Documents**") all dated October 9, 2019. Kirkland Dec., ¶ 6.   Copies of the Debenture, Agreement and IPSA are attached to the Kirkland Dec. as Exhibits 1, 2 and 3, respectively.

3.      Pursuant to the Debt Documents, Discover lent $5 million to Immune, consisting of $2 million paid in cash on October 9, 2019 and a Promissory Note to Debtor for an additional $3 million, all secured by a perfected first priority lien on and security interest in all assets of Immune. Under the Promissory Note, Discover was to have paid $3 million in cash if and when Immune met the closing conditions.  Through the incompetence and misfeasance of Immune's officers, directors and lawyers, Immune repeatedly breached multiple covenants, representations and warranties of the Debt Documents, and failed to ever meet the conditions precedent to Discover's obligation to fund the remaining $3 million in cash. Kirkland Dec., ¶ 7.

4.      Among the conditions precedent to Discover's funding the additional $3 million under the Promissory Note was that the  Securities and Exchange Commission ("SEC") must have

3

"declared effective"  Immune's registration statement to permit Immune to register and issue to

Discover sufficient shares of Immune's stock to permit Discover to convert the Debenture in its

entirety.  Debenture, p. 1.  In the Motion, the Plaintiffs fail to point out that Immune failed to have

the SEC declare its registration statement effective, and, therefore, the conditions precedent to

Discover's obligation to fund the $3 million never occurred.

      **B.**    **The Origin Of The Contract Phrases Now At Issue**

    5.    Funds advised by DFM have invested $13 million in cash in Immune over five

years, including the Debenture issued to Discover on October 9, 2018.  The Debtor's stock was

previously publicly traded on the Nasdaq Capital Market under the trading symbol IMNP, and later

on the OTCQB under the same symbol, before being delisted following the bankruptcy filing.

Kirkland Dec., ¶ 8.

    6.    On July 28, 2015, Discover Growth Fund, a Cayman Islands limited liability

company ("**Discover Cayman**"), for which DFM also served as investment advisor, agreed to

invest $9 million in cash in the Debtor pursuant to two separate Stock Purchase Agreements, copies

of which are attached to the Kirkland Dec. as Exhibits 4 and 5.  These agreements started with a

basic form of purchase agreement that Discover had developed over the years, based upon multiple

drafts and comments from numerous issuers, that effectively represented a pre-negotiated industry

standard form.  In addition, the two agreements themselves were extensively negotiated with the

Debtor and its lawyers and financial advisors, with more than a score of drafts of those agreements

having been reviewed, revised, negotiated and discussed.  Kirkland Dec., ¶ 9.

    7.    The first agreement Kirkland participated in negotiating with Immune was the Stock

Purchase Agreement for the purchase of $4.2 million in preferred stock in July 2015, which is

attached to the Kirkland Dec. as Exhibit 4.  That agreement was heavily negotiated, with a dozen

different drafts exchanged between the parties.  The second agreement was a "Stock Purchase

4

Agreement" for the purchase of $7.8 million in preferred stock, which is attached to the Kirkland

Dec., as Exhibit 5 ("2015 Agreement"). The $7.8 million 2015 Agreement started with the $4.2

million agreement as a form, and the parties thereafter negotiated an additional nine versions of the

document. Thus, the second agreement represents more than 20 drafts negotiated between the

parties. Kirkland Dec., ¶ 10.

8.      Based on Kirkland's contemporaneous discussions with Immune's representatives at

the time of the 2015 Agreement, the phrase "after payment or provision for payment of debts and

other liabilities of the Corporation" in Section E.1 concerning "Liquidation" meant that, in the event

of a liquidation, the parties could agree on how to provide for the expenses of such a liquidation.

No one ever suggested that this phrase was intended to establish the priority of Discover's position

relative to other debts of the corporation.  To the contrary, everyone agreed that relative priority was

expressly dealt with in Section B.1 concerning "Ranking."  The above-noted phrase in Section E.1

was simply a preamble to providing how Liquidation Value would be calculated, which is the

purpose of Section E.1.  Kirkland Dec., ¶ 11.

9.      No one from Immune ever suggested to Discover that this phrase was a

subordination provision.  Based on Kirkland's professional knowledge and experience, no one in

the industry would ever interpret the language in this way.  Subordination agreements are extensive

documents that lay out in detail exactly what is subordinated to what, how and under what

circumstances.  Kirkland has never seen subordination handled as a single clause in an unrelated

section.  Kirkland Dec., ¶ 12.

10.     The parties agreed upon a $250,000 materiality threshold for contractually defined

Indebtedness, Liens and other liabilities of the company to third parties.  It is very common to

exclude smaller debts and liabilities in this manner.  The $250,000 figure was used throughout the

2015 Agreement in reference to various third-party debts and obligations.   Kirkland Dec., ¶ 13.

11.     Based on Kirkland's contemporaneous discussions with Immune's representatives at

the time of the 2015 Agreement, the representation and warranty by Immune in Section III.A.3(b) of

the 2015 Agreement that, "[t]he execution, delivery and performance of the Transaction Documents

by Company, the issuance and sale of the Shares and the consummation by Company of the other

transactions contemplated thereby do not and will not … (b) conflict with, or constitute a default (or

an event that with notice or lapse of time or both would become a default) under, result in the

creation of any Lien upon any of the properties or assets of Company or any Subsidiary, or give **to**

**others** any rights of termination, amendment, acceleration or cancellation (with or without notice,

lapse of time or both) of, any material agreement, credit facility, debt or other instrument

(evidencing Company or Subsidiary debt or otherwise) or other understanding to which Company

or any Subsidiary is a party or by which any property or asset of Company or any Subsidiary is

bound or affected," does not have anything to do with Discover's rights under the agreement.  To

the contrary, by this provision Immune was representing and warranting that nothing about the 2015

Agreement with Discover would give **others** any rights, for example, the creation of a lien, as a

result of their then-existing agreements with Immune.  No one from Immune ever suggested this

phrase in any way limited Discover's rights under the 2015 Agreement.  To the contrary, everyone

agreed that the purpose of this provision was to protect Discover from any claims by third parties.

Kirkland Dec., ¶ 14.

12.     After entering into the agreements in 2015, the Debtor failed to fully comply with all

of its contractual requirements, resulting in contractually-defined "Trigger Events."  However, the

Debtor acknowledged the defaults, the economics were adjusted accordingly, and the Debtor

6

otherwise continued to comply with its ongoing obligations under the agreements. Kirkland Dec., ¶ 15.

13.    On September 6, 2016, Discover Cayman invested an additional $2 million in cash in the Debtor, pursuant to the Stock Purchase Agreement attached hereto as Exhibit 6. Under that agreement, the investment in the Debtor converted into common stock at a split-adjusted fixed price of $5.00 per share. That was a straight equity investment, on which Discover Cayman lost money. Kirkland Dec., ¶ 16.

### C.    2018 Loan To Debtor

14.    On July 6, 2018, the Debtor was delisted by Nasdaq, and began trading on the OTCQB over-the-counter market under the same symbol, IMNP. Kirkland Dec., ¶ 17.

15.    On August 6, 2018, Kirkland was approached by the Maxim Group, a registered broker-dealer representing the Debtor, about making an additional investment. Kirkland told the banker and the company that Discover Cayman had lost money doing the prior equity deal, and as such would not be willing to do another equity deal. Kirkland repeatedly said that Discover would not do an equity deal. However, Kirkland said that Discover might be willing to loan the Debtor money, provided the loan was first-position secured by all assets, including all intellectual property. Kirkland Dec., ¶ 18.

16.    After more than a month, a negotiated term sheet was executed between the Debtor and Discover on September 18, 2018. The proposed structure was substantially similar to the 2015 agreements, except that the deal was for secured debt rather than preferred stock. Kirkland Dec., ¶ 19.

17.    In discussing a potential deal with Immune in 2018, Anthony Fiorino ("Fiorino"), the Debtor's then President and interim CEO, and Kirkland agreed that that parties would start with the prior 2015 Agreement (Exhibit 5 to the Kirkland Dec.) as a form, and revise it to reflect the

7

different terms for the new debt deal. Thus, the form of written document would essentially be pre-

negotiated between the two parties, as it would already reflect most of the mutual agreement of the

parties in the prior deal, with which the parties were all familiar. The only changes would be as

reflected in the new term sheet negotiated between Discover and Immune. The major change would

be that this would be a debt deal, for a secured debenture; whereas the prior agreement was an

equity deal, for preferred stock. Fiorino and Kirkland agreed that neither of us would try to

renegotiate any of the terms of the prior agreement that had already been agreed to. Kirkland Dec.,

¶ 20.

18.     In order to save on Immune's legal fees, Kirkland agreed to take the laboring oar in

creating the first draft of the Agreement from the prior $7.8 million agreement. On September 19,

2018, Kirkland emailed to Fiorino a draft of the Agreement, along with a redline comparing it to the

$7.8 million 2015 Agreement previously entered into between the parties. A copy of my email and

redline are attached hereto as Exhibit 7. The parties negotiated an additional seven drafts of the

Agreement. Thus, the final Agreement incorporates approximately thirty different drafts negotiated

and exchanged between the parties. Kirkland Dec., ¶ 21.

19.     The Plaintiffs' claim that Discover drafted the Debt Documents is categorically

false. The agreements were mutually drafted by both parties. Not only did Immune substantially

draft and contribute to the wording of the Debt Documents, they are among the most heavily

negotiated agreements Kirkland has ever done. Kirkland Dec., ¶ 22.

20.     Section VII.N of the Agreement accurately states: "Construction. The parties agree

that each of them and/or their respective counsel has reviewed and had an opportunity to revise the

Transaction Documents and, therefore, the normal rule of construction to the effect that any

ambiguities are to be resolved against the drafting party will not be employed in the interpretation of

8

the Transaction Documents or any amendments hereto. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party." Kirkland Dec., ¶ 23.

21.     Kirkland had multiple discussions with Fiorino and Gary Rabin ("**Rabin**") about the terms of the deal, including that all $5 million had to be first-position secured debt. Kirkland used the phrases "secured lender," "fully secured," "first position UCC" and "first position lien" dozens if not hundreds of times in those discussions. The pitch of Fiorino and Rabin was that the intellectual property owned by Immune had immense value, in particular the bertilimumab ("**Bert**") antibody that they repeatedly touted to Kirkland as almost ready to partner for tens of millions of dollars, and that, by taking a lien, Discover's money would be fully protected. Kirkland Dec., ¶ 24.

22.     As reflected in Exhibit 7, the parties revised Section E.1 of the Debenture (attached as Exhibit 2 to the draft Agreement), entitled "Liquidation" to change the phrase, "pari passu with any distribution or payment made to the holders of Preferred Stock and Common Stock" to instead say, "prior to any distribution or payment made to any other creditors or the holders of any Preferred Stock or Common Stock." Kirkland discussed this provision with Fiorino after sending the redline, noting that Kirkland revised this provision to make clear that Discover took first, not pari passu. Fiorino confirmed this understanding of the language, and readily acknowledged the business deal was that Discover would have a first-priority security interest in all assets. Kirkland Dec., ¶ 25.

23.     Neither Fiorino nor anyone else ever suggested that the phrase "after payment or provision for payment of debts and other liabilities of the Corporation" was intended to establish the priority of Discover's position relative to other debts of the corporation. Neither Mr. Fiorino nor anyone else ever suggested this phrase was some kind of subordination provision. To the contrary,

9

Mr. Fiorino expressly agreed that the opposite was true, i.e. that the new language we added clearly established that Discover took first.  Kirkland Dec., ¶ 26.

24.      Fiorino expressed concern that the holders of the debentures issued by Immune in May 2018 ("**May Debentures**") might not like that Discover was going in front of them.  He said that he would obtain waivers from them.  In this context, Kirkland and Fiorino discussed Immune's representations and warranties in Section III.A.3(b) of the Agreement.  Specifically, Kirkland said that he wanted to be sure that the May Debenture holders would not be a problem.  Kirkland and Fiorino turned to and read aloud Section III.A.3(b), and Fiorino said that Immune was clearly representing that no third-party liens would be created by our Agreement, and that this broad language would include the May Debenture holders.  Neither Fiorino nor anyone else ever suggested this phrase in any way limited Discover's rights under the Agreement, or somehow capped the amount of Discover's security interest.  To the contrary, Fiorino expressly reaffirmed that the purpose of this provision was to protect Discover from any claims by third parties, such as the May Debenture holders.  Kirkland Dec., ¶ 27.

25.      Kirkland and Fiorino also discussed the "Liens" definition, which Fiorino reaffirmed referred to the liens of third parties, such as the May Debenture holders.  He said he would like to increase the $250,000 amount to $500,000, since the company had many debts.  Kirkland said that he was already uncomfortable with the $250,000 materiality threshold, which made perfect sense in the context of an $11 million deal, but was too high in the context of a $5 million deal.  Kirkland said that he would live with the prior number because that is what had been agreed upon, but would not agree to double it.  This discussion would have made no sense at all if Section III.A.3(b) somehow put a cap on Discover's lien.  Fiorino would have wanted it lower, not higher.  Discover, on the other hand, would have insisted that it be the full amount of the loan.  Kirkland Dec., ¶ 28.

2780273.1 115785-100485

26.     In revising the 2015 Agreement, Kirkland and Fiorino did not change any of the capitalized defined terms, including Company and Investor.  There was no reason to change Company to Borrower, or Investor to Lender.  Kirkland also would not have changed it if it had said Purchaser, Fund, or Discover.  The defined term does not matter.  Being a Company is not inconsistent with being a Borrower.  Being a Lender is not inconsistent with being an Investor. There are debt investments as well as equity investments.  Discover was not willing to do an equity investment in 2018, but it was willing to do a debt investment.  It was still an investor.  It was also a lender.  The two terms are not mutually exclusive.  Using the term company does not mean that the company is not a borrower.  Using terms like investor or investment do not mean that a loan is not a loan.  Nor do they mean that a lender is not a lender.  Unnecessarily changing defined terms would have resulted in hundreds of completely unnecessary changes, complicated the redline, and accomplished nothing.  No one involved ever suggested such stupid changes.  Kirkland Dec., ¶ 29.

D.     **The Loan And Defaults**

27.     On October 9, 2018, the Debtor and Discover entered into the Agreement, and the Debtor issued the Debenture in the face amount of $5,500,000.00.  In order to fully secure repayment of the indebtedness and its other Obligations to Discover, the Debtor granted Discover a security interest in all assets (other than all tangible and intangible assets associated with Ceplene unless such assets were not fully disposed of by March 31, 2019), including most importantly Bert. See Agreement, Exh. 1, p.1 (definition of Collateral) and p.3 (definition of Obligations); IPSA. Kirkland Dec., ¶ 30.

28.     Discover perfected its security interest in the Collateral.  On October 9, 2018, Discover filed (a) UCC-1 Financing Statement No. 2018 6983973 with the Department of State of the State of Delaware, where the Debtor is incorporated, a copy of which is attached hereto as Exhibit 8, and (b) UCC-1 Financing Statement No. 53034144 with the Department of the Treasury

11

of the State of New Jersey, where the Debtor has its principal place of business, a copy of which is

attached to the Kirkland Dec. as Exhibit 9. Discover also filed the IPSA with the United States

Patent and Trademark Office. Thus, all of the Debtor's Obligations (as defined in the Agreement)

under the Agreement, the Debenture and the other Debt Documents are fully secured by a perfected,

first-position lien on the Collateral (as defined in the Agreement), which includes substantially all

assets of the Debtor. Kirkland Dec., ¶ 31.

29.    On October 10, 2018, the Debtor filed a Current Report on Form 8-K with the SEC.[2]

The Current Report states in pertinent part:

> On October 9, 2018, Immune Pharmaceuticals, Inc. ("Immune" or the
> "Company") entered into a Securities Purchase Agreement (the
> "Securities Purchase Agreement") with an institutional investor pursuant
> to which it sold to the investor $5.5 million in principal amount of its
> Senior Secured Redeemable Convertible Debentures (the "Debentures")
> for $2 million in cash and a $3 million promissory note (the "Investor
> Note") payable upon the earlier of the effectiveness of a registration
> statement covering the resale of the shares issuable upon conversion of
> the Debentures or one year….
> The Debentures are secured by first priority security interests on all of
> the Company's assets, other than all tangible and intangible assets
> associated with Ceplene (histamine dihydrochloride) unless such assets
> are not disposed of by March 31, 2019. . . .

Form 8-K dated Oct. 10, 2018 (emphasis added). Kirkland Dec., ¶ 32.

30.    The prospectus that the Debtor filed with the SEC[3] states in pertinent part:

> On May 18, 2018, we issued $2.8 million in aggregate principal amount
> of our Original Issue Discount Convertible Debentures (the "May
> Debentures"). Pursuant to Waiver Amendment and Exchange
> Agreements entered into with certain holders of the May Debentures in
> connection with the sale of the October Debentures, the aggregate face
> amount of the May Debentures was increased to $3.9 million. By their
> terms, the May Debentures matured and became due and payable on

---

[2] A copy of the Form 8-K is available at:
https://www.sec.gov/Archives/edgar/data/1208261/000114420418053234/0001144204-18-053234-index.htm.
[3] A copy of the prospectus is available at:
https://www.sec.gov/Archives/edgar/data/1208261/000114420419005598/tv512674_424b4.htm.

12

November 18, 2018. We did not repay the May Debentures on the maturity date. …

Our failure to repay the May Debentures when due resulted in a "Trigger Event" under the October Debentures.

The Selling Stockholder is not obligated to fund the remaining $3.0 million of its investment in the October Debentures until the earlier of the date on which all of the shares of common stock issuable in respect of the October Debentures and the October Debenture Warrants are registered and the first anniversary of the issuance of the October Debentures. Because we are not able to register all of the shares required under the securities purchase agreement, the Selling Stockholder has advised us that it believes we are in default of our obligations under the October Debentures and that it does not intend to fund its remaining $3 million investment in the October Debentures. We are negotiating with the Selling Stockholder regarding terms under which it would be willing to fund its remaining investment. However, no agreement has been reached as of the date hereof and we cannot assure you that we will reach any agreement with the Selling Stockholder or as to the terms of any such agreement. If the Selling Stockholder does not fund a substantial portion of its remaining $3 million investment, we may be required to find alternative sources of financing. If we are unable to do so, we may need to cease operations and file for protection under applicable bankruptcy law."

Prospectus dated Feb. 6, 2019 (emphasis added).    Kirkland Dec., ¶ 33.

31.    On February 8, 2019, Discover served the Debtor with a Notice of Default and

Notice of Sale of Collateral ("**Notice of Default**"), a copy of which is attached to the Kirkland Dec.

as Exhibit 10. Discover notified the Debtor that it was in default under the terms of the Debt

Documents due to various defaults, including, but not limited to, the Debtor's failure to repay the

May Debentures when due, and the failure of one or more of the equity conditions specified in the

Debenture because the Debtor was not in compliance with all provisions, covenants, representations

and warranties of the Debt Documents. In the Notice of Default, Discover declared all of the

Debtor's Obligations under the Debenture, Agreement, and other Transaction Documents

immediately due and payable.

32.    Upon receiving the Notice of Default, Immune did not claim that Discover's

position was junior to other creditors, nor did it claim that there was a $250,000 cap on Discover's

security interest.  Discover's first-position secured lien secures all of the Debtor's Obligations under

the Debenture, the Agreement, and the other Transaction Documents.  Kirkland Dec., ¶ 35.

33.    On February 17, 2019, the Debtor filed its voluntary petition under chapter 11 of the

Bankruptcy Code.  Kirkland Dec., ¶ 36.

**E.    Debtor's Factual Misrepresentations In Support Of Motion**

34.    The Motion mischaracterizes two provisions of the Debt Documents and completely

ignores a third in an apparent effort to mislead the Court and wrongly cut off Discover's legitimate

rights as Immune's secured creditor.  Kirkland Dec., ¶ 37.

35.    The Motion is supported by the Fiorino Dec. from Fiorino, Immune's former

President and Acting Chief Executive Officer ("CEO") with whom Kirkland negotiated the Debt

Documents in 2018 as discussed above.  As is his wont, the Fiorino Dec. is laden with omissions,

mischaracterizations, and outright lies, that are easily belied by a review of the Debt Documents and

the facts.  Kirkland Dec., ¶ 38.

**F.    The Agreement Was Jointly Drafted**

36.    The entirety of the Motion is predicated upon the falsehood that the Debt Documents

do not contain a provision that the agreements were jointly drafted by Immune and Discover.

Fiorino Dec., ¶16, Motion, ¶13.  To the contrary, the Agreement, at Section VII.N., p. 27, under the

heading "Construction", states:

> The parties agree that each of them and/or their respective counsel has reviewed and had
> an opportunity to revise the Transaction Documents [i.e. the Debt Documents] and,
> therefore, the normal rule of construction to the effect that any ambiguities are to be
> resolved against the drafting party will not be employed in the interpretation of the
> Transaction Documents or any amendments thereto.  The language used in this
> Agreement will be deemed to be the language chosen by the parties to express their
> mutual intent, and no rules of strict construction will be applied against any party. . . .

Kirkland Dec., ¶ 39.

14

37.    Whether Fiorino intentionally ignored this provision, **which appears four short paragraphs above his signature**, or signed the Fiorino Dec. without reviewing it and/or the Agreement is unclear.  It is clear that he will say anything he is told to say to win.   Kirkland Dec., ¶ 40.

38.    Fiorino goes on the falsely claim that Kirkland personally "adamantly refused to deviate" from the form documents that we used to draft the Debt Documents.  Fiorino Dec., ¶17. That is a lie.  Kirkland Dec., ¶ 41.

39.    As discussed in detail above, the form documents that the parties started from were negotiated documents from Discover Cayman's prior investment in Immune in 2015.  The parties agreed to use those documents, with agreed deal changes as reflected in the term sheet.  Both parties agreed that they would not try to renegotiate the whole deal.  Kirkland and Fiorino necessarily made mutual changes to the documents in order to accommodate the terms of the 2018 debt transaction. Kirkland Dec., ¶ 42.

40.    Kirkland remembers receiving a mark-up from Immune that contained massive changes, many of which were minor, non-substantive edits on stylistic points from Immune's outside counsel.  Others were a wholesale attempt to renegotiate material deal points Immune had already agreed to—which was directly contrary to what Fiorino promised he would do.  Kirkland told Fiorino that he was shocked to see such extensive comments.  Kirkland said that Discover's deal documents are generally viewed as issuer friendly, and that Discover frequently receives no comments at all, or sometimes two or three at most.  Kirkland Dec., ¶ 43.

41.    Nevertheless, Discover agreed to numerous changes requested by Immune (far more than three), and the parties turned multiple additional drafts of the documents.  As explained in detail above, we went through 30 rounds of comments from Immune (i.e. there were 10 times more

15

*drafts* than the 3 total *comments* Fiorino claims were allowed), and the final Agreement was unquestionably mutually drafted by both parties. Kirkland Dec., ¶ 44.

     **G.**    **The Debenture Is A Debt Instrument**

    42.    Never did Discover ever remotely suggest that the Debenture and Agreement were equity instruments, not debt instruments. Never did Discover remotely suggest that it was entering into the Debt Documents for "the option value of the equity" and not to earn interest on a loan. These claims have no basis in reality. Kirkland Dec., ¶ 45.

    43.    Fiorino further falsely claims that the "plain language" of the Agreement "is consistent with the fact that Discover made a $2 million equity investment in Immune." Fiorino Dec., ¶17. That is lunacy. A loan that has to be repaid pursuant to a secured debt instrument is a debt, not an equity, investment. Kirkland Dec., ¶ 46. In his Fed. R. Bankr. P. 2004 examination taken in the Chapter 11 Case in connection with Discover's pending stay relief motion, Mr. Fiorino testified that the Debenture is a debt instrument until it is converted. Declaration of Dale E. Barney etc. dated February 12, 2020 and filed herewith ("**Barney Dec**."), ¶ 2, Exhibit A, p. 24, ll. 22-25, p. 25, ll. 1-5. Fiorino also testified that, when he signed the Agreement, he understood that that Immune was granting to Discover a security interest in Immune's assets. Barney Dec., ¶ 2, Exhibit A, p. 31, ll. 12-25, p. 32, ll. 1-15. Rabin, who would become President and Interim CEO of Immune after it filed the Chapter 11 Case, similarly testified that, until the Debenture is converted, Immune owed a debt obligation to Discover. Barney Dec., ¶ 3, Exhibit B, p. 30, ll. 20-25, p. 31, ll. 1-2. Rabin also testified that the Collateral set forth in the IPSA was the Collateral being granted by Immune to Discover under the Agreement. Barney Dec., ¶ 3, Exhibit B, p. 40, ll. 3-25, p. 41, ll. 1-11.

    44.    The fact that Discover is defined and referred to as "Investor" in the Agreement does not change the fact that, under the terms of the Debt Documents, monies due to Discover are debt

16

until the Debenture is converted. In fact, Discover's equity investment in Immune under the Debenture is only $530 as discussed below. Kirkland Dec., ¶ 47.

45.    In Kirkland's negotiations with the investment banker, Fiorino and Rabin, Kirkland reiterated scores of times that Discover was not willing to do an equity investment, but was only willing to make a debt investment. How the two parties are defined in a contract has no particular significance. Discover could have been defined as Lender, Investor, Purchaser, Discover, Fund, or John Doe. It made – and makes - no difference. It's a defined shorthand for convenience. There was no reason to change it. If the defined term had been Equity Investor or Stockholder it may have been changed. But the term Investor is neutral and innocuous. Kirkland Dec., ¶ 48.

46.    The fact something is an investment does not mean that it is not debt. For example, every lender calculates return on investment (ROI) for every loan. The fact someone is an investor does not mean that they are not a lender. At no time did Fiorino or anyone else ever make any such contention. In Kirkland's professional experience, no one in busioness would ever claim that a debt investment is not debt, or that someone identified as an investor cannot be a lender. The claim does not pass the laugh test. This is an argument only a lawyer could love. Kirkland Dec., ¶ 49.

47.    Fiorino goes on to state that "Discover converted a portion of the Debenture to over 9,000,000 shares in Immune," while conveniently omitting the fact that that conversion was of only $530 of the Debenture. Fiorino Dec., ¶19. The large number of shares that resulted from the conversion of that small dollar amount is purely a function of the fact that the stock price had plummeted under Fiorino's stewardship, and there were hundreds of millions of shares outstanding. That is the nature of penny stocks, at least in poorly run companies. Fiorino's reference to millions of shares appears to be intended to give the Court the false impression that Discover was a major shareholder in Immune, when in fact it never held more than 4.99%. The large number of shares is

17

due simply to the fact that each share was almost worthless, not surprising as Immune shortly thereafter filed bankruptcy. Kirkland Dec., ¶ 50.

48.    Fiorino falsely suggests that the only reason that Discover entered into the Debt Documents "was to allow Discover to gain access to common shares of" Immune. Fiorino Dec., ¶20. That is a lie. And Fiorino knows it. Kirkland Dec., ¶ 51.

49.    Discover made a loan. The reason Discover asked for a large prepayment penalty and high interest rate were that those were likely to be the primary ROI for the loan. The loan also had an equity kicker, in the form of a conversion feature.[4] The equity kicker provided a potential upside, but was not the primary—let alone sole—reason for the loan. To the contrary, the primary purpose of the conversion feature was to enable Discover to reduce the principal amount of the loan via *seriatim* conversions, thereby mitigating some of its risk over time. Conversion was primarily a method to facilitate timely loan repayment. Kirkland Dec., ¶ 52.

50.    The entire pitch of Fiorino and Rabin to Kirkland was that, as a secured lender, Discover would be protected by the value of Immune's IP portfolio, particularly Bert. They promised over and over again that Discover's loan would allow Bert to be partnered, generating tens of millions of dollars—with which the Debtor could repay the loan with interest. Indeed, even after the Debtor defaulted (by, among other things, secretly giving away Discover's conversion shares to the May Debenture holders and the Debtor's own insiders), Rabin vociferously argued that it made no difference, because the real value was in Bert and that Discover should therefore fund the remaining $3 million anyway. Kirkland Dec., ¶ 53.

51.    While the Debenture was convertible into stock, it was never converted into stock (aside from $530 worth). The transaction was structured as a convertible debt instrument

---

[4] "An equity kicker is an equity incentive where the lender … gets an equity position in the borrower's company. An equity kicker is structured as a conditional reward, where the lender gets equity ownership that will be paid at a future date" https://corporatefinanceinstitute.com/resources/knowledge/deals/equity-kicker/

2780273.1 115785-100485

specifically to protect Discover.  The Debt Documents are structured as secured debt so that

Discover could recover the principal amount of the loan, plus make whole interest in the form of the

"Early Redemption Price" calculated under the Debenture.[5]  Immune did default under the Debt

Documents (as detailed in my Declaration dated February 25, 2019 and filed in support of

Discover's stay relief motion [Doc 11-3 in the Chapter 11 Case], ¶¶21-48).  As a result, Discover

issued the Notice of Default.  Discover is therefore entitled to be paid the Early Redemption Price,

as detailed in my Declaration dated March 22, 2019 and filed in further support of Discover's stay

relief motion [Doc 77-1 in the Chapter 11 Case], ¶¶10-13).  Those declarations are incorporated

herein by reference.  Kirkland Dec., ¶ 54.

52.     Regardless, unless and until any portion of the Debenture is ever converted, it

remains debt.  The outstanding principal amount or Face Value of the Debenture is $5,499,470,

after deducting the $530 conversion discussed above.  Kirkland Dec., ¶ 55.

## H.     There Was No Subordination Agreement

53.     The Fiorino Dec. and the Motion go on to argue that Section I.E of the Debenture,

entitled "Liquidation," (fancifully referred to by Plaintiffs as the "Liquidation Priority Provision")

was intended to subordinate Discover's secured claims to those of all other creditors of Immune.

Fiorino Dec., ¶¶27-30.  Nothing could be further from the truth.  Kirkland Dec., ¶ 56.

54.     The September 19, 2018 email from Kirkland to Fiorino (Exhibit 7), attaches a

redline of the Agreement (which includes the Debenture and other documents).  The redline of the

Liquidation section of the Debenture is set forth below and is instructive.

## I.     Liquidation.

**1.**     Upon any liquidation, dissolution or winding up of the Corporation, whether
voluntary or involuntary, after payment or provision for payment of debts and other liabilities of

---

[5] Capitalized terms used herein shall have the meaning ascribed in the Debenture and/or the Agreement unless
otherwise defined.

the Corporation, ~~pari passu with~~ prior to any distribution or payment made to any other creditors or the holders of any Preferred Stock ~~and~~or Common Stock by reason of their ownership thereof, the Holders of ~~Series D Preferred Stock~~this Debenture will be entitled to be paid out of the assets of the Corporation available for distribution to its ~~stockholders~~creditors an amount with respect to ~~each share of Series D Preferred Stock equal to $10,000.00 ("~~the then outstanding Face Value~~")~~, plus an amount equal to any accrued but unpaid ~~Dividends~~Interest thereon (collectively with the Face Value, the "**Liquidation Value**"). If, upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the amounts payable with respect to the ~~shares of Series D Preferred Stock~~Debenture are not paid in full, the ~~holders of shares of Series D Preferred Stock~~Holders will share equally and ratably ~~with the holders of shares of Preferred Stock and Common Stock~~ in any distribution of assets of the Corporation in proportion to the liquidation preference and an amount equal to all accumulated and unpaid ~~Dividends~~Interest, if any, to which each such ~~holder~~Holder is entitled.

2.    If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation will be insufficient to make payment in full to all Holders, then ~~such~~the assets distributable to the Holders will be distributed among the Holders at the time outstanding, ratably in proportion to the full amounts to which they would otherwise be respectively entitled.

Kirkland Dec., ¶ 57.

55.    The changes make clear that Discover, as Holder of the Debenture, will be paid "prior to" any payment to "any other creditors." Kirkland Dec., ¶ 58.

56.    To the extent that the new language is found to be inconsistent with the holdover language from the 2015 agreement, that the parties could make provision for payment of liabilities in connection with liquidation, that would, at most, create an ambiguity. That ambiguity can be resolved by looking at the redline, which adds language making clear that Discover takes first, and by looking at the rest of the Debt Documents, which provide that Discover is the secured creditor. For example, V.A. of the Agreement provides: "Grant of Security Interest. To secure the Obligations, Company, as debtor, hereby assigns and grants to Investor, as secured party, a continuing **first-position** lien on and security interest in, all right, title and interest of the Company, whether now owned or existing or hereafter created, acquired, or arising, in and to all of the Collateral." (emphasis added.) Kirkland Dec., ¶ 59.

57.     Even when read as urged in the Motion, this provision is at most internally inconsistent, providing both that Discover's claims will be paid before and after claims of other creditors.  That inconsistency can only be resolved by looking to the entirety of the Debt Documents, taken as a whole.  Kirkland Dec., ¶ 60.

58.     The Debt Documents expressly and repeatedly evidence a mutual intent to grant to Discover a first-priority security interest and lien to secure repayment of Immune's obligations prior to claims of other creditors.  First, the Debenture is entitled *Senior Secured* Redeemable Convertible Debenture.  Second, the "Security Agreement" section of the Agreement, Section V., pp. 19-22, runs three and one-half pages, and states in Section A that "[t]o secure the Obligations [i.e. all of Immune's debts under the Debt Documents, "Glossary" identified below, p. 3], Company [Immune], as debtor, hereby assigns to Investor [Discover], as secured party, a continuing first-position lien on and security interest in, all right, title and interest of the Company, whether now owned or existing or hereafter created, acquired, or arising, in and to all of the Collateral [i.e. all of Immune's assets other than Ceplene if that asset were disposed of by March 31, 2019, Glossary, p.1].  Third, Section C of the Security Agreement sets forth Immune's representation that it had good, marketable and indefeasible title to the Collateral and that it would defend Discover's security interest from adverse claims.  Fourth, the IP Security Agreement, which the Motion ignores altogether, states that Immune grants to Discover a security interest in the patents, trademarks and related assets set forth on a seven page attachment.  Kirkland Dec., ¶ 61.

59.     The Plaintiffs' interpretation requires the Court to disregard not only the contradictory language in the same provision, but also the entire security structure and priority scheme set forth in the Debt Documents.  Kirkland Dec., ¶ 62.

21

60.     The Plaintiffs' interpretation is entirely inconsistent with the multi-page Section V. of the Agreement, the Security Agreement, and the IP Security Agreement which expressly evidence an intent on the part of Immune to grant to Discover a first priority lien and security interest in all of the assets of Immune and proceeds thereof.  Why would this secured creditor provide that its claims would be subordinate to other creditors when it took pains to obtain a first lien on all assets of its borrower?  The answer is simple – it would not, and did not.  Kirkland Dec., ¶ 63.

61.     The arguments made in paragraph 31 of the Fiorino Dec. are gibberish, randomly mixing unrelated concepts.  Interest absolutely could be paid by delivering shares which Discover could then sell.  This was a mechanism to allow Immune to pay the interest due on the loan.  It does not mean the loan was not a loan or that the interest is not interest.  That is not in any way "consistent with treating Discover's interest in Immune as equity not debt."  That is consistent with an interest-bearing loan, which is exactly what the Debenture evidenced.  Discover did not have an "interest" in Immune, it made a secured loan to Immune.  Kirkland Dec., ¶ 64.

62.     Fiorino laughably claims that the Security Agreement section of the Agreement "*purport[]s* to grant to Discover a first priority security interest" in Immune's assets.  Fiorino Dec., ¶ 32.  A plain reading of that section, quoted in ¶ 33 of the Fiorino Dec., and the IP Security Agreement demonstrates uncontrovertibly that there is nothing purported about the grant.  See, e.g. § V.A. ("Company, as debtor, hereby assigns and grants to Investor, as secured party, a continuing first-position lien on and security interest in, all right, title and interest of the Company").  Kirkland Dec., ¶ 65.

63.     Fiorino's specious quibbling regarding the security interest is the prelude to the most absurd of the many misrepresentations made by the Plaintiffs in the Motion: that the Agreement

22

provides Discover's agreement that the Debt Documents limit Discover's lien on and security

interest in Immune's assets to $250,000, i.e. the spuriously named "Lien Limitation Provision."

Fiorino Dec., ¶¶ 34-36.  Kirkland Dec., ¶ 66.

64.     What Plaintiffs fail to inform that Court is that the claimed Lien Limitation

Provision is set forth in *Immune's* representations and warranties in the Agreement, and does not

constitute an acknowledgement by Discover at all.  In fact, the representation in question was made

by Immune to Discover to confirm that the Agreement did not create any third party rights, such as

for the holders of the May Debentures as described above.  Kirkland Dec., ¶ 56.

65.     The provision in issue is set forth in the Agreement's Section III, entitled

"Representations and Warranties," and its subsection A.3, which provides in pertinent part:

> A. **Representations Regarding Transaction**.  Except as set forth under
> the corresponding section of the Disclosure Schedules, if any, Company
> [Immune] hereby represents and warrants to, and as applicable covenants
> with, Investor [Discover] as of the Closing: . . .
>
> 3. **No Conflicts**.  The execution, delivery and performance of the
> Transaction Documents [Debt Documents] by Company, the issuance
> and sale of the Securities and the consummation by the Company of the
> other transactions contemplated thereby do not and will not . . . (b) after
> giving effect to the Waiver Agreements, conflict with, or constitute a
> default (or an event that with notice or lapse of time or both would
> become a default) under, result in the creation of any Lien upon any of
> the properties or assets of Company or any Subsidiary, or give **to others**
> any rights of termination, amendment, acceleration or cancellation (with
> or without notice, lapse of time or both) of, any material agreement,
> credit facility, debt or other instrument (evidencing Company or
> Subsidiary debt or otherwise) or other understanding to which Company
> or any Subsidiary is a party or by which any property or asset of
> Company or any Subsidiary is bound or affected . . . .

Kirkland Dec., ¶ 68.

66.     The Agreement's Exhibit 1, entitled "Glossary of Defined Terms", p. 5

("Glossary"), defines "Waiver Agreements" as "the Waiver and Amendment Agreements, dated

23

October 5, 2018, by and between Company and the required number of holders of Company's Original Issuance Discount Debentures." The Glossary defines "Liens" as "a lien, charge, security interest or encumbrance in excess of $250,000, or a right of first refusal, preemptive right or other restriction." Kirkland Dec., ¶ 69.

67.    Immune never delivered copies of the Waiver Agreements, but Kirkland understood from conversations with Fiorino that he obtained the same from the holders of the May Debentures, which Kirkland understood to be the Original Issuance Discount Debentures identified in the Glossary. Fiorino advised Kirkland that Immune's entry into the Debt Documents would constitute a default under the May Debentures, so that Immune needed the Waiver Agreements, which were to provide that Immune's entry into the Debt Documents would not be a default under the May Debentures. Kirkland Dec., ¶ 70.

68.    As such, the alleged Lien Limitation Provision was intended to provide that, once the Waiver Agreements were executed by the holders of the May Debentures, Immune's execution of the Debt Documents would not result in a default under or create any liens in favor of the holders of the May Debentures, or any other third parties. Kirkland Dec., ¶ 71.

69.    Moreover, this provision was another carry-over from the 2015 transaction, and Kirkland had conversations with Fiorino and Rabin about the provision. They wanted the Lien threshold to be higher, such as $500,000, but Discover was unwilling to agree to a threshold that high. Throughout these conversations, Fiorino and Rabin repeatedly acknowledged that the Lien limitation applied only to liens held by third parties. No one ever suggested that it would apply to or affect Discover's liens under the Security Agreement or the IP Security Agreement. That would be contrary to everyone's clear understanding, as repeatedly expressed in our discussions. Kirkland Dec., ¶ 72.

24

70.   After Immune was in default under the Debt Documents but before the bankruptcy was filed, Kirkland had several telephone conversations with Fiorino and Rabin. During those conversations, they begged Discover to fund the $3 million under the Promissory Note, which Kirkland refused to do due to the facts that Immune was in default in a multitude of ways. At one point, Rabin said that, if they had to, they would file bankruptcy at which point they would "raise a whole bunch of arguments" against Discover. Kirkland Dec., ¶ 73.

   ~~I.~~J.   **Debtor's Recent Admissions Against Interest**

71.   In November and December 2019, Rabin called and texted Kirkland multiple times, in an effort to get Discover to consent to a payment to him and to try to settle the case so that he could get paid more. He appeared to be growing increasingly desperate and frantic. Kirkland was very angry. Kirkland recalls the conversations in some detail, because they were very heated. Kirkland Dec., ¶ 74.

72.   Kirkland told Mr. Rabin that the claims made in the Complaint in this adversary proceeding were lies, and that Rabin knew it. He said, "Of course they're lies. They're lawyers, that's what they do." Kirkland said that was no excuse. Kirkland said Rabin knew that Discover was always supposed to be the senior secured creditor. Rabin said, "Of course, John, I know that, obviously." Kirkland said the claim that our lien was somehow limited to a quarter million dollars was ridiculous, and that no one could ever possibly really think that. Kirkland said the claim that language in the Debenture meant we were subordinate to other creditors was total "b---s---." Kirkland Dec., ¶ 75.

73.   Rabin said, "I know that. The lawyers came up with it. What am I supposed to do?" Kirkland said, "Tell the truth." Rabin said that the lawyer for the Creditors Committee came up with the arguments, and was insisting on making them, even though Rabin and Fiorino told the

25

lawyers they weren't true.  Rabin said, "They won't back off.  There's nothing I can do about it."

Kirkland Dec., ¶ 76.

74.     Kirkland and Fiorino discussed that no one would ever read the contract the way

they do, we had all discussed these provisions at the time and understood exactly what they mean,

and that their interpretation would render the contract internally inconsistent and "bizarre."   Rabin

agreed with all of that.  He said, "It doesn't matter, John, you should just settle."  Kirkland said,

"So, you're using these "b---s----" arguments to try to extort a settlement, is that it?"  Rabin said

that's how the game works.  Kirkland Dec., ¶ 77.

75.     Kirkland said not with me.  Kirkland told Mr. Rabin that he would not stand for it,

and that if they wanted to talk settlement, they had to first withdraw the claims in the Complaint that

they know are lies.  Rabin tried to convince Kirkland that he should just settle the case.  Ultimately,

Kirkland hung up on Rabin.  Kirkland recalls this specifically, because it is something that Kirkland

rarely does.  Kirkland Dec., ¶ 78.

76.     Rabin called Kirkland back several times.  Kirkland said, "Stop lying" and hung up.

Rabin then sent an email to Discover's counsel saying I was "acting like a child."   Barney Dec. ¶ 4,

Exhibit C.  Kirkland Dec., ¶ 79.

## LEGAL ARGUMENT

"A party moving for summary judgment must clear two hurdles to meet its initial burden.

The party must show that (1) there are no genuine questions of material fact and (2) the party is

entitled to judgment as a matter of law." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,

602 F.3d 237, 251 (3d Cir. 2010).   If the moving party can meet this initial burden, the

nonmoving party then must "set out specific facts showing a genuine issue for trial." *Betts v.*

*New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (quoting Fed. R. Civ. P. 56(e)(2)).

"An issue of material fact is 'genuine' if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 545 (3d Cir. 2012). The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In adjudicating a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080-81 (3d Cir. 1996).

As demonstrated below, the Plaintiffs have fallen far short of clearing the hurdles for summary judgment. They patently misstate and ignore relevant provisions of the Debenture and the Agreement. They also engage in a futile attempt to distract this Court's attention from potential ambiguities in the documents and the extrinsic evidence that would be necessary to resolve any such ambiguities, some of which evidence must be developed through further discovery.

The fact that discovery in this adversary proceeding is only beginning is reason enough for the Court's denial of the Motion, particularly where the alleged "factual" predicate of the Motion is directly contradicted by Discover's counterstatement of facts and the Kirkland Dec., which the Court must take at face value. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. A comparison of the Kirkland Dec. to the prevarications of the Fiorino Dec. conclusively establishes the existence of myriad material factual disputes that preclude the entry of summary judgment on the Motion. Where such factual disputes are evident from the record on a summary judgment motion, the non-moving party is entitled to full and fair discovery, such as a full deposition of Fiorino regarding the claims made in his declaration, prior to the motion being

27

determined.    *See Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir.2007) (quoting

*Dowling v. City of Philadelphia*, 855 F.2d 136, 139 (3d Cir.1988))("a court is 'obliged to give a

party opposing summary judgment an adequate opportunity to obtain discovery.'") Further,

summary judgment presupposes the existence of an adequate record.    *See* Fed.R.Civ.P. 56(c);

Anderson v. Liberty Lobby, Inc. 477 U.S. at 257, 106 S.Ct. 2505 (the non-moving party's burden

at summary judgment assumes that the party "had a full opportunity to conduct discovery").

Among other issues, the Plaintiffs' "Lien Limitation Provision" argument conveniently

fails to mention the Waiver Agreements that were to be made by the holders of the May

Debentures and are an integral part of the provision in question, and which the Plaintiffs omitted.

Discover's counsel has searched Immune's prior document production in the Chapter 11 Case

and has been unable to locate either the Waiver Agreements or the May Debentures.    Discover is

entitled to discovery on these open issues prior to the Court's consideration of the Motion.

### 1.    The Debenture Does Not Subordinate Discover's Claims.

The Debenture and the Agreement provide that they will be governed by the law of the

U.S. Virgin Islands.    Dkt. No. 8-3, §VII.G, p. 27.    In the U.S. Virgin Islands, as in most

jurisdictions, "contracts must be viewed in their entirety" with all provisions "interpreted

together." *Matter of Carpe Diem 1969 LLC*, 2019 WL 3413841 at \*5 (D.V.I. 2019); *Delponte v.*

*Coral World Virgin Islands, Inc.*, 48 V.I. 386, 389 (D.V.I. Aug. 14, 2006), aff'd, 233 F. App'x

178 (3d Cir. 2007).    The "meaning of the contract is determined from the entire instrument."

*Phillip*, 66 V.I. at 624.    Contract provisions "should be construed together and interpreted as a

whole, each one contributing to the ascertainment of the true intent of the parties." *Id.*    In

addition, "all parts of the writing will be given effect if possible." *Coakley Bay Condo. Ass'n v.*

*Cont'l Ins. Co.*, 770 F. Supp. 1046, 1050 (D.V.I. 1991).    Each contract provision must be "read in

the context of the entire agreement." *Id.*

28

A similar rule governs contracts that form an integrated series of agreements. "[A]ll writings that are part of the same transaction are interpreted together.'" *Delponte*, 48 V.I. at 389, quoting Restatement (Second) of Contracts § 202(2). "Under the law of the Virgin Islands, interpretation of an integrated agreement is to be determined as a question of law by the court if it does not depend on the credibility of extrinsic evidence or a choice of reasonable inferences to be drawn from extrinsic evidence. *Tamarind Resort Associates v. Government of the Virgin Islands*, 138 F.3d 107, 110 (3d Cir. 1998), quoting Restatement (Second) of Contracts § 212(2) (1981). Any determination as to meaning should be made in light of the relevant evidence, but after the transaction has been examined in its entirety, the words of an integrated agreement are the most important evidence of intention. *Tamarind Resort Associates, id.*, quoting Restatement (Second) of Contracts § 212, cmt. b.

"Integration of an agreement need not be accomplished through a formal provision in the document but, rather, may be shown through the plain language of the agreement evidencing an intent to have it represent the complete understanding of the parties or by the conduct of the parties pointing to their manifestation of intent to regard the writing as an integrated document." *Phillips v. Andrews*, 322 F.Supp.2d 797, 803 (D.V.I. 2004).

The Agreement references both the Debenture and the IP Security Agreement. Kirkland Dec., Exhibit 2, pp. 1-2. Drafts of the Debenture and the IP Security Agreement are attached as Exhibits 2 and 9, respectively, to the Agreement. *Id.*, at pp. 37-48 and 87-95. The Agreement defines "Transaction Documents" [i.e. the Debt Documents] to include the Agreement and "the other agreements, certificates and documents referenced herein or the form of which is attached hereto . . . . *Id.*, at p. 35. In the Kirkland Dec., he describes an integrated transaction of which the Agreement, the Debenture and the IP Security Agreement were crucial components.

29

Although replete with misrepresentations and omissions, the Fiorino Dec. similarly describes an integrated transaction of which the Agreement, the Debenture and the IP Security Agreement were crucial components. Accordingly, it is beyond dispute that the Debt Documents memorialize a single, integrated transaction, and for that reason, the Agreement, Debenture and IP Security Agreement must be read together. See, e.g., *Delponte, supra*, 48 V.I. at 389.

In light of the foregoing authorities, the Plaintiffs' contention that § I.E.1 of the Debenture, the so-called "Liquidation Priority Provision," subordinates Discover's claims to those of all other claims of is patently false. Section I.E.1 provides as follows:

> Upon any liquidation, dissolution or winding up of [Immune], whether voluntary or involuntary, *after payment or provision for payment of debts and other liabilities of [Immune]*, prior to any distribution or payment made to any other creditors or holders of Preferred Stock or Common Stock by reason of their ownership thereof, the holders of this Debenture shall be entitled to be paid out of the assets of [Immune] available for distribution to its creditors an amount equal to the then outstanding Face Value, plus an amount equal to any accrued but unpaid interest thereon (collectively with the Face Value, the **"Liquidation Value"**). If upon any liquidation, dissolution or winding up of [Immune], whether voluntary or involuntary, the amounts payable with respect to the Debenture are not paid in full, the Holders will share equally and ratably in any distribution of assets of [Immune] in proportion to the liquidation preference and an amount equal to all accumulated and unpaid interest, if any to which the Holder is entitled.

Kirkland Dec., Exhibit A, § I.E.1, p. 39.

The Plaintiffs misinterpret the italicized language – which is immediately contradicted by the underlined language - to give rise to a division of Immune's creditors into three categories: (i) holders of debts and other liabilities of Immune; (ii) Discover as the holder of the Debenture; and (iii) *"other creditors or* other holders any Preferred or Common Stock. Dkt. No. 8-1, ¶25, pp. 8-9. Such an interpretation is patently absurd. Essentially, the Plaintiffs interpret § I.E.1 to

provide that the claims of Immune's creditors are ***both*** senior and subordinated to Discover as Holder of the Debenture.

The Plaintiffs' interpretation of § I.E.1 completely takes the italicized language cited above out of context and ignores the contrary provision that Discover's claims are senior to those of general creditors, thereby demonstrating the very ambiguity the Plaintiffs insist does not exist. Kirkland Dec., Exhibit A, pp. 13-15. The operative language of § I.E.1, which immediately follows the italicized language cited above provides as follows:

> . . . prior to any distribution or payment made to any other creditors or holders of Preferred Stock or Common Stock by reason of their ownership thereof, the holders of this Debenture shall be entitled to be paid out of the assets of [Immune] available for distribution to its creditors an amount equal to the then outstanding Face Value, plus an amount equal to any accrued but unpaid interest thereon (collectively with the Face Value, the "**Liquidation Value**").

Kirkland Dec., Exhibit A, § I.E.1, p. 39. The language of § I.E.1 cited immediately above makes clear that, as Holder of the Debenture, Discover is senior to all existing and future indebtedness of Immune, and that Discover is to be paid prior to any other creditors of Immune.

At most, the provision is ambiguous due to its internal inconsistency, so that the Court must look to extrinsic evidence to interpret the provision. The entirety of the Debt Documents demonstrate a clear, mutual intent of the parties to grant to Discover a blanket lien to secure all obligations of Immune under the Debt Documents. If the provision is ambiguous, the Court must resolve the ambiguity by reference to extrinsic evidence, such as the redline of the Debenture discussed above that conclusively establishes that (i) the changes made to the 2015 form debenture clearly were intended to make Discover Immune's senior secured creditor and (ii) the alleged Liquidation Priority Provision relied upon by Plaintiffs was a holdover from the 2015 that the parties inadvertently left in the document and that is at odds with the entirety of the rest of the Debt Documents. By contrast, the Plaintiffs' interpretation of § I.E.1 effectively

2780273.1 115785-100485

writes the section's operative language (and Discover's indisputable priority, which is supported by all other pertinent provisions of the Debt Documents) out of the Debenture, thereby violating the basic rules of contract interpretation. *See Phillip*, 66 V.I. at 624 (contract provisions "should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties").

The Plaintiffs' misinterpretation of § I.E.1 violates the rule that all documents memorializing an integrated agreement must be read together. In that regard, the Plaintiff's misinterpretation of § I.E.1 renders sub-sections V.A and V.H of the Agreement a nullity. Section V of the Agreement grants Discover all rights of a secured creditor under the Uniform Commercial Code. Dkt. No. 8-3, §§V.A at p. 20 and V.H at op. 22. Fiorino laughably claims that § V of the SPA "purport[]s to grant to Discover a first priority security interest" in Immune's assets. Fiorino Dec., ¶ 32. A plain reading of that section, quoted in ¶ 33 of the Fiorino Dec., as well as the IP Security Agreement, demonstrates uncontrovertibly that there is nothing purported about Immune's grant to Discover of a first priority security interest in its assets. Kirkland Dec. ¶ 25.

It is beyond dispute, therefore, that Discover is a secured creditor of Immune. As any bankruptcy practitioner knows, secured creditors take first in bankruptcy, not last. Indeed, Fiorino and Rabin each acknowledged as much. They both stated *under oath*, that the Debenture constituted a debt until its conversion and that the intent of the parties to the Debt Documents was to grant Discover a blanket lien to secure the repayment of that debt. Barney Dec., ¶ 2 and Exhibit A, p. 31, ll. 12-25, p. 32, ll. 1-15. Barney Dec., ¶ 3 and Exhibit B, p. 40, ll. 3-25, p. 41, ll. 1-11. For this reason, the Court should reject the Plaintiffs' invitation to misinterpret § I.E.1 to nullify a plain and unambiguous security agreement.

32

Moreover, the Plaintiffs' characterization of § I.E.1 as a subordination agreement is, to put it charitably, disingenuous at best. As the Plaintiffs (or at least their counsel) should know, subordination agreements are heavily negotiated and lengthy documents with extensive provisions explaining the agreed subordination in detail. A single clause in a compound sentence addressing distributions upon a liquidation –*which is directly contradicted by another clause that follows immediately* - cannot reasonably be interpreted to have been intended as a subordination agreement. Under the circumstances, therefore, the most reasonable interpretation of the phrase in the Debenture that the Plaintiffs isolate from the rest of § I.E., the Debenture and the Debt Documents is that it was an inadvertent inclusion due to an oversight by the parties.

### 2. Discover Did Not Limit the Amount of Its Lien to $250,000.

By § V of the Agreement, Immune granted Discover a blanket security interest in substantially all of its assets. The broad scope of that grant is underscored by the IP Security Agreement. The Plaintiff's contention that Discover's lien on Immune's assets is limited to $250,000 not only flies in the face of the plain language of § V of the Agreement and the IP Security Agreement, but also raises significant questions as to their good faith in filing the Motion.

The Plaintiffs admit, as they must, that § V.A of the Agreement provides as follows:

> To secure the Obligations, [Immune], as debtor, hereby assigns and grants to [Discover], as secured party, a continuing first priority lien on and security interest in, all right, title and interest of [Immune], whether now owned or existing hereafter created, acquired or arising, in and to all of the Collateral.

Dkt. No. 8-3, § V.A, at p. 20. Additionally, § V.H of the Agreement provides, in pertinent part, that:

> Upon the occurrence of any Event of Default and at any time thereafter, [Discover] may declare all Obligations secured hereby immediately due and payable and shall have, in addition to any remedies provided herein or by any applicable law or in equity, all

33

the remedies of a secured creditor under the [Uniform Commercial
Code].

Kirkland Dec., Exhibit B,, § V.H, at p. 22.  None of the provisions of either § V.A., § V.H, or §

V as a whole or the IP Security Agreement limit Discover's liens to $250,000.

Unfazed by the utter lack of support for their position in the Agreement or the IP Security

Agreement, the Plaintiffs combed the Agreement for support.  In support of the most blatant of

their misrepresentations in the Motion, they settled on the following language selectively taken

from § III.A.3(b) that they spuriously call the Lien Limitation Provision (Fiorino Dec. ¶¶ 34-36):

> The execution, delivery and performance of the Transaction
> Documents by [Immune], the issuance and sale of the Securities
> and the consummation by [Immune] of the other transactions
> contemplated thereby do not and will not . . . result in the creation
> of any lien upon any of the properties or assets of [Immune].

Dkt. No. 8-3, § III.A.3(b), at pp. 4-5.  The term, Lien, is defined in the Agreement to include

security interests in excess of $250,000.  Kirkland Dec., Exhibit B, at p. 35

Were the Plaintiffs' reliance on § III.A.3(b) not so disingenuous, it might be considered

creative.  However, § III.A sets forth *Immune's* representations and warranties to Discover

concerning the transaction memorialized in and effectuated by the Transaction Documents; it

does not contain any representations, warranties or covenants by Discover.  ***This section does***

***not set forth anything that binds Discover, but is strictly an undertaking by Immune.***

Moreover, the Plaintiff's quotation of  § III.A.3(b) is deceptively selective.  Freed from the

Plaintiffs' redactions, § III.A.3(b) actually provides as follows:

> The execution, delivery and performance of the Transaction
> Documents by [Immune], the issuance and sale of the Securities
> and the consummation by [Immune] of the other transactions
> contemplated thereby do not and will not . . . (b) after giving effect
> to the Waiver Agreements, conflict with, or constitute a default (or
> an event that with notice or lapse of time or both would become a
> default) under, result in the creation of any Lien upon any of the
> properties or assets of [Immune] or any Subsidiary, or give to

34

others any rights of termination, amendment, acceleration or
cancellation (with or without notice, lapse of time or both) of, any
material agreement, credit facility, debtor or other instrument
(evidencing [Immune] or Subsidiary debt or otherwise) or other
understanding to which [Immune] or any Subsidiary is a party or
by which any property or asset of [Immune] or any Subsidiary is
bound or affected.

Dkt. 8-3, § III.A.3(b), at pp. 4-5. The plain language of an unredacted § III.A.3(b), particularly

when the title of the section, "No Conflicts," is considered, demonstrates that it is simply the

type of provision commonly included in financing documents like the Agreement by which a

debtor represents and warrants that entering into and performing its obligations under the subject

transaction will not constitute a violation of the debtor's other obligations that might trigger such

remedies as a springing lien. That being the case, the Plaintiffs' manipulation of this provision to

contend that Discover's lien is limited to $250,000 is not only demonstrably wrong but also

exudes bad faith.

The Plaintiffs' misinterpretation of § III.A.3(b) is absurd in the context of both the

Agreement and the remaining Debt Documents. The parameters of Discover's security interest

in Immune's assets is addressed in § V of the Agreement and not in § III.A.3. Nowhere in § V is

there any indication that Discover's lien would be limited to $250,000. Such a limitation would

make no sense when the Debenture has a Face Value of $5.5 million and Discover has already

advanced $2 million to Immune pursuant to the Debt Documents. Similarly, it would not have

been necessary for Discover to have obtained a security interest in all of Immune's assets

including its intellectual property had Discover agreed to limit its lien on Immune's assets to

$250,000. At most, therefore, the Plaintiffs' interpretation of § III.A.3(b) raises another

ambiguity in the Debt Documents that the Plaintiffs' deny exist but which must be resolved by a

resort to extrinsic evidence.

2780273.1 115785-100485

### 3. Immune Expressly Waived Application of the Rule That Contractual Ambiguities Must Be Interpreted Against the Drafter.

Unsurprisingly, the Plaintiffs demonstrate an lack of confidence in their contention that the Agreement and the Debenture are unambiguous. Relying on a statement by Fiorino, the Plaintiffs state that the Agreement contains no provision identifying Immune and Discover as joint drafters. Dkt. Nos. 8-1, ¶ 13, at p.6; and 8-2, ¶ 16, at p. 5. They contend that Discover was the sole drafter of the Agreement and the Debenture. Dkt. Nos. 8-1, at pp. 16-17; 8-2, ¶13-17, at pp. 4-5. The Plaintiffs contend that Discover took advantage of Immune's desperate financial circumstances and imposed the Debt Documents on it. Dkt. No. 8-1, ¶¶ 13-17. On that basis, the Plaintiffs argue that the rule that contractual ambiguities are to be construed against the drafter compel this Court to interpret any ambiguity in the Agreement (or the Debenture, for that matter) against Discover as their drafter. Dkt. No. 8-1, pp. 16-17.

This argument ignores, either intentionally or otherwise, § VII.N of the Agreement, which clearly states that the parties had an equal opportunity to negotiate and comment on the Debt Documents, and waived the right to make the argument that the Plaintiffs make here, i.e. that provisions of the documents should be construed against Discover as sole drafter. That provision is set forth **four short paragraphs** above Fiorino's signature on the Agreement. Thus, unless he simply signed the documents without reading them at all, his claim that no such provision is set forth in the documents is a blatant falsehood - among many - on which Discover is entitled to discovery in order to impeach Fiorino's credibility at trial.

Even without that waiver, a material factual dispute exists as to whether Discover should be deemed the sole drafter of the Debt Documents. In reality, the Debt Documents had to be negotiated because they were based on the 2015 transaction between Immune and Discover, which, unlike the financing transaction memorialized in the Debt Documents, was simply a stock

36

purchase. The bulk of the changes Immune's counsel wanted were minor, non-substantive edits, which Discover deemed unnecessary and likely to delay the consummation of the deal at a time when Immune needed money. In particular, § I.E.1 of the Debenture, the "Liquidation" provision, was subject to negotiation. In sum, the Kirkland Dec. demonstrates the existence of a multitude of questions of material fact concerning the drafting of the Debt Documents. Consequently, that issue cannot be decided on a motion for summary judgment, and the Motion must be denied to the extent that the identity of the drafter is material to a resolution of the Motion.

In point of fact, the identity of the drafter of the Agreement and the Debenture is irrelevant. The Plaintiff's insistence that the Court interpret any ambiguities in the Debenture and the Agreement against the Debtors is utterly inexplicable in light of the plain language and import of § VII.N of the Agreement, which the Plaintiffs ignore in their Motion papers. Section VII.N provides, in pertinent part, as follows:

> The parties agree that each of them and/or their respective counsel has reviewed and had the opportunity to revise the Transaction [Debt] Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of the Transaction Documents or any amendments thereto. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party. . . . .

Kirkland Dec., Exhibit B, § VII.N, at pp. 28-29. Immune, therefore, indisputably and expressly waived any requirement that ambiguities in the Agreement and the Debenture are to be interpreted against Discover. For that reason, § VII.N alone precludes the automatic

37

interpretation of any ambiguity in either the Agreement or the Debenture[6] against either Discover

(or Immune for that matter). This last point is important, because the Plaintiffs themselves have

demonstrated potential ambiguities in the Debenture and the Agreement.

4. **To the Extent the Agreement or the Debenture Contain Ambiguities, the Court Must Consider Extrinsic Evidence to Resolve Those Ambiguities**

In determining the intent of contracting parties, the Third Circuit applies the "plain

meaning rule" of interpretation of contracts, which assumes that the intent of the parties to an

instrument is "embodied in the writing itself, and when the words are clear and unambiguous the

intent is to be discovered only from the express language of the agreement." *Sunshine Shopping

Center v. Kmart Corp.*, 85 F. Supp. 2d 537,540 (D.V.I. 2000), citing *Hullett v. Towers, Perrin,

Forster & Crosby, Inc.,* 38 F.3d 107, 111 (3d Cir.1994), quoting *County of Dauphin v. Fidelity &

Deposit Co.,* 770 F. Supp. 248, 251 (M.D.Pa.), *aff'd,* 937 F.2d 596 (3d Cir. 1991). When

examining a contract like the Agreement or the Debenture, in addition to interpreting the

contracting parties' intent as objectively manifested by them, the Court must also make a

preliminary inquiry as to whether the contract is ambiguous. *Sunshine,* 85 F. Supp. 2d at 540,

citing *Hullett,* 38 F.3d at 111. A contract provision is ambiguous if it is susceptible to two

reasonable alternative interpretations. *Id.*

If the Court determines that the written terms of a contract are unambiguous, then the

Court will interpret the contract as a matter of law. *Id.* If, however, the Court determines that the

contract is ambiguous, then the interpretation of the contract is left to the fact finder to resolve

the ambiguity in light of extrinsic evidence. *Id.* Indeed, the Third Circuit recognizes that a

"determination as to whether the language of an agreement is unambiguous may not be possible

---

[6] Because the Debenture is referenced in the Agreement and a form of the Debenture is attached as Exhibit 2 thereto, it constitutes one of the "Transaction Documents." Kirkland Dec., Exhibit A, at p. 35 (definition of "Transaction Documents").

2780273.1 115785-100485

without examining the context in which the agreement arose." *Id.* Thus, in determining whether ambiguity exists, a court is not always confined to the four corners of the written document. *Id.* The judge must consider not only the words of the contract, but also "the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Hullett,* 38 F.3d at 111, quoting *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980).

As noted above, § I.E.1 of the Debenture can be read to provide that the claims of Immune's creditors other than Discover are both senior and subordinate to Discover's claims. As a result, the provision could be deemed internally inconsistent and, therefore, ambiguous. That ambiguity can be resolved by considering all of the Debt Documents as material components of an integrated transaction. The Debt Documents--particularly the Agreement, the Debenture and the IP Security Agreement—clearly expressly and repeatedly evidence a mutual intent to grant to Discover a first priority security interest and lien to secure repayment of Immune's obligations prior to claims of other creditors. In his Declaration, Kirkland provides further, persuasive and detailed factual support for the proposition that, as Immune's secured creditor, Discover did not—and would have had no incentive to—subordinate its secured claims to the payment of Immune's other creditors. Kirkland Dec., ¶¶ 19-25. More specifically, Kirkland details the evolution of § I.E.1 from its iteration in a 2015 stock purchase transaction between Discover and Immune and the 2018 financing transaction to eliminate the subordination of Discover's claims. Id., ¶ 19.

Representations by Fiorino and Rabin actually belie the Plaintiff's position. Both men acknowledged under oath at Fed. R. Bankr. P. 2004 examinations in Immune's bankruptcy case that the Debenture constituted a debt until it was converted and that Immune intended to provide

Discover with a blanket lien on its assets. Barney Dec., ¶ 2, Exhibit A, p. 24, ll. 22-25, p. 25, ll. 1-5. Barney Dec., ¶ 2, Exhibit A, p. 31, ll. 12-25, p. 32, ll. 1-15. Barney Dec., ¶ 3, Exhibit B, p. 30, ll. 20-25, p. 31, ll. 1-2. Barney Dec., ¶ 3, Exhibit B, p. 40, ll. 3-25, p. 41, ll. 1-11. Those acknowledgements are completely inconsistent with the position the Plaintiffs take in the Motion. Indeed, Fiorino and Rabin have previously acknowledged that the Plaintiffs' argument that Discover agreed to subordinate its loans is without merit and that Immune's counsel had advised them as such. Kirkland Dec., ¶¶ 33-34.

As demonstrated above, the Plaintiff's contention that Discover agreed to limit its lien to $250,000 is totally belied by the terms and provisions of the Debt Documents. Additionally, Fiorino and Rabin were well aware of that § III.A.3(b) was included in the Agreement as a representation by Immune that its execution of the Debt Documents would not trigger liens on its assets exceeding $250,000 in favor of parties other than Discover. Kirkland Dec. ¶¶ 27-28, 69-72. Indeed, Immune wanted a higher ceiling on those liens. *Id*. In any event, Fiorino and Rabin acknowledged that § III.A.3(b) did not apply to liens in favor of Discover. Kirkland Dec., ¶¶ 69-72. They have also acknowledged that the position that Discover's liens were limited to $250,000 is without merit. Kirkland Dec., ¶¶ 69-72, 74-77.

In sum, the Plaintiffs' position on the subordination and lien limitation issues flies in the face of logic and the Debt Documents. Additionally, extrinsic evidence thoroughly undercuts those claims. Of most importance, however, two principals of Immune have acknowledged that the Plaintiffs' position on the subordination and lien limitation issues lack merit. Accordingly, at the very least, a multitude of material questions of fact remain that preclude granting the partial summary judgment the Plaintiffs seek by the Motion.

40

## CONCLUSION

The Plaintiffs' interpretation of the so-called Liquidation Priority Provision of the Debenture defies logic and reason and completely ignores the extensive security scheme set forth in the Transaction Documents. The Plaintiffs' present no basis for subordinating Immune's claims pursuant to 11 U.S.C. § 510(a) – the Motion fails to conclusively establish the existence of a subordination agreement. Instead, the Plaintiffs disingenuously and selectively distort the so-called Lien Limitation Provision of the Agreement in a futile attempt to convince this Court that Discover agreed to limit the lien securing Discover's multi-million dollar claim against Immune $250,000. At best, the Motion succeeds only in establishing that material disputes of fact exist on these points and that the provisions that the Motion turns on are ambiguous. In sum, the plain language reading of the Debt Documents urged by the Plaintiffs by itself compels denial of the Motion. Moreover, the Plaintiffs implicitly acknowledge potential ambiguities in the Transaction Documents. The plain language of § VII.N of the Agreement precludes the Court from interpreting those ambiguities against Discover. The Court must consider extrinsic evidence to resolve those ambiguities, including the acknowledgement by Immune's principals that the positions asserted in the Motion lack merit. Consequently, it is respectfully submitted that the Court should deny the Motion.

Respectfully submitted,

**GIBBONS P.C**
Attorneys for the Defendant,
Discover Growth Fund, LLC

By: | /s/ Dale E. Barney
Dale E. Barney

Dated: February 12, 2020
Newark, New Jersey

41