UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Dale E. Barney, Esq.
David N. Crapo, Esq.
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
E-mail: dbarney@gibbonslaw.com
     dcrapo@gibbonslaw.com
*Counsel for Discover Growth Fund, LLC*

| | |
|---|---|
| **In re:** | Chapter 11 |
| IMMUNE PHARMACEUTICALS, INC., *et al.*,[1] | Case No. 19-13273 (VFP) |
| | (Jointly Administered) |
| **Debtors.** | |
| IMMUNE PHARMACEUTICALS, INC.; IMMUNE PHARMACEUTICALS, LTD.; CYTOVIA, INC.; IMMUNE ONCOLOGY PHARMACEUTICALS, INC.; MAXIM PHARMACEUTICALS, INC.; IMMUNE PHARMACEUTICALS USA CORP.; and THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF IMMUNE PHARMACEUTICALS, INC., et al., Plaintiffs, vs. DISCOVER GROWTH FUND, LLC, Defendant. | Adv. Pro. No.: 19-02033 (VFP) |

## DECLARATION OF JOHN C. KIRKLAND IN SUPPORT OF DISCOVER GROWTH FUND, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DISCOVER GROWTH FUND, LLC

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Immune Pharmaceutical, Inc. (1431); Immune Pharmaceuticals, Ltd.; Cytovia, Inc. (7805); Immune Oncology Pharmaceuticals, Inc.; Maxim Pharmaceuticals, Inc. (9983); and Immune Pharmaceuticals USA Corp. (9630).

**Error! Unknown document property name.**

2781502.1 115785-100485

I, John C. Kirkland, pursuant to 28 U.S.C. § 1746, declare the following:

1.    I am the Fund Manager and President of Discover Fund Management, Inc., the general partner of Discover Fund Management, LLLP ("DFM"), which is the investment advisor to and managing member of Discover Growth Fund, LLC ("Discover") and, in that capacity, am authorized to submit this declaration (this "Declaration") in support of Discover's Opposition (the "Opposition") to Plaintiffs' Motion for Partial Summary Judgment against Discover Growth Fund LLC [Doc 8] (the "Motion").

2.    Unless otherwise stated, I have personal knowledge of the matters set forth in this Declaration, and if called as a witness, could and would competently testify to the same. I have reviewed the representations in the Opposition and believe them to be true and correct to the best of my knowledge.

A.    **Professional Background and Experience**

3.    I received a B.A. in Biology-Psychology from Columbia University in 1986, and a J.D. from UCLA School of Law in 1990. I was duly admitted to practice before all courts of the state of California from 1990 until becoming voluntarily inactive in 2016. I began my legal career as an associate at Cadwalader, Wickersham & Taft, and was an equity partner at Greenberg Traurig, and later at Luce Forward Hamilton & Scripps, which subsequently merged into Dentons.

4.    I represented leading investment banks, private equity firms, and public companies as a practicing securities attorney for more than 20 years. I have handled several hundred billion dollars in public offerings and private placements of debt and equity securities. I was also a corporate litigator, trying multiple cases to verdict in state and federal courts. I am the author of "Practical Approaches to Securities Compliance Issues," SEC Compliance Best Practices (Thomson Reuters 2010 ed.), and various articles on legal and business topics. I was frequently

2

listed as a Southern California Super Lawyer in both business and litigation, and have been quoted in publications such as the New York Times, Washington Post, and Wall Street Journal.

5.    Over the last ten years, I have served as manager of investment advisors to institutional investors making hundreds of millions of dollars in direct equity investments, loans, and financing commitments to small cap and microcap public companies. My industry experience includes pharmaceuticals, biotechnology, life sciences, energy, and transportation. I have conducted detailed due diligence with regard to hundreds of public and private companies, analyzing, quantifying, and valuing their assets. Most of our investments are in pharmaceutical, healthcare, biotechnology and life science companies.

**B.    Transaction Documents**

6.    Discover is the senior secured lender of lead debtor Immune Pharmaceuticals Inc. ("Immune" or "Debtor") in the captioned chapter 11 cases ("Chapter 11 Case"). Immune and Discover are parties to that certain $5.5 million face amount Senior Secured Redeemable Convertible Debenture ("Debenture"), which was issued pursuant to a Securities Purchase Agreement ("Agreement"), a Grant of Security Interest Agreement in United States Patents and Trademarks ("IP Security Agreement" or "IPSA"), and related documents and instruments (collectively, the "Debt Documents") all dated October 9, 2019. Copies of the Debenture, Agreement and IPSA are attached hereto as Exhibits 1, 2 and 3, respectively.

7.    Pursuant to the Debt Documents, Discover lent $5 million to Immune, including $2 million paid in cash on October 9, 2019 and a Promissory Note to Debtor for an additional $3 million, all secured by a perfected first priority lien on and security interest in all assets of Immune. Under the Promissory Note, Discover was to have paid $3 million in cash if and when Immune met the closing conditions. Through the incompetence and misfeasance of Immune's officers, directors and lawyers, Immune repeatedly breached multiple covenants, representations and

3

warranties of the Debt Documents, and failed to ever meet the conditions precedent to Discover's obligation to fund the remaining $3 million in cash.

**C.    The Origin Of The Contract Phrases Now At Issue**

8.    Funds advised by DFM have invested $13 million in cash in Immune over five years, including the Debenture issued to Discover on October 9, 2018.  Debtor's stock was previously publicly traded on the Nasdaq Capital Market under the trading symbol IMNP, and later on the OTCQB under the same symbol, before being delisted following the bankruptcy filing.

9.    On July 28, 2015, Discover Growth Fund, a Cayman Islands limited liability company ("Discover Cayman"), for which DFM also served as investment advisor, agreed to invest $9 million in cash in the Debtor pursuant to two separate Stock Purchase Agreements, copies of which are attached hereto as Exhibits 4 and 5.  These agreements started with a basic form of purchase agreement that Discover had developed over the years, based upon multiple drafts and comments from numerous issuers, that effectively represented a pre-negotiated industry standard form.  In addition, the two agreements themselves were extensively negotiated with the Debtor and its lawyers and financial advisors, with more than a score of drafts of those agreements having been reviewed, revised, negotiated and discussed.

10.    The first agreement I participated in negotiating with Immune was the Stock Purchase Agreement for the purchase of $4.2 million in preferred stock in July 2015, which is attached hereto as Exhibit 4.  That agreement was heavily negotiated, with a dozen different drafts exchanged between the parties.  The second agreement was a Stock Purchase Agreement for the purchase of $7.8 million in preferred stock, which is attached hereto as Exhibit 5 ("2015 Agreement").  The $7.8 million agreement started with the $4.2 million agreement as a form, and the parties thereafter negotiated an additional nine versions of the document.  Thus, the second agreement represents more than 20 drafts negotiated between the parties.

4

11.     Based on my contemporaneous discussions with Immune's representatives at the time of the 2015 Agreement, the phrase "after payment or provision for payment of debts and other liabilities of the Corporation" in Section E.1 concerning Liquidation meant that, in the event of a liquidation, the parties could agree on how to provide for the expenses of such a liquidation.  No one ever suggested that this phrase was intended to establish the priority of Discover's position relative to other debts of the corporation.  To the contrary, everyone agreed that relative priority was expressly dealt with in Section B.1 concerning Ranking.  The above-noted phrase in Section E.1 was simply a preamble to providing how Liquidation Value would be calculated, which is the purpose of Section E.1.

12.     No one from Immune ever suggested this phrase was a subordination provision.  Based on my professional knowledge and experience, no one in the industry would ever interpret the language in this way.  Subordination agreements are extensive documents that lay out in detail exactly what is subordinated to what, how and under what circumstances.  I have never seen subordination handled as a single clause in an unrelated section.

13.     The parties agreed upon a $250,000 materiality threshold for contractually defined Indebtedness, Liens and other liabilities of the company to third parties.  It is very common to exclude smaller debts and liabilities in this manner.  The $250,000 figure was used throughout the 2015 agreement in reference to various third-party debts and obligations.

14.     Based on my contemporaneous discussions with Immune's representatives at the time of the 2015 Agreement, the representation and warranty by Immune in Section III.A.3(b) of the agreement that, "[t]he execution, delivery and performance of the Transaction Documents by Company, the issuance and sale of the Shares and the consummation by Company of the other transactions contemplated thereby do not and will not … (b) conflict with, or constitute a default

5

(or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of Company or any Subsidiary, or give **to others** any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any material agreement, credit facility, debt or other instrument (evidencing Company or Subsidiary debt or otherwise) or other understanding to which Company or any Subsidiary is a party or by which any property or asset of Company or any Subsidiary is bound or affected," does not have anything to do with Discover's rights under the agreement.  To the contrary, by this provision Immune was representing and warranting that nothing about the agreement with Discover would give **others** any rights, for example, the creation of a lien, as a result of their then-existing agreements with Immune.  No one from Immune ever suggested this phrase in any way limited Discover's rights under the 2015 Agreement.  To the contrary, everyone agreed that the purpose of this provision was to protect Discover from any claims by third parties.

15.    After entering into the agreements in 2015, the Debtor failed to fully comply with all of its contractual requirements, resulting in contractually-defined Trigger Events.  However, the Debtor acknowledged the defaults, the economics were adjusted accordingly, and the Debtor otherwise continued to comply with its ongoing obligations under the agreements.

16.    On September 6, 2016, Discover Cayman invested an additional $2 million in cash in the Debtor, pursuant to the Stock Purchase Agreement attached hereto as Exhibit 6.  Under that agreement, the investment in the Debtor converted into common stock at a split-adjusted fixed price of $5.00 per share.  That was a straight equity investment, on which Discover Cayman lost money.

**D.    2018 Debt Documents**

17.    On July 6, 2018, the Debtor was delisted by Nasdaq, and began trading on the OTCQB over-the-counter market under the same symbol, IMNP.

6

18.     On August 6, 2018, I was approached by the Maxim Group, a registered broker-dealer representing the Debtor, about making an additional investment.  I told the banker and the company that we had lost money doing the prior equity deal, and as such would not be willing to do another equity deal.  I repeatedly said we would not do an equity deal.  However, I said that Discover might be willing to loan the company money, provided the loan was first-position secured by all assets, including all intellectual property.

19.     After more than a month, a negotiated term sheet was executed between the Debtor and Discover on September 18, 2018.  The proposed structure was substantially similar to the 2015 agreements, except that the deal was for secured debt rather than preferred stock.

20.     In discussing a potential deal with Immune in 2018, Anthony Fiorino, Immune's former President and interim Chief Executive Officer ("CEO") and I agreed that we would start with the prior agreement (Exhibit 5) as a form, and revise it to reflect the different terms for the new debt deal.  Thus, the form of written document would essentially be pre-negotiated between the two parties, as it would already reflect most of the mutual agreement of the parties in the prior deal, with which we were all familiar.  The only changes would be as reflected in the new term sheet negotiated between Discover and Immune.  The major change would be that this would be a debt deal, for a secured debenture; whereas the prior agreement was an equity deal, for preferred stock.  Mr. Fiorino and I agreed that neither of us would try to renegotiate any of the terms of the prior agreement that had already been agreed to.

21.     In order to save on Immune's legal fees, I agreed to take the laboring oar in creating the first draft of the Agreement from the prior $7.8 million 2015 Agreement.  On September 19, 2018, I emailed Mr. Fiorino a draft of the Agreement, along with a redline comparing it to the $7.8 million agreement previously entered into between the parties.  A copy of my email and redline

7

are attached hereto as Exhibit 7. The parties negotiated an additional seven drafts of the Agreement. Thus, the final Agreement incorporates approximately thirty different drafts negotiated and exchanged between the parties.

22.    The claim that Discover drafted the Debt Documents is categorically false. The agreements were mutually drafted by both parties. Not only did Immune substantially draft and contribute to the wording of the Debt Documents, they are among the most heavily negotiated agreements I have ever done.

23.    Section VII.N of the Agreement accurately states: "Construction. The parties agree that each of them and/or their respective counsel has reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of the Transaction Documents or any amendments hereto. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party."

24.    I had multiple discussions with Mr. Fiorino, and Gary Rabin about the terms of the deal, including that all $5 million had to be first-position secured debt. I used the phrases "secured lender," "fully secured," "first position UCC" and "first position lien" dozens if not hundreds of times in our discussions. The pitch of Messrs. Fiorino and Rabin was that the intellectual property owned by Immune had immense value, in particular the bertilimumab ("Bert") antibody that they repeatedly touted to me as almost ready to partner for tens of millions of dollars, and that, by taking a lien, Discover's money would be fully protected.

25.    As reflected in Exhibit 7, we revised Section E.1 of the Debenture (attached to the Agreement as Exhibit 2), entitled "Liquidation", to change the phrase, "pari passu with any

8

distribution or payment made to the holders of Preferred Stock and Common Stock" to instead say, "prior to any distribution or payment made to any other creditors or the holders of any Preferred Stock or Common Stock." I discussed this provision with Mr. Fiorino after sending the redline, noting that I revised this provision to make clear that Discover took first, not pari passu. Mr. Fiorino confirmed this understanding of the language, and readily acknowledged the business deal was that Discover would have a first-priority security interest in all assets.

26.     Neither Mr. Fiorino nor anyone else ever suggested that the phrase "after payment or provision for payment of debts and other liabilities of the Corporation" was intended to establish the priority of Discover's position relative to other debts of the corporation. Neither Mr. Fiorino nor anyone else ever suggested this phrase was some kind of subordination provision. To the contrary, Mr. Fiorino expressly agreed that the opposite was true, i.e. that the new language we added clearly established that Discover took first.

27.     Mr. Fiorino expressed concern that the holders of the debentures that Immune issued in May 2018 ("May Debentures") might not like that Discover was going in front of them. He said that he would obtain waivers from them. In this context, we discussed Immune's representations and warranties in Section III.A.3(b) of the agreement. Specifically, I said that I wanted to be sure that the May Debenture holders would not be a problem. We turned to and read aloud Section III.A.3(b), and Mr. Fiorino said that Immune was clearly representing that no third-party liens would be created by our Agreement, and that this broad language would include the May Debenture holders. Neither Mr. Fiorino nor anyone else ever suggested this phrase in any way limited Discover's rights under the Agreement, or somehow capped the amount of Discover's security interest. To the contrary, he expressly reaffirmed that the purpose of this provision was to protect Discover from any claims by third parties, such as the May Debenture holders.

2781502.1 115785-100485

28.    We also discussed the Liens definition, which Mr. Fiorino reaffirmed referred to the liens of third parties, such as the May Debenture holders. He said that he would like to increase the $250,000 amount to $500,000, since the company had many debts. I said that I was already uncomfortable with the $250,000 materiality threshold, which made perfect sense in the context of an $11 million deal, but was too high in the context of a $5 million deal. I said that I would live with the prior number because that is what we agreed upon, but would not agree to double it. This discussion would have made no sense at all if Section III.A.3(b) somehow put a cap on Discover's lien. Mr. Fiorino would have wanted it lower, not higher. I, on the other hand, would have insisted that it be the full amount of the loan.

29.    In revising the 2015 agreement, we did not change any of the capitalized defined terms, including Company and Investor. There was no reason to change Company to Borrower, or Investor to Lender. I also would not have changed it if it had said Purchaser, Fund, or Discover. The defined term does not matter. Being a Company is not inconsistent with being a Borrower. Being a Lender is not inconsistent with being an Investor. There are debt investments as well as equity investments. Discover was not willing to do an equity investment in 2018, but it was willing to do a debt investment. It was still an investor. It was also a lender. The two terms are not mutually exclusive. Using the term company does not mean that the company is not a borrower. Using terms like investor or investment do not mean that a loan is not a loan. Nor do they mean that a lender is not a lender. Unnecessarily changing defined terms would have resulted in hundreds of completely unnecessary changes, complicated the redline, and accomplished nothing. No one involved ever suggested such stupid changes.

E.    **The Loan And Defaults**

30.    On October 9, 2018, the Debtor and Discover entered into the Agreement, and the Debtor issued the Debenture in the face amount of $5,500,000.00. In order to fully secure

10

repayment of the indebtedness and its other Obligations to Discover, the Debtor granted Discover a security interest in all assets (other than all tangible and intangible assets associated with Ceplene unless such assets were not fully disposed of by March 31, 2019), including most importantly Bert. See Agreement, Exhibit 1, p.1 (definition of Collateral) and p.3 (definition of Obligations); IPSA.

31.    Discover perfected its security interest in the Collateral.  On October 9, 2018, Discover filed (a) UCC-1 Financing Statement No. 2018 6983973 with the Department of State of the State of Delaware, where the Debtor is incorporated, a copy of which is attached hereto as Exhibit 8, and (b) UCC-1 Financing Statement No. 53034144 with the Department of the Treasury of the State of New Jersey, where the Debtor has its principal place of business, a copy of which is attached hereto as Exhibit 9.  Discover also filed the IPSA with the United States Patent and Trademark Office.  Thus, all of the Debtor's Obligations (as defined in the Agreement) under the Agreement, the Debenture and the other Debt Documents are fully secured by a perfected, first-position lien on the Collateral (as defined in the Agreement), which includes substantially all assets of the Debtor.

32.    On October 10, 2018, the Debtor filed a Current Report on Form 8-K with the SEC.[2] The Current Report states in pertinent part:

> On October 9, 2018, Immune Pharmaceuticals, Inc. ("Immune" or the "Company") entered into a Securities Purchase Agreement (the "Securities Purchase Agreement") with an institutional investor pursuant to which it sold to the investor $5.5 million in principal amount of its Senior Secured Redeemable Convertible Debentures (the "Debentures") for $2 million in cash and a $3 million promissory note (the "Investor Note") payable upon the earlier of the effectiveness of a registration statement covering the resale of the shares issuable upon conversion of the Debentures or one year….
> The Debentures are secured by first priority security interests on all of the Company's assets, other than all tangible and intangible assets

---

[2] A copy of the Form 8-K is available at:
https://www.sec.gov/Archives/edgar/data/1208261/000114420418053234/0001144204-18-053234-index.htm.

11

associated with Ceplene (histamine dihydrochloride) unless such assets are not disposed of by March 31, 2019. . . .

Form 8-K dated Oct. 10, 2018 (emphasis added).

33.    The prospectus that the Debtor filed with the SEC[3] states in pertinent part:

On May 18, 2018, we issued $2.8 million in aggregate principal amount of our Original Issue Discount Convertible Debentures (the "May Debentures"). Pursuant to Waiver Amendment and Exchange Agreements entered into with certain holders of the May Debentures in connection with the sale of the October Debentures, the aggregate face amount of the May Debentures was increased to $3.9 million. By their terms, the May Debentures matured and became due and payable on November 18, 2018. We did not repay the May Debentures on the maturity date. …
Our failure to repay the May Debentures when due resulted in a "Trigger Event" under the October Debentures.
The Selling Stockholder is not obligated to fund the remaining $3.0 million of its investment in the October Debentures until the earlier of the date on which all of the shares of common stock issuable in respect of the October Debentures and the October Debenture Warrants are registered and the first anniversary of the issuance of the October Debentures. Because we are not able to register all of the shares required under the securities purchase agreement, the Selling Stockholder has advised us that it believes we are in default of our obligations under the October Debentures and that it does not intend to fund its remaining $3 million investment in the October Debentures. We are negotiating with the Selling Stockholder regarding terms under which it would be willing to fund its remaining investment.  However, no agreement has been reached as of the date hereof and we cannot assure you that we will reach any agreement with the Selling Stockholder or as to the terms of any such agreement. If the Selling Stockholder does not fund a substantial portion of its remaining $3 million investment, we may be required to find alternative sources of financing.  If we are unable to do so, we may need to cease operations and file for protection under applicable bankruptcy law."

Prospectus dated Feb. 6, 2019 (emphasis added).

34.    On February 8, 2019, Discover served the Debtor with a Notice of Default and

Notice of Sale of Collateral ("Notice of Default"), a copy of which is attached hereto as Exhibit

---

[3] A copy of the prospectus is available at:
https://www.sec.gov/Archives/edgar/data/1208261/000114420419005598/tv512674_424b4.htm.

2781502.1 115785-100485

**10**. Discover notified the Debtor that it was in default under the terms of the Debt Documents due to various defaults, including, but not limited to, the Debtor's failure to repay the May Debentures when due, and the failure of one or more of the equity conditions specified in the Debenture because the Debtor was not in compliance with all provisions, covenants, representations and warranties of the Transaction Documents. In the Notice of Default, Discover declared all of the Debtor's Obligations under the Debenture, Agreement, and other Debt Documents immediately due and payable.

35.    Upon receiving the Notice of Default, Immune did not claim that Discover's position was junior to other creditors, nor did it claim that there was a $250,000 cap on Discover's security interest. Discover's first-position secured lien secures all of the Debtor's Obligations under the Debenture, the Agreement, and the other Transaction Documents.

36.    On February 17, 2019, the Debtor filed its voluntary petition under chapter 11 of the Bankruptcy Code.

**F.    Debtor's Factual Misrepresentations In Support Of Motion**

37.    The Motion mischaracterizes two provisions of the Debt Documents and completely ignores a third in an apparent effort to mislead the Court and wrongly cut off Discover's legitimate rights as Immune's secured creditor.

38.    The Motion is supported by a Declaration from Mr. Fiorino, Immune's former President and Acting CEO with whom I negotiated the Debt Documents in 2018. As is his wont, Mr. Fiorino's declaration is laden with omissions, mischaracterizations, and outright lies, that are easily belied by a review of the Debt Documents and the facts.

**G.    The Agreement Was Jointly Drafted**

39.    The entirety of the Motion is predicated upon the falsehood that the Debt Documents do not contain a provision that the agreements were jointly drafted by Immune and

13

Discover.  Fiorino Dec., ¶16, Motion, ¶13.  To the contrary, the Agreement, at Section VII.N., p. 27, under the heading "Construction", states:

> The parties agree that each of them and/or their respective counsel has reviewed and had an opportunity to revise the Transaction Documents [i.e. the Debt Documents] and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of the Transaction Documents or any amendments thereto.  The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party. . . .

40.     Whether Mr. Fiorino intentionally ignored this provision, **which appears four short paragraphs above his signature**, or signed the Fiorino Dec. without reviewing it and/or the Agreement is unclear.  It is clear that he will say anything he is told to say to win.

41.     Mr. Fiorino goes on the falsely claim that I personally "adamantly refused to deviate" from the form documents that we used to draft the Debt Documents.  Fiorino Dec., ¶17.  That is a lie.

42.     As discussed in detail above, the form documents that we started from were negotiated documents from Discover Cayman's prior investment in Immune in 2015.  The parties agreed to use those documents, with agreed deal changes as reflected in the term sheet.  Both parties agreed that they would not try to renegotiate the whole deal.  We necessarily made mutual changes to the documents in order to accommodate the terms of the 2018 debt transaction.

43.     I do remember receiving a mark-up from Immune that contained massive changes, many of which were minor, non-substantive edits on stylistic points from Immune's outside counsel.  Others were a wholesale attempt to renegotiate material deal points Immune had already agreed to—which was directly contrary to what Mr. Fiorino promised he would do.  I told Mr. Fiorino that I was shocked to see such extensive comments.  I said that Discover's deal documents

are generally viewed as issuer friendly, and we frequently receive no comments at all, or sometimes two or three at most.

44.    Nevertheless, Discover agreed to numerous changes requested by Immune (far more than three), and the parties turned multiple additional drafts of the documents.  As explained in detail above, we went through 30 rounds of comments from Immune (i.e. there were 10 times more *drafts* than the 3 total *comments* Mr. Fiorino claims were allowed), and the final Agreement was unquestionably mutually drafted by both parties.

**H.    The Debenture Is A Debt Instrument**

45.    Never did Discover ever remotely suggest that the Debenture and Agreement were equity instruments, not debt instruments.  Never did Discover remotely suggest that it was entering into the Debt Documents for "the option value of the equity" and not to earn interest on a loan.  These claims have no basis in reality.

46.    Mr. Fiorino further falsely claims that the "plain language" of the Agreement "is consistent with the fact that Discover made a $2 million equity investment in Immune."  Fiorino Dec., ¶17.  That is lunacy.  A loan that has to be repaid pursuant to a secured debt instrument is a debt, not an equity, investment.  In his Fed. R. Bankr. P. 2004 examination taken in the Chapter 11 Case in connection with Discover's pending stay relief motion, Mr. Fiorino testified that the Debenture is a debt instrument until it is converted.  Declaration of Dale E. Barney etc. dated February 12, 2020 and filed herewith ("Barney Dec."), ¶ 2, ExhibitA, p. 24, ll.22-25, p. 25, ll.1-5.

47.    The fact that Discover is defined and referred to as "Investor" in the Agreement does not change the fact that, under the terms of the Debt Documents, monies due to Discover are debt until the Debenture is converted.  In fact, Discover's equity investment in Immune under the Debenture is only $530 as discussed below.

15

48.    In my negotiations with the investment banker, Mr. Fiorino and Mr. Rabin, I reiterated scores of times that Discover was not willing to do an equity investment, but was only willing to make a debt investment. How the two parties are defined in a contract has no particular significance. Discover could have been defined as Lender, Investor, Purchaser, Discover, Fund, or John Doe. It made – and makes - no difference. It's a defined shorthand for convenience. There was no reason to change it. If the defined term had been Equity Investor or Stockholder it may have been changed. But the term Investor is neutral and innocuous.

49.    The fact something is an investment does not mean that it is not debt. For example, every lender calculates return on investment (ROI) for every loan. The fact someone is an investor does not mean that they are not a lender. At no time did Mr. Fiorino or anyone else ever make any such contention. In my professional experience, no one in our industry would ever claim that a debt investment is not debt, or that someone identified as an investor cannot be a lender. The claim does not pass the laugh test. This is an argument only a lawyer could love.

50.    Mr. Fiorino goes on to state that "Discover converted a portion of the Debenture to over 9,000,000 shares in Immune," while conveniently omitting the fact that that conversion was of only **$530** of the Debenture. Fiorino Dec., ¶19. The large number of shares that resulted from the conversion of that small dollar amount is purely a function of the fact that the stock price had plummeted under Mr. Fiorino's stewardship, and there were hundreds of millions of shares outstanding. That is the nature of penny stocks, at least in poorly run companies. Mr. Fiorino's reference to millions of shares appears to be intended to give the Court the false impression that Discover was a major shareholder in Immune, when in fact it never held more than 4.99%. The large number of shares is due simply to the fact that each share was almost worthless, not surprising as Immune shortly thereafter filed bankruptcy.

51.    Mr. Fiorino falsely suggests that the only reason that Discover entered into the Debt Documents "was to allow Discover to gain access to common shares of" Immune.  Fiorino Dec., ¶20.  That is a lie.  And he knows it.

52.    Discover made a loan.  The reason Discover asked for a large prepayment penalty and high interest rate were that those were likely to be the primary ROI for the loan.  I never told Mr. Fiorino that Immune was "lucky" that the penalty was not higher as he falsely claims in ¶21 of his declaration.  I did tell him that interest rate and/or prepayment penalty were likely the only returns to Discover on the loan.  The loan also had an equity kicker, in the form of a conversion feature.[4]  The equity kicker provided a potential upside, but was not the primary—let alone sole—reason for the loan.  To the contrary, the primary purpose of the conversion feature was to enable Discover to reduce the principal amount of the loan via *seriatim* conversions, thereby mitigating some of its risk over time.  Conversion was primarily a method to facilitate timely loan repayment.

53.    The entire pitch of Mr. Fiorino and Mr. Rabin to me was that, as a secured lender, Discover would be protected by the value of Immune's IP portfolio, particularly Bert.   They promised over and over again that Discover's loan would allow Bert to be partnered, generating tens of millions of dollars—with which Debtor could repay the loan with interest.  Indeed, even after Debtor defaulted (by, among other things, secretly giving away Discover's conversion shares to the May Debenture holders and Debtor's own insiders), Mr. Rabin vociferously argued that it made no difference, because the real value was in Bert and that Discover should therefore fund the remaining $3 million anyway.

---

[4] "An equity kicker is an equity incentive where the lender … gets an equity position in the borrower's company. An equity kicker is structured as a conditional reward, where the lender gets equity ownership that will be paid at a future date" https://corporatefinanceinstitute.com/resources/knowledge/deals/equity-kicker/

2781502.1 115785-100485

54.    While the Debenture was convertible into stock, it was never converted into stock (aside from $530 worth).    The transaction was structured as a convertible debt instrument specifically to protect Discover.    The Debt Documents are structured as secured debt so that Discover could recover the principal amount of the loan, plus make whole interest in the form of the "Early Redemption Price" calculated under the Debenture.[5]    Immune did default under the Debt Documents (as detailed in my Declaration dated February 25, 2019 and filed in support of Discover's stay relief motion [Doc 11-3 in the Chapter 11 Case], ¶¶21-48).    As a result, Discover issued the Notice of Default.    Discover is therefore entitled to be paid the Early Redemption Price, as detailed in my prior Declaration dated March 22, 2019 and filed in further support of Discover's stay relief motion [Doc 77-1 in the Chapter 11 Case], ¶¶10-13.

55.    Regardless, unless and until any portion of the Debenture is ever converted, it remains debt.    The outstanding principal amount or Face Value of the Debenture is $5,499,470, after deducting the $530 conversion discussed above.

I.    **There Was No Subordination Agreement**

56.    The Fiorino Dec. and the Motion go on to argue that Section I.E of the Debenture, entitled "Liquidation," (fancifully referred to by Plaintiffs as the "Liquidation Priority Provision") was intended to subordinate Discover's secured claims to those of all other creditors of Immune. Fiorino Dec., ¶¶27-30.    Nothing could be further from the truth.

57.    The September 19, 2018 email from me to Mr. Fiorino (Exhibit 7), attaches a redline of the Agreement (which includes the Debenture and other documents).    The redline of the Liquidation section is set forth below and is instructive.

---

[5] Capitalized terms used herein shall have the meaning ascribed in the Debenture and/or the Agreement unless otherwise defined.

2781502.1 115785-100485

### E.    Liquidation.

1.    Upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, after payment or provision for payment of debts and other liabilities of the Corporation, ~~pari passu with~~ prior to any distribution or payment made to any other creditors or the holders of any Preferred Stock ~~and~~or Common Stock by reason of their ownership thereof, the Holders of ~~Series D Preferred Stock~~this Debenture will be entitled to be paid out of the assets of the Corporation available for distribution to its ~~stockholders~~creditors an amount with respect to ~~each share of Series D Preferred Stock equal to $10,000.00 ("~~the then outstanding Face Value")~~,~~, plus an amount equal to any accrued but unpaid ~~Dividends~~Interest thereon (collectively with the Face Value, the "**Liquidation Value**").    If, upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the amounts payable with respect to the ~~shares of Series D Preferred Stock~~Debenture are not paid in full, the ~~holders of shares of Series D Preferred Stock~~Holders ~~will share equally and ratably with the holders of shares of Preferred Stock and Common Stock~~ in any distribution of assets of the Corporation in proportion to the liquidation preference and an amount equal to all accumulated and unpaid ~~Dividends~~Interest, if any, to which each such ~~holder~~Holder is entitled.

2.    If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation will be insufficient to make payment in full to all Holders, then ~~such~~the assets distributable to the Holders will be distributed among the Holders at the time outstanding, ratably in proportion to the full amounts to which they would otherwise be respectively entitled.

58.    The changes make clear that Discover, as Holder of the Debenture, will be paid "prior to" any payment to "any other creditors."

59.    To the extent that the new language is found to be inconsistent with the holdover language from the 2015 agreement, that the parties could make provision for payment of liabilities in connection with liquidation, that would, at most, create an ambiguity.  That ambiguity can be resolved by looking at the redline, which adds language making clear that Discover takes first, and by looking at the rest of the Debt Documents, which provide that Discover is the secured creditor. For example, V.A. of the Agreement provides:  "Grant of Security Interest.  To secure the Obligations, Company, as debtor, hereby assigns and grants to Investor, as secured party, a continuing **first-position** lien on and security interest in, all right, title and interest of the Company,

19

whether now owned or existing or hereafter created, acquired, or arising, in and to all of the Collateral." (emphasis added.)

60.    Even when read as urged in the Motion, this provision is at most internally inconsistent, providing both that Discover's claims will be paid before and after claims of other creditors.    That inconsistency can only be resolved by looking to the entirety of the Debt Documents, taken as a whole.

61.    The Debt Documents expressly and repeatedly evidence a mutual intent to grant to Discover a first-priority security interest and lien to secure repayment of Immune's obligations prior to claims of other creditors.    First, the Debenture is entitled *Senior Secured* Redeemable Convertible Debenture.    Second, the "Security Agreement" section of the Agreement, Section V., pp. 19-22, runs three and one-half pages, and states in Section A that "[t]o secure the Obligations [i.e. all of Immune's debts under the Debt Documents, "Glossary" identified below, p. 3], Company [Immune], as debtor, hereby assigns to Investor [Discover], as secured party, a continuing first-position lien on and security interest in, all right, title and interest of the Company, whether now owned or existing or hereafter created, acquired, or arising, in and to all of the Collateral [i.e. all of Immune's assets other than Ceplene if that asset were disposed of by March 31, 2019, Glossary, p.1].    Third, Section C of the Security Agreement sets forth Immune's representation that it had good, marketable and indefeasible title to the Collateral and that it would defend Discover's security interest from adverse claims. Fourth, the IP Security Agreement, which the Motion ignores altogether, states that Immune grants to Discover a security interest in the patents, trademarks and related assets set forth on a seven page attachment.

62.     The Plaintiffs' interpretation requires the Court to disregard not only the contradictory language in the same provision, but also the entire security structure and priority scheme set forth in the Debt Documents.

63.     The Plaintiffs' interpretation is entirely inconsistent with the multi-page Section V. of the Agreement, the Security Agreement, and the IP Security Agreement which expressly evidence an intent on the part of Immune to grant to Discover a first priority lien and security interest in all of the assets of Immune and proceeds thereof.  Why would this secured creditor provide that its claims would be subordinate to other creditors when it took pains to obtain a first lien on all assets of its borrower?  The answer is simple – it would not, and did not.

64.     The arguments made in paragraph 31 of the Fiorino Declaration are gibberish, randomly mixing unrelated concepts.  Interest absolutely could be paid by delivering shares which Discover could then sell.  This was a mechanism to allow Immune to pay the interest due on the loan.  It does not mean the loan was not a loan or that the interest is not interest.  That is not in any way "consistent with treating Discover's interest in Immune as equity not debt."  That is consistent with an interest-bearing loan, which is exactly what the Debenture evidenced.  Discover did not have an "interest" in Immune, it made a secured loan to Immune.

65.     Mr. Fiorino laughably claims that the Security Agreement section of the Agreement "*purport[]s* to grant to Discover a first priority security interest" in Immune's assets.  Fiorino Dec., ¶ 32.  A plain reading of that section, quoted in ¶ 33 of the Fiorino Dec., and the IP Security Agreement demonstrates uncontrovertibly that there is nothing purported about the grant.  See, e.g. § V.A. ("Company, as debtor, hereby assigns and grants to Investor, as secured party, a continuing first-position lien on and security interest in, all right, title and interest of the Company").

21

66.     Mr. Fiorino's specious quibbling regarding the security interest is the prelude to the most absurd of the many misrepresentations made by the Plaintiffs in the Motion: that the Agreement provides Discover's agreement that the Debt Documents limit Discover's lien on and security interest in Immune's assets to $250,000, i.e. the spuriously named "Lien Limitation Provision." Fiorino Dec., ¶¶ 34-36.

67.     What Plaintiffs fail to inform that Court is that the claimed Lien Limitation Provision is set forth in *Immune's* representations and warranties in the Agreement, and does not constitute an acknowledgement by Discover at all.  In fact, the representation in question was made by Immune to Discover to confirm that the Agreement did not create any third party rights, such as for the holders of the May Debentures described above.

68.     The provision in issue is set forth in the Agreement's Section III, entitled "Representations and Warranties," and its subsection A.3, which provides in pertinent part:

> A. **Representations Regarding Transaction**.  Except as set forth under the corresponding section of the Disclosure Schedules, if any, Company [Immune] hereby represents and warrants to, and as applicable covenants with, Investor [Discover] as of the Closing: . . .
>
> 3. **No Conflicts**.  The execution, delivery and performance of the Transaction Documents [Debt Documents] by Company, the issuance and sale of the Securities and the consummation by the Company of the other transactions contemplated thereby do not and will not . . . (b) after giving effect to the Waiver Agreements, conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of Company or any Subsidiary, or give **to others** any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any material agreement, credit facility, debt or other instrument (evidencing Company or Subsidiary debt or otherwise) or other understanding to which Company or any Subsidiary is a party or by which any property or asset of Company or any Subsidiary is bound or affected . . . .

69.    The Agreement's Exhibit 1, entitled "Glossary of Defined Terms", p. 5 ("Glossary"), defines "Waiver Agreements" as "the Waiver and Amendment Agreements, dated October 5, 2018, by and between Company and the required number of holders of Company's Original Issuance Discount Debentures." The Glossary defines "Liens" as "a lien, charge, security interest or encumbrance in excess of $250,000, or a right of first refusal, preemptive right or other restriction."

70.    Immune never delivered copies of the Waiver Agreements, but I understood from conversations with Mr. Fiorino that he obtained the same from the holders of the May Debentures, which I understood to be the Original Issuance Discount Debentures identified in the Glossary. Mr. Fiorino advised me that Immune's entry into the Debt Documents would constitute a default under the May Debentures, so that Immune needed the Waiver Agreements, which were to provide that Immune's entry into the Debt Documents would not be a default under the May Debentures.

71.    As such, the alleged Lien Limitation Provision was intended to provide that, once the Waiver Agreements were executed by the holders of the May Debentures, Immune's execution of the Debt Documents would not result in a default under or create any liens in favor of the holders of the May Debentures, or any other third parties.

72.    Moreover, this provision was another carry-over from the 2015 transaction, and I had conversations with Messrs. Fiorino and Rabin about the provision. They wanted the Lien threshold to be higher, such as $500,000, but Discover was unwilling to agree to a threshold that high. Throughout these conversations, Messrs. Fiorino and Rabin repeatedly acknowledged that the Lien limitation applied only to liens held by third parties. No one ever suggested that it would apply to or affect Discover's liens under the Security Agreement or the IP Security Agreement.

23

That would be contrary to everyone's clear understanding, as repeatedly expressed in our discussions.

73.    After Immune was in default under the Debt Documents but before the bankruptcy was filed, I had several telephone conversations with Mr. Fiorino and Mr. Rabin. During those conversations, they begged Discover to fund the $3 million under the Promissory Note, which I refused to do due to the facts that Immune was in default in a multitude of ways. At one point, Mr. Rabin said that, if they had to, they would file bankruptcy at which point they would "raise a whole bunch of arguments" against Discover.

**J.    Debtor's Recent Admissions Against Interest**

74.    In November and December 2019, Mr. Rabin called and texted me multiple times, in an effort to get Discover to consent to a payment to him and to try to settle the case so that he could get paid more. He appeared to be growing increasingly desperate and frantic. I was very angry. I recall the conversations in some detail, because they were very heated.

75.    I told Mr. Rabin that the claims made in the Complaint in this adversary proceeding were lies, and he knew it. He said, "Of course they're lies. They're lawyers, that's what they do." I said that was no excuse. I said he knew that Discover was always supposed to be the senior secured creditor. He said, "Of course, John, I know that, obviously." I said the claim that our lien was somehow limited to a quarter million dollars was ridiculous, and that no one could ever possibly really think that. I said the claim that language in the Debenture meant we were subordinate to other creditors was total "b---s---."

76.    Mr. Rabin said, "I know that. The lawyers came up with it. What am I supposed to do?" I said, "Tell the truth." He said that the lawyer for the Creditors Committee came up with the arguments, and was insisting on making them, even though Mr. Rabin and Mr. Fiorino told the lawyers they weren't true. He said, "They won't back off. There's nothing I can do about it."

24

77.      We discussed that no one would ever read the contract they way they do, we had all discussed these provisions at the time and understood exactly what they mean, and that their interpretation would render the contract internally inconsistent and "bizarre."  Mr. Rabin agreed with all of that.  He said, "It doesn't matter, John, you should just settle."  I said, "So, you're using these "b---s---" arguments to try to extort a settlement, is that it?"  He said that's how the game works.

78.      I said not with me.  I told Mr. Rabin that I would not stand for it, and that if they wanted to talk settlement, they had to first withdraw the claims in the Complaint that they know are lies.  He tried to convince me that I should just settle the case.  Ultimately, I hung up on him.  I recall this specifically, because it is something that I rarely do.

79.      He called me back several times.  I said, "Stop lying" and hung up.  Mr. Rabin then sent an email to Discover's counsel saying I was "acting like a child."   Barney Dec. ¶ 4, Exhibit C.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 12, 2020.

John C. Kirkland

2781502.1 115785-100485