# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                          .     Case No. 19-13273-VFP
                                .     Jointly Administered
IMMUNE PHARMACEUTICALS,         .
INC. and BARUCH HAKIM           .     M.L.K. Federal Building
("Israeli Trustee"),            .     50 Walnut Street, 3rd Floor
                                .     Newark, NJ 07102
            Debtors.            .
. . . . . . . . . . . . .       .
                                .
IMMUNE PHARMACEUTICALS,         .
INC., ET AL,                    .     Adversary No. 19-02033-VFP
                                .
            Plaintiffs,         .
                                .
      vs.                       .
                                .
DISCOVER GROWTH FUND,           .
LLC,                            .
                                .     June 23, 2020
            Defendant.          .     11:44 a.m.
. . . . . . . . . . . ..

TRANSCRIPT OF MOTION TO SUBSTITUTE THE TRUSTEE FOR DEBTORS AND
   COMMITTEE COUNSEL, MOTION TO EXPUNGE THE CLAIM OF FIDELITY
VENTURE CAPITAL, MOTION TO RECONSIDER ORDER DENYING SUMMARY
      JUDGMENT, AND MOTION FOR RELIEF FROM STAY

          BEFORE HONORABLE VINCENT F. PAPALIA
          UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For Discover Growth      Gibbons, P.C.
Fund:                    BY:  DALE BARNEY, ESQ.
                         One Gateway Center
                         Newark, NJ 07102

Audio Operator:          Mariela Primo

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

2

TELEPHONIC APPEARANCES (Cont'd):


For the Chapter 7          Rabinowitz Lubetkin & Tully
Trustee:                   BY:  JONATHAN L. RABINOWITZ
                           293 Eisenhower Parkway, Suite 100
                           Livingston, NJ 07039


                           - - -

3

1          THE COURT:  All right.  Let's see.  Immune

2    Pharmaceuticals, Inc., et al., versus Discover Growth Fund,

3    LLC, 19-2033, in case number 19-13273.  There are several

4    matters on.

5          One is the motion to substitute the trustee for

6    debtors and committee counsel.  There is a motion to expunge

7    the claim of Fidelity Venture Capital.  And there is a motion

8    to reconsider the Court's order denying summary judgment on the

9    510(b) claim.  And there is a motion for relief from stay.

10          Can I get appearances and a suggested order, please?

11          MR. RABINOWITZ:  Good morning, Your Honor.  John

12   Rabinowitz of Rabinowitz Lubetkin & Tully on behalf of the

13   Chapter 7 Trustee, Jeffrey Lester.

14          Your Honor, I would suggest that the Fidelity motion

15   be taken first, then the substitution, then reconsideration,

16   and then stay relief, in that order.

17          Fidelity, I think, has been resolved.  The

18   substitution issue is fairly discrete.  Reconsideration is a

19   significant motion, and the stay relief motion is a significant

20   motion as well.

21          THE COURT:  Yeah.  Okay.

22          MR. BARNEY:  Your Honor, Dale Barney, good morning,

23   Gibbons, on behalf of Discover Growth Fund.

24          I'm fine with the order that Mr. Rabinowitz

25   suggested.

4

1        THE COURT:  Yeah.  Actually, that makes sense to me,

2   too.  So why don't we -- why don't we just take them in that

3   order, and let's get going.

4        MR. RABINOWITZ:  Your Honor, then, if I might, John

5   Rabinowitz, on behalf of the trustee.  With regard to the

6   Fidelity motion, this is a motion that was filed by the

7   Committee shortly before conversion, objecting to the claim of

8   approximately $15 million that Fidelity filed against Immune,

9   Inc., here in the United States proceedings, and the cases were

10  then converted.

11       The trustee has taken over the Committee's motions,

12  objected to the claim, and filed a reply last week.  And it

13  appears, based upon that reply, that Fidelity is withdrawing

14  its claim.

15       A pleading was served on me.  I assume it was filed

16  with the Court as well.  And Fidelity is saying, based upon an

17  expected small or no distribution here, they were withdrawing

18  the claim and preserving their rights against Immune

19  Pharmaceuticals, Ltd., in the Israeli bankruptcy proceeding.

20       Just to give Your Honor a little flavor here, the

21  Committee's motion was based upon absence of contractual

22  privity, arguing that Fidelity's claim was against Ltd., the

23  Ltd. entity, and they only had a surviving claim in the United

24  States against the Inc. entity, and then alternatively argued

25  that if they had a claim against Inc., that it should be

5

1 subordinated, it was a damage claim arising from a securities

2 purchase agreement and should be subordinated under Section

3 510(b).

4          The trustee added to those grounds in his reply.  In

5 the interim, the claim administrator in Israel issued an

6 opinion disallowing Fidelity's claim against Ltd.  And the

7 grounds for that disallowance were that they hadn't satisfied

8 the conditions of the contract between the parties.  Secondly,

9 there was no new or subsequent contract.  And, thirdly, any

10 claim for damages was impermissible interest.

11          In addition, the trustee here argues that that

12 rationale applies equally as well to any claim that Fidelity

13 asserts against Inc., and that the merger didn't create any

14 further liability.

15          So, the trustee does not object to Fidelity's

16 withdrawal of the claim.  The only issue that I would raise,

17 Your Honor, is Bankruptcy Rule 3006 requires court action upon

18 withdrawal of a claim when an objection has been filed.

19          So, if Your Honor is satisfied that Fidelity is

20 withdrawing its claim, the trustee requests that Your Honor

21 enter an order to that effect or approve the withdrawal because

22 of the requirements of Bankruptcy Rule 3006, since an objection

23 to plan has been filed.

24          THE COURT:  Okay.  Just one -- one clarification

25 point, Mr. Rabinowitz.  Fidelity is withdrawing its claim

6

1 against Inc. and Ltd. in the U.S. or just Inc.?

2          MR. RABINOWITZ:  Well, it had -- it's a good

3 question, Your Honor.

4          Prior to conversion, Fidelity filed two claims in the

5 United States, one against Inc., and one against Ltd.

6          THE COURT:  Right.

7          MR. RABINOWITZ:  Previously, they filed a letter on

8 the docket indicating that their claim against Ltd. had been

9 withdrawn.

10          So it is the position of the Chapter 7 Trustee that

11 the only remaining claim in the United States proceedings is

12 the claim against Inc.  I was not involved in the case when

13 that letter withdrawing the Ltd. claim was submitted.  I don't

14 know if the Court took any action with regard to it.  But it

15 would be the trustee's position that they withdrew the prior

16 claim against Ltd.

17          And I believe that's what -- Fidelity perceives that

18 they previously withdrew the claim against Ltd., and doesn't

19 see a need to take further action to effect that.

20          It's my understanding that the reason that Fidelity

21 withdrew its claim against Ltd. was to avoid an argument that

22 there has been -- that jurisdiction of the Israeli bankruptcy

23 proceeding had been divested with regards to its claims against

24 Ltd., because it has continued to prosecute its claim in the

25 Israeli Ltd. bankruptcy proceeding.

7

1    So my view would be that the only claim that remains

2  is Inc., and that is what they are withdrawing.

3    THE COURT:  So, two things.  One is why don't you

4  submit an order on notice to Fidelity's counsel in Israel that

5  the Court is accepting the withdrawal of both claims against

6  Inc. and Limited in the United States with prejudice, because I

7  agree that Fidelity has no claim at all on the merits under

8  subordination for the reasons that were stated in Israel, for

9  the reasons that were stated when they objected to the proposed

10 sale.

11    I have no problem -- I would have had no problem

12 disallowing their claim, but I have no problem allowing

13 withdrawal and to confirm that it's against both Inc. and

14 Limited.  So, we can do that.

15    And then, the second thing I wanted to just ask, you

16 know, I should remember this, but I don't remember it exactly,

17 I entered an order on the protocol that allows them to continue

18 in Israel, which I guess they're appealing, right, so that all

19 remains in place with Fidelity.

20    MR. RABINOWITZ:  Yes, Your Honor, but just an

21 updated, if I might, without belaboring the record, Your Honor

22 approved the claims protocol motion.  Your Honor had comments,

23 and I modified the order consistent with Your Honor's comments

24 on the record and circulated it to all parties in interest.  I

25 have received some feedback from the Israeli receiver, and I am

8

1  in the process of resolving his concerns so that I can submit

2  an order.  So Your Honor hasn't actually had an order to enter

3  yet on the claims protocol.

4          THE COURT:  Oh, that was a gap in my memory.

5          MR. RABINOWITZ:  Yeah, because I have to try -- I'm

6  working it out with the Israeli receiver.

7          The issue that is being worked out is Your Honor was

8  rightfully concerned that creditors here in the United States

9  had taken steps to file claims here in the United States.  In

10 addition, the debtor has listed certain creditors as neither

11 contingent disputed or unliquidated on the schedules, and Your

12 Honor wanted the United States Trustee to present those timely

13 filed claims and the claims that were not listed as C, U, and

14 D, to the Israeli receiver, thereby obviating the needs of

15 those creditors to refile or take new steps in Israel.

16         And so it was a very good suggestion.  It's just

17 taken a little time to coordinate with the Israeli trustee his

18 acceptance of that procedure.  We will get there, but that's

19 what has delayed the submission of the order.

20         THE COURT:  Okay.  So you'll submit an order on

21 notice to the Israeli parties as well?

22         MR. RABINOWITZ:  I will do that, Your Honor.

23         THE COURT:  Fidelity and I guess the receiver?

24         MR. RABINOWITZ:  Fidelity -- yes.

25         THE COURT:  All right.  So that's done.

9

1        Then we -- what did we say in order, the substitution

2   motion, right?

3        MR. RABINOWITZ:  The substitution next, Your Honor.

4        THE COURT:  Right.  And, you know, I mean, I looked

5   at it.  I don't think I need to decide the issue right now to

6   say that you are substituted in.  But, to me, you are

7   substituted in -- this is a bit of an advisory opinion, but if

8   you're substituted in, you're substituted in.  You don't get to

9   take bits and pieces of what you substituted in for.  You take

10  the whole thing.

11       But, you know, if and when -- I don't need to address

12  it now, because we need to get to a place where the offer of

13  judgment becomes an issue.  But I don't need to address it now,

14  but that's the way I'm leaning.

15       MR. RABINOWITZ:  And, Your Honor, I understand Your

16  Honor's position.  Your Honor did so indicate at the last

17  hearing we had that that was Your Honor's thinking.

18       I do agree with Your Honor that it is not necessary

19  to make a ruling on that issue today.  I think the trustee

20  meets the criteria for substitution under B.R. 7025 and

21  F.R.C.P. 25(c), where the real party -- where the trustee is

22  the real party in interest.  There are a number of statutory

23  provisions under the Code that indicate that.

24       And both Mr. Barney and myself can preserve whatever

25  rights we have with regard to the effect of the offer of the

10

1 judgment.  If Mr. Barney is right and the offer of the judgment

2 becomes a significant issue at some point in the adversary

3 proceeding, Your Honor will make that determination.  I don't

4 think it's necessary to rule at this point in time.  I am

5 mindful of Your Honor's comments.

6        MR. BARNEY:  Your Honor, may I be heard on that?

7        THE COURT:  Yes.  Sure.

8        MR. BARNEY:  Your Honor, Dale Barney again for

9 Discover.

10        Your Honor, you're going to enter an order presumably

11 substituting the trustee in as plaintiff in the adversary

12 proceeding.  So, while it may not be necessary to rule on the

13 offer of judgment issue at this point, I don't see why you

14 wouldn't, frankly, because it just makes clear that the

15 substitution is conditional on being bound by the offer of

16 judgment.

17        And, as Your Honor correctly observes, when you

18 substitute in as a plaintiff, you take -- you step into the

19 shoes of the prior plaintiffs and whatever baggage that comes

20 with.

21        So, rather than -- I don't see any reason, frankly,

22 to not enter the order that we submitted.  That way the issue

23 is clear, and it's a record, and there's not -- if it's

24 meaningful later, it's meaningful later.  If it's not, it's

25 not.  But I don't see a reason to delay that determination,

11

1 frankly.

2        THE COURT:  Well, I really disagree with you, because

3 it's not conditional.  Why is it conditional?  It's not

4 conditional.  It is what it is.  It's -- they step into the

5 shoes.  Like, for example, if I granted a summary judgment

6 motion, they don't get to say, "I don't want the summary

7 judgment motion because I didn't like it."  Or maybe you could

8 move for reconsideration.

9        But, you know, I think it comes with the -- it just

10 goes with being substituted.  But --

11        MR. BARNEY:  Okay.

12        THE COURT:  -- A, we may not be -- it's just not ripe

13 now.  I'm not going to say what -- you know, what particular

14 things the substitution is conditioned on, it's substituted as

15 the Plaintiff in all respects, and whatever that means, that

16 means.

17        MR. BARNEY:  Thank you.

18        THE COURT:  All right.  I've told you what I think.

19 Okay.

20        MR. BARNEY:  That's fine.  I'm happy to rely on that

21 record, Your Honor.

22        THE COURT:  Okay.  All right.  So I'm just going to

23 allow the substitution, and that's it.

24        So that brings us to reconsideration.

25        MR. RABINOWITZ:  Your Honor, yes.  And, Your Honor, I

12

1  recognize specifically this context --

2          THE COURT:  I'm sorry, Mr. Rabinowitz, you're coming

3  in and out, and I'm not hearing you at all right now.  Hello?

4          MR. BARNEY:  I'm still here, Your Honor.

5          THE COURT:  Hello?

6          MR. BARNEY:  Judge, this is Dale Barney.  Can you

7  hear me?

8          THE COURT:  Yeah, I hear you, Dale.

9          Mr. Rabinowitz?

10          MR. BARNEY:  I can't hear John, either.

11          MR. RABINOWITZ:  Hello.

12          MR. BARNEY:  Oh, there he is.  He's back.

13          MR. RABINOWITZ:  Okay.  I don't know what happened.

14  I did not disconnect.  For some reason the service --

15          THE COURT:  It is breaking up quite a bit, and you

16  just broke up again.  Hello?

17          MR. RABINOWITZ:  Your Honor, if I can disconnect and

18  re-dial in, to see if that solves the problem?

19          THE COURT:  Yeah.  All right.  Go ahead.

20          MR. BARNEY:  I think we had this same issue at one of

21  our prior hearings, Your Honor.

22          THE COURT:  Yeah.  I don't know what the issue is,

23  what it relates to, but he was just getting to the good part.

24          MR. RABINOWITZ:  Can you not hear me now?

25          THE COURT:  I can, but even then, the words chopped

1  up a little bit.  But let's give it a try.

2         MR. RABINOWITZ:  All right.  Well, I'm going to take

3  the speaker and put it on handheld mode.  Can you hear me?

4         THE COURT:  Yes.

5         MR. RABINOWITZ:  Okay.  So, Your Honor, I was

6  starting to say that I recognize, that especially in these

7  circumstances, there is a --

8         THE COURT:  Mr. Rabinowitz, you know what, I've got

9  to ask you, maybe you have to pick up the phone.  Is that --

10 because it's just not --

11        MR. RABINOWITZ:  I've done -- I've done that.

12        THE COURT:  Oh.

13        MR. BARNEY:  I think, John, what you might have to do

14 is log out of Court Solutions on your computer and hang up the

15 phone and then reenter your credentials and call in again.

16        MR. RABINOWITZ:  I'm logging out and calling in.

17        THE COURT:  Oh, I thought that's what you were doing.

18 I'm sorry.  Yeah.  I think we're at that point.

19        MR. BARNEY:  There he goes.

20        THE COURT:  All right.

21        (Pause)

22        MR. RABINOWITZ:  Good morning, Your Honor.

23        THE COURT:  All right.  That sounds much more clear.

24        MR. RABINOWITZ:  Okay.  I'm on a landline.

25        THE COURT:  Oh, that might be it, too.

14

1        MR. RABINOWITZ:  Sorry about that.

2        THE COURT:  That's okay.

3        MR. RABINOWITZ:  So, Judge, where I was was

4 indicating that I recognize that there is a high burden here on

5 a motion for reconsideration when asking a trial court to

6 essentially change its mind.

7        But if Your Honor will indulge me for a few minutes,

8 I think there are compelling reasons to do so.

9        So Your Honor is aware that prior to conversion, the

10 Committee and the debtors filed an adversary proceeding against

11 Discover seeking to -- various relief, but basically seeking to

12 subordinate their claim and lien on various theories.

13        And there were two motions for summary judgment,

14 partial summary judgment, one on 510(a), which Your Honor

15 denied, and one on 510(b), which Your Honor denied.  And it is

16 that second motion for partial summary judgment, not the first,

17 that the trustee seeks to have Your Honor reconsider.

18        The motion is made under Bankruptcy Rule 9023, which

19 incorporates F.R.C.P. 59, and this denial of partial summary

20 judgment is an interlocutory order, and Your Honor has the

21 power to modify an interlocutory order anytime up until the

22 entry of final judgment.  There is no prejudice to Discover,

23 because there's no reliance.

24        We think the standard under the case law that we have

25 cited is that reconsideration should be consonant with justice

15

1  or, alternatively, there is clear error, especially in light of

2  the Supreme Court's recent ruling in <u>Bostock</u> where it confirmed

3  its plain meaning rule of statutory construction.

4         With regard to the substance of the argument, it

5  turns primarily on a plain meaning rule of construction, both

6  with regard to the applicable statutory provisions and with

7  regard to the terms of the contract.

8         The trustee submits that a convertible debenture is a

9  security under 510(b) for purposes of 510(b) and cites law,

10 particularly the <u>Enron</u> case, where the Court said that in

11 determining what is a security for purposes of 510(b), we look

12 to the terms and definitions contained in the bankruptcy court.

13        And the Court actually said, and I quote, that the

14 issue can be simply framed as whether a stock option

15 constitutes a security of the debtor, and to this question, the

16 Bankruptcy Code provides an immediate answer.  Section

17 101(49)(A)(xv) defines security as including a warrant or a

18 right to subscribe to or purchase or sell a security, and as

19 section 101(49)(A)(ii) makes plain, a stock is a security.

20        Therefore, the Bankruptcy Code is clear that a stock

21 option is a security as that term is used in Section 510(b).

22        And so what <u>Enron</u> -- the proposition that <u>Enron</u>

23 stands for is -- and it's not the only court.  Many courts,

24 essentially all courts that have addressed the issue, look to

25 the Bankruptcy Code to determine what is a security for

16

1    purposes of 510(b). And here we have a definition in Section

2    101(49)(A)(v) that defines a security to include a debenture.

3            THE COURT:  Well, every -- so every debenture and

4    every note is subject to subordination under 510(b)?

5            MR. RABINOWITZ:  I am not saying that, Your Honor.

6            THE COURT:  Well, I think you are. And that's what

7    we've got -- that's what we went through last time is that

8    every convertible -- every time it says -- and this one says,

9    "Senior secured convertible debenture" is automatically, no

10   discussion, subordinated under 510(b).

11           MR. RABINOWITZ:  Well, I have a response to that,

12   Your Honor. And the rules in our court do not provide for a

13   surreply. I thought about this at length at the end of last

14   week as to whether to file a surreply or not.

15           But on Monday of last week, the Supreme Court, the

16   United States Supreme Court came down with a decision under the

17   Civil Rights Act that relied on rules of statutory construction

18   in determining what a particular term meant under the Civil

19   Rights Act.

20           And in that case, Bostock, this is what the Supreme

21   Court said, "When Congress chooses not to include any

22   exceptions to a broad rule, courts apply the broad rule." And

23   that is a rule of statutory construction that has been

24   confirmed by the Supreme Court.

25           So here we have a rule, a definition, for which

17

1  Congress has not provided any exceptions, and courts are

2  charged with applying what that broad rule says.  The plain

3  meaning of the statute, the clear and unambiguous meaning of

4  that statute, is that a debenture is a security.  And the Court

5  --

6          THE COURT:  So is a note.  So is a note.

7          MR. RABINOWITZ:  But that's not consistent with the

8  second rule of statutory construction that I just cited to,

9  that Congress created a rule, a broad rule, for which it did

10 not apply any exceptions.

11         The fact that there may be or one could conceptualize

12 an exception to that broad rule doesn't mean that courts are

13 able to ignore the broad rule.  The broad rule here is that a

14 debenture is defined as a security.  And that's the plain and

15 unambiguous meaning of the statute.

16         Now, I've got alternate arguments, but I think

17 applying those two rules of statutory construction, one is the

18 plain and unambiguous meaning of the statute, which says that

19 we don't look to extrinsic material to determine what it means,

20 and the fact that Congress did not define any statutory

21 exceptions to that definition, requires the Court to apply the

22 broad rule as to what the definition of a debenture is.

23         But that's not --

24         THE COURT:  So the answer to my question is yes?

25         MR. RABINOWITZ:  But it doesn't matter -- it doesn't

18

1  matter that Your Honor may say that I don't think a note is a

2  security for these purposes.  We have a broad rule here that

3  says a debenture is a security.

4       THE COURT:  Well, that's what I'm saying.  So the

5  argument that is being made to me again this time, just like it

6  was made last time, is that because debenture is defined as a

7  security under 101(49), it is automatically subordinated,

8  whether it's converted or not, under 510(b)?

9       MR. RABINOWITZ:  That is one of the arguments that I

10 am making.

11      THE COURT:  And you know what, Mr. Rabinowitz, you

12 know I have tremendous respect for you.  You're a fine lawyer.

13 And I think, by the way, parenthetically, I think Mr. Barney's

14 description of your brief was right on target.  It was the same

15 arguments, without the histrionics.

16      So that's a compliment in one sense, and it's telling

17 you another thing in another sense, because I don't know what

18 the different arguments are at this point.  I just -- I don't

19 have it.  They said 258 times the word "investor" was repeated.

20 You said  258 times it was repeated.  They said you have to

21 look at the plain meaning, and debenture is a security under

22 101(49), and, therefore, it's automatically subordinated.  And

23 you're saying the same thing.

24      MR. RABINOWITZ:  I'm saying more than that.  Your

25 Honor may or may not be correct that the arguments repeat

1 arguments that were made by the debtors and the Committee.  But

2 I'm not relying solely on the plain meaning, although I think

3 that is a persuasive argument, because Your Honor said two

4 things in a very extended oral argument with a lot of give and

5 take, but I believe Your Honor said two things, as I read that

6 transcript.

7 　　　　The first thing Your Honor said was that I don't

8 agree with the NAL case -- and NAL does not bind me, because

9 it's outside the jurisdiction.  I don't agree with the NAL case

10 that a convertible debenture per se is a security for 510(b).

11 That's what NAL says in dicta.  And Your Honor said, "I don't

12 agree with that.  I'm not bound by that."

13 　　　　THE COURT:  I said it was dicta, and I don't agree

14 with it, because it makes no sense.

15 　　　　MR. RABINOWITZ:  Right.  So that's the first thing

16 Your Honor said.

17 　　　　And the second thing Your Honor said is that Your

18 Honor found a disputed issue of material fact, which would be

19 the standard for denying partial summary judgment, because

20 there was essentially extrinsic evidence or parol evidence that

21 the parties may have intended this instrument, for lack of a

22 better term, to be a debt instrument and not a security.

23 　　　　Those are the two things that Your Honor held.  And

24 with regard to the second -- and I think I am presenting this

25 argument with a slightly, at a minimum, different approach.

1  With regard to the second, the trustee suggests that Your Honor

2  shouldn't consider what the parties said to each other with

3  regard to that, because there is nothing that is not clear and

4  unambiguous on the face of the statute -- and I'm going to get

5  to the face of the agreement in a minute -- as to what this

6  term means.  And it's only if there were some ambiguity should

7  Your Honor then take the opportunity to consider what the

8  parties' intent was.

9         And that's a longstanding rule of statutory

10 construction, again, confirmed by the Supreme Court in the

11 Bostock case.  So with regard to that, the plain meaning simply

12 says this is what the statute says, and you don't consider

13 extrinsic stuff.

14        And I'll take it a step further.  This is an argument

15 that was not raised by the debtors or the Committee, that the

16 security purchase agreement has a merger integration clause.

17        THE COURT:  It was raised.  It was raised in spades.

18 Every argument was raised.  But it doesn't matter, because what

19 I'm saying to you is that there -- and, you know, just like

20 there's the NAL case, there's other cases, the Mobile case --

21 and what was the other one in Delaware -- you know, that go the

22 other way.  And also, you know, the plain meaning, you know,

23 about five appellate courts have said there is no plain meaning

24 in this statute.  It's difficult to understand.

25        MR. RABINOWITZ:  Well, Your Honor, that's not what

21

1  those courts say.

2  　　　　THE COURT:  Oh, _Telegroup_ -- _Telegroup_ says we have

3  to go legislative history, we have to go to this, we have to go

4  to that, because it's a tough call.

5  　　　　MR. RABINOWITZ:  Yes, but not as to both elements of

6  the cause of action.  The cause of action contains two

7  elements, what is a security, is it a security, and does the

8  damage claim arise from a breach of the securities purchase

9  agreement.

10  　　　　So the term "arises from" is where the courts have

11  said that there is ambiguity that requires some construction.

12  I don't deny that.  The courts are clear that the term "arises

13  from" requires some interpretation and construction.  And we

14  can go to legislative -- and it's ambiguous, and we can go to

15  legislative history.

16  　　　　But I don't remember seeing a case that says that the

17  term "security" has the same ambiguity requiring that

18  construction.  So there is a distinction.

19  　　　　THE COURT:  But what about _Mobile_ case, where it says

20  you can't have every note become a security?

21  　　　　MR. RABINOWITZ:  Okay.  Your Honor --

22  　　　　THE COURT:  What about that?  It doesn't count?

23  　　　　MR. RABINOWITZ:  It does count, but that's a note.

24  And here we're talking about a debenture.  And just because

25  Congress didn't say there is an exception -- Congress could

1  have said that 510(b) only applies to an equity security.  The

2  statute doesn't say that.

3        I mean, I can make an argument.  I'm not putting that

4  argument before the Court today.  I can make the argument that

5  a bond, other instruments that have higher degree of debt

6  indicia associated with them, are still subject to 510(b), but

7  I'm not doing that.

8        But the Congress could have said, and it didn't -- it

9  created a broad rule.  It could have said only equity

10 securities are subject to 510(b), but it didn't.  It used the

11 term "security."  And you're not being -- Your Honor is not

12 being asked to rule as to whether a note is a security for

13 these purposes, but a convertible debenture which entitles the

14 holder of that convertible debenture to get equity at some

15 point, bargain for the right -- and again, I'm getting to a

16 later argument -- but bargaining for the right to get it, to

17 get the equity at some point in the future.  And, in fact,

18 there was a partial exercise in this case of a small one,

19 admittedly, a very small one in the -- but they bargained for

20 it, they got the right, and they exercised a portion of that

21 right, which makes this different than a note.

22       So, Your Honor, I understand the example of a note,

23 but that's not --

24       THE COURT:  You know, bond is in 101(49) as well.

25       MR. RABINOWITZ:  Say that again.

1        THE COURT:  Bond -- bond is in 101(49) as well.

2        MR. RABINOWITZ:  I understand that.  But, again, Your

3 Honor is not being asked to rule as to whether a bond is a

4 security under 510(b) or a note is a security.

5        Your Honor simply has a broad rule, with no statutory

6 exceptions, that is clear on its face, and you're being asked

7 to rule with regard to a convertible debenture.

8        So, again, I go back to that second rule of statutory

9 construction that I -- that I raised.  So the -- if I can just

10 -- I recognize that I started this argument, Your Honor, that

11 there are difficulties in terms of overcoming a hurdle here,

12 but I think with due consideration, these arguments have merit.

13        The securities law argument was raised.  An

14 alternative argument, but basically the federal securities law

15 creates a multi-part test, and I think without going through

16 all the elements, that this security satisfies each of the

17 elements of that test, but --

18        THE COURT:  But how does it satisfy each of the

19 elements of that test?  This is a one-time transaction.  It

20 wasn't publicly traded.  It was between two parties, and that's

21 it.  What does the investing public know or care about this?

22 Other than that they were advised -- other than the investing

23 public was immediately advised of the debenture and its

24 characteristics.  And if you go to that article by those two

25 fellows who are -- who are, I guess, credited with developing

24

1 this theory, A, they talk about purchase and sale, you know,

2 right at the time, right at -- they're talking about it right

3 at the beginning, and they're talking about -- they're talking

4 about, like, traditional securities law claims.

5      MR. RABINOWITZ:  Well, actually, the article does

6 mention in one sentence a reference to bonds, although they

7 don't carry forward with it.

8      But the article -- the article creates a principle,

9 if we're going to get to legislative history, which was based

10 upon this article, that says that if you bargain for any kind

11 of upside beyond the return that a normal creditor would

12 receive, that you assume a greater risk on the downside.

13 That's the principle here.

14      And this debenture has that feature.  It could have

15 been a straight debenture.  I don't want to -- and I would

16 argue under the plain meaning in the definitional section that

17 510(b) would apply, but here, it's more.  It's a convertible

18 debenture, and they bargained for the right to get -- convert

19 their entire investment into equity.  It didn't turn out that

20 way, but they bargained for that right.  They bargained for

21 that potential upside.  In accordance with the Slain and Kripke

22 article, they should assume more of the risk on the downside.

23      Now, Your Honor may say -- and I'm taking this

24 piecemeal -- but Your Honor may say, but they didn't do it.

25 They didn't exercise it.  There was a partial -- small, partial

25

1  exercise, recognize that it was small.

2       There are cases that say that you don't have to

3  exercise the right, you don't have to have received the equity

4  as of the petition date in order for the 510 principle of

5  subordination to apply.

6       <u>Enron</u> is one of them. These were employee stock

7  options that were never exercised.

8       THE COURT: That -- doesn't that -- that stopped me

9  right away with <u>Enron</u>. Employee stock options.

10      MR. RABINOWITZ: Right.

11      THE COURT: Okay. I have no trouble with that.

12 That's kind of an easy one. Employee stock options. It's

13 options to purchase stock. That sounds like --

14      MR. RABINOWITZ: Which were part of an employment

15 compensation package. These were not traditional traded

16 securities. They weren't even assignable. So if we're going

17 to analogize to typical equity security investments that trade,

18 employee stock options were not them. They weren't tradeable,

19 they weren't assignable, and they were not done as an

20 investment. Think about it. They weren't purchased by the

21 employees --

22      THE COURT: That's not what they said.

23      MR. RABINOWITZ: They were issued as employee

24 compensation.

25      THE COURT: I know, but that's not the way -- as

26

1 incentives, and to get the upside, that's what I read in that

2 case.

3       MR. RABINOWITZ:  Well, the upside comes from the

4 exercise of the options to get equity.  And here, the

5 convertible feature allows the holder of the debenture to

6 exercise to get the upside of that -- of that equity.

7       So, I mean, I don't want to belabor the elements of

8 Reeves (phonetic), but when Your Honor says, "What were the

9 expectations of the trading public with regard to this

10 particular security?" I'm not sure that's the element of the

11 test in Reeves.  It says, "What were the expectations of the

12 trading public with this category of securities?"  It didn't

13 have to say this particular security, what were the

14 expectations?

15       THE COURT:  And in this particular case, right,

16 assuming that this public information is read by anyone, and

17 going back to the article, in this particular case, we have a

18 disclosure of a senior secured convertible debenture that is

19 secured by all the debtor's assets, although they might have

20 some problem with that, and the investing public gets that, so

21 even that other element about, you know, extending credit on

22 the belief that there is equity, well, how does that come into

23 play?  They have extended credit -- if anybody -- I don't know

24 that anybody extended any credit after that anyway, because

25 this was a company in dire straits financially, but even if

27

1  they did, they were on notice by UCCs, but 8K's, by all kinds

2  of things that there was a senior secured indebtedness out

3  there.

4       MR. RABINOWITZ:  I think, if I understand correctly,

5  what Your Honor is suggesting is that there were debt indicia

6  associated with this transaction that in some way disqualified

7  this instrument as a security for purposes of 510(b).

8       THE COURT:  You know what, I'm not really saying

9  that, because I'm going back to the -- to the two offers and

10 everything.  But I want to say, I didn't find that this is not

11 a security.  I didn't find that at all.

12      I found that -- I found that it might be, and it

13 might not be for purposes of 510.  That's what I found.  I

14 found there were issues of fact, and I feel like I really need

15 to emphasize that, because the principles of the debtor said

16 it's debt until it's converted, twice.

17      Mr. Kirkland said, "I am not doing another equity

18 transaction this time," and he changed the preferred to this

19 debenture instrument with the conversion feature.

20      Are there factors that cut both ways?  I think so.  I

21 really do.  I think so.

22      MR. RABINOWITZ:  Your Honor put great emphasis on

23 what the parties said to each other.  So let me just suggest a

24 hypothetical for a moment.  Let's assume that the parties write

25 up an agreement that clearly and unequivocally describes this

1 instrument as an equity security for purposes of 510(b). And

2 then as between the two of them, they say, with a wink and a

3 nod, this is not a 510(b) equity security, it's something else.

4 That's what we consider it.

5       I'm suggesting to Your Honor that given the rules of

6 statutory construction that have been the trend in the past 20

7 to 30 years in our judicial system, that the plain and

8 unambiguous meaning of a statute and the plain and unambiguous

9 meaning of a contractual provision are going to bind the

10 parties. And unless there is some ambiguity on the face of

11 either the statute or the contractual provision, we don't get

12 to what the parties said to each other. You can't draft

13 something up, call it something, and then say it's something

14 else.

15       THE COURT: Oh, you better watch out there. You're

16 hurting your investor argument.

17       MR. RABINOWITZ: Okay. Tell me -- I don't think so.

18       THE COURT: That's the exact -- that's the exact

19 thing in a way, you know. You're saying just because you call

20 it an investor, that means it's an investor, but really, it's

21 something else.

22       MR. RABINOWITZ: All I'm saying is that because it is

23 not ambiguous on its face, you don't look to what the people

24 may have said. I'm not suggesting that in this particular

25 instance there was an acknowledgment or an admission that is

29

1  admissible independently.  I'm saying you don't look to it.

2       They sat down and they negotiated a document, and the

3  document said what it said.  It defines it as a security.  It

4  has a conversion feature which allows them to get equity.  And

5  that is what Your Honor should be looking to to make the

6  determination as well as the clear, plain, and unambiguous face

7  of the statute.

8       But I wanted to get back to the debt indicia for a

9  moment.  In BetaCom, there were promissory notes involved.  In

10  TriStar, it dealt with the conversion -- the failure to honor a

11  repurchase agreement for a membership interest, resulted in a

12  damage judgment for that.

13       The courts both said, even though those things look

14  and smell like debt, the fact that there are debt indicia,

15  i.e., here a security interest and maybe some repayment

16  obligation if, in fact, the convertible feature is not

17  exercised, those don't disqualify the instrument from being

18  deemed a security for purposes of 510(b).

19       Let me just see, Your Honor.  We've jumped around a

20  little bit.

21       THE COURT:  That's the way I do it, because, Mr.

22  Rabinowitz, I have to tell you, I really thought about this,

23  and I considered it very carefully the first time around.  I'm

24  considering it very carefully this time around.  I don't care

25  what standard you go by.  And I just -- I just can't overlook

30

1  that, you know, the vast majority of this was never converted,

2  that there are cases that go in every direction on this, that

3  the Third Circuit said that, you know, contrary, I think, to

4  what you're saying, that the "arising from" language is very

5  ambiguous, and you need to look at legislative history.  And

6  they could have gone either way on the TeleGroup case.

7        I just -- I think this is an issue that I need to see

8  what Mr. Fiorino says.  I need to see what Mr. Rabin's

9  deposition testimony was.  I need to see what Mr. Kirkland says

10  when he gets on the stand.  Because, as I said, there's things

11  that go both ways.

12        I just -- I didn't decide that this can be

13  subordinated or can't be subordinated -- or is being

14  subordinated or is not being subordinated.  I've said that I

15  need to get a better record on this because I think there are

16  factual issues as to what the transaction was and was intended

17  to be and whether -- and things like the two prior transactions

18  that were straight equity deals and this one wasn't.

19        The fact that there was a -- there is security.

20  Which case has security?  Out of all those cases that you cited

21  to me, which one has a security interest?

22        MR. RABINOWITZ:  I don't think I have identified a

23  case that talks about a security interest.

24        THE COURT:  No, because there aren't any, because

25  there aren't any.

1          MR. RABINOWITZ:  But that is a debt indicia.  And the

2     general principle, the debt indicia does not disqualify the

3     instrument for treatment under 510(b) is both in <u>BetaCom</u> and

4     <u>Tristar</u>.  But, yes, I did not find a case that talks about a

5     security interest.

6          THE COURT:  I agree.  I agree.  But I'm saying I

7     can't decide it on a summary judgment motion.  That's what I'm

8     saying.  I said it before, and I'm saying it again.  I'm not

9     comfortable --

10          MR. RABINOWITZ:  Understood, Your Honor.

11          THE COURT:  I'm not comfortable deciding it on a

12     summary judgment motion when the debtor's principals said what

13     they said.  And you make great arguments.  I said this to Mr.

14     Mairo, and I'm saying it to you.  You make great arguments.  I

15     think they're very good arguments.

16          You may win this case.  I don't know.  But I need to

17     hear from the parties.  I don't think I'm in a position -- in

18     giving oral inferences, one of the things that you said, a fair

19     inference from this is that it's a -- that it's intended as a

20     security.  Well, I have to give the inferences the other way.

21          MR. RABINOWITZ:  Judge, let me just say three

22     remaining things that I have.  First, my arguments in the

23     motion in no way should be construed by Your Honor to suggest

24     that I don't believe that Your Honor gave fair and thorough and

25     comprehensive thought and analysis.  I'm not suggesting that,

32

1 because that's not the purpose of the motion.

2       I do want to just -- although I don't think this was

3 a large issue, at least for purposes of any record that may be

4 created here, the Telegroup case does define a very broad but

5 for quasality in construing the term "arises from." And to the

6 extent that this convertible debenture is a security, I don't

7 think there is any dispute that under the Third Circuit's "but

8 for" standard that the damage claim arises from the breach of a

9 security purchase agreement, assuming this is a security.

10      And the last thing, Judge, I am smart enough to know,

11 as I started this presentation, that this is a difficult burden

12 to satisfy or a high hurdle, and from the tenor of the

13 argument, I expect that Your Honor is likely to deny the motion

14 for reconsideration.

15      At least on the issue of whether as a matter of law,

16 as a matter of law, a convertible debenture is a security for

17 purposes of 510(b) I believe is a case of first impression in

18 the Third Circuit. There is nothing in the Third Circuit

19 addressing that particular issue.

20      And for purposes of moving this litigation forward to

21 a logical and expeditious conclusion, I would ask Your Honor to

22 make reference to Bankruptcy Rule 8006. And as Your Honor is

23 aware, 8006 creates a procedure that allows a certification for

24 a direct appeal to the circuit. It can be done in three

25 different ways. One of them is by consent of the parties. I

1  don't know that Discover and the trustee are going to be able

2  to reach consent.  It's possible.  And maybe Mr. Barney's

3  client wants this resolved as quickly as possible and would be

4  interested in consenting to a certification.

5        It can be done on motion, which the trustee, assuming

6  that Your Honor denies the motion for reconsideration, is

7  contemplating.  Or it can be done sua sponte by Your Honor.

8  And I would ask Your Honor to give some consideration, if Your

9  Honor is inclined, to deny the motion for reconsideration for a

10  certification for a direct appeal to the circuit, because the

11  legal issue of whether this convertible debenture is an equity

12  security -- is a security under 510(b) is one of first

13  impression in the Third Circuit.

14        So that's everything I have to say.

15        THE COURT:  Okay.

16        MR. RABINOWITZ:  And Your Honor has indulged me and

17  given me a full and fair opportunity to say my piece.

18        THE COURT:  I appreciate it.  Thank you.  And, like I

19  said, they are very good arguments, you know, except that

20  that's the first I'm hearing of the 8006.  I've got enough on

21  my plate for today.  I'm not ready to deal with 8006 today.

22        Okay.  All right.  Mr. Barney do you want to respond?

23        MR. BARNEY:  Well, Your Honor, I think I said the

24  last time, after you got done with Mr. Mairo, that Frank

25  Vecchione told me a long time ago that when you think you're

34

1  ahead, don't say too much.

2          I think Your Honor properly proceeds again with the
3  nature of the transaction.  I know you've said that you're
4  certainly not ruling in Discover's favor, and I understand
5  that, and that there are issues on both sides.  I understand
6  that.

7          But, you know, it certainly -- with respect to some
8  of Mr. Rabinowitz's arguments regarding the unambiguous nature
9  of the loan documents, or the debt documents as we called them,
10 his view of unambiguous ambiguity -- or lack of ambiguity, I
11 should say, is that you ignore the five-page security agreement
12 and the fact that we have a UCC on file and the fact that we
13 have an intellectual property security agreement and all the
14 indicia of debt.  I know he walked that back a little bit with
15 respect to talking about indicia of debt.

16         But like the Committee and the Plaintiffs, the
17 trustee asked the Court to look to the parts of the debt
18 documents that favor the trustee's arguments and ignore the
19 other ones.  And they don't have a response to it, because
20 there is not a good response.  And it's because of the nature
21 of the debenture.  It's debt until it's converted, as Your
22 Honor rightly perceives.

23         And, you know, as we said in the papers on these
24 motions, there is not any dispute that debtor loaned $2 million
25 to Immune.  It did.  It accrued interest, but the debenture has

1 got an interest rate, it's got a maturity date.  It says that

2 we get to recover our attorney's fees, whatever that amount is

3 ultimately determined to be.  And we can fight about $14.85

4 million, and the make whole provisions in the·rest of it, but I

5 don't really see that there is a fight, absent subordination,

6 that Discover is owed $2 million, plus interest, plus some

7 fees.

8          So, with that, Your Honor, I'll rely on our papers.

9 I know we've got to move along here.  But I just wanted to

10 point that out, that this is -- Your Honor rightly perceives

11 the loan documents as a whole and understands what happened in

12 this transaction.  And I'll rely on our pleadings for the rest

13 of it, Your Honor.

14          MR. RABINOWITZ:  Your Honor, if I might, just

15 briefly.  Mr. Barney has raised an issue that I didn't address

16 affirmatively, and that is the size of damages, as compared to

17 the out of pocket advance or investment that was made here.

18          So I don't think there's any dispute that the

19 investment was $2 million.  With the make whole provision and

20 legal fees -- and I'm not sure -- we don't need to address the

21 enforceability of the make whole provision as a make whole

22 provision, we don't need to address whether they're entitled to

23 post-petition legal fees or whatever, or whether they've even

24 sought them, I don't know.

25          But roughly $15 million, as compared to a $2 million

1  out-of-pocket investment, and this additional fact.  And I know

2  Mr. Barney says that the proof of claim has superceded this.

3  And I'm not sure I fully understand the argument.  I don't

4  dispute it's bona fide, but I'm not sure I fully understand the

5  argument.

6          In the immediate aftermath of the filing of this

7  petition, Discover filed a motion for relief from the stay.

8  And, as our local rules require, they annexed a statement of

9  amount due to that motion, and it said $328 million is the

10 amount due.

11         They have subsequently filed a proof of claim for

12 $14,858,000, I believe, roughly.  But what that demonstrates is

13 that the expectations of Discover here, by their own position

14 taken in this bankruptcy case, is that they are going to get an

15 upside here that is greater than a creditor who loans money and

16 has a reasonable expectation of permissible interest on that

17 return.

18         I think that's an additional factor, so I just wanted

19 to make that comment, Judge.

20         THE COURT:  Well --

21         MR. BARNEY:  Well -- go ahead, Your Honor.  I'm

22 sorry.

23         THE COURT:  Go ahead.  Go ahead, Mr. Barney.

24         MR. BARNEY:  I would just say, Your Honor, look, we

25 talked about this the last time, and that statement of amount

1  due wasn't filed by me.  But all that was an attempt to do was

2  to demonstrate, as the rules require, how the contracts work.

3          And we immediately clarified with a declaration that

4  was put in for the first hearing on the stay of relief motion

5  that the claim is for $14.85 million, based on the make wholes.

6          So this constant harping on that statement of amount

7  due that was filed 15 months ago and doesn't say what the

8  trustee and the Committee said it says, it's just -- it just --

9  it doesn't reflect reality, and it doesn't reflect Discover's

10  position, and the Court should just disregard it.

11          THE COURT:  I'll tell you what -- I'll tell you what,

12  Mr. Barney, this is what I think it doesn't reflect.  It

13  doesn't reflect very well on Mr. Kirkland's arguments.  It's

14  definitely a factor that I have considered and that I think I

15  raised it the first time I saw that.  I said, "Look at this

16  number.  Where does this number come from?"

17          It was a crazy number.  That's why I say I think he

18  can lose.  I didn't rule definitively on this issue.  I just

19  denied summary judgment, which --

20          MR. BARNEY:  I understand that.

21          THE COURT:  -- which, you know, a lot of -- but I

22  think both sides kind of take the position that I ruled on the

23  issue, and I haven't, because I'm not comfortable ruling on it,

24  because there's facts in my mind that go both ways, and some

25  more significant than others.

38

1          But on a summary judgment motion, I have to give

2    inferences in favor of the non-moving party.  And here, I mean,

3    let me just go through it.  I've got -- I'll give you my

4    decision.

5          This is the motion by the Chapter 7 Trustee, Jeffrey

6    Lester, to reconsider the Court's April 20th, 2020, order that

7    denied Plaintiff's motion for summary judgment to subordinate

8    the claim of Discover Growth Fund under 11 U.S.C. 510(b).

9          The Court has jurisdiction over these matters under

10   28 U.S.C. 1334(b) and standing order of reference entered by

11   the District Court on July 10th, 1984, and amended on September

12   18th, 2012, the core proceeding under 167(b)(2)(a), (h), (k)

13   and (o).  Venue is proper in this court under 28 U.S.C. 1408,

14   and the Court issues the following findings of facts and

15   conclusions of law pursuant to 7052.  To the extent any of the

16   finding of fact might constitute conclusions of law, they are

17   adopted as such and the reverse is true.

18        In this motion for reconsideration, the trustee

19   basically adopts the debtor's statements of facts and arguments

20   and in some respects amplifies them, and Discover really

21   incorporated its prior statement of facts and statement of

22   undisputed facts which, you know, many material facts were

23   disputed.  So that was one factor.

24        The motion for reconsideration is based on the debtor

25   and Creditors Committee second motion for partial summary

39

1 judgment on the adversary complaint to establish that the claim

2 held by Discover Growth Fund is a security subordinate to other

3 claims under 510(b).

4       Discover's claim is undoubtedly based on October 9th,

5 2018, security purchase agreement senior secured convertible

6 debenture and related documents that the parties entered into

7 pre-petition, that is, before the debtor's (indiscernible)

8 filing on February 17, 2019.

9       These facts that I'm going to indicate are mostly

10 undisputed.  The debtors were a clinical and approved stage 5

11 pharmaceutical company specializing in the development of novel

12 (indiscernible) therapeutic agents in the field of

13 inflammation, dermatology, and oncology.

14       Mr. Kirkland serves as the fund manager and

15 (indiscernible) Discover Management, Inc., which was general

16 partner of Discover Fund Management, LLLC, which is an

17 investment (indiscernible) and managing member of the

18 Defendant, Discover.

19       The debtor had a prior relationship with the Discover

20 entity, Discover Growth Fund, a Cayman Islands liability

21 company, for which Discover Fund Management also serves as an

22 advisor, and to the best of my memory, the debtor, in July of

23 2015, under two stock purchase agreements that were purchases

24 of preferred stock, I believe -- there might have been some

25 convertible stock, some common stock -- and then the Cayman

1  entity invested another $2 million in cash in the debtor on

2  September 6, 2016, which Mr. Kirkland described as a straight

3  equity investment.

4        On July 6, 2018, the debtor, which was experiencing

5  severe financial difficulties, sought operating capital and a

6  means to dispose of two principal assets, the bert asset and

7  the Ceplene asset, as they are licensed, and there was

8  negotiations between the debtor and Discover, and they

9  ultimately entered into a securities purchase agreement on

10  October 9, 2018, along with a senior secured convertible

11  debenture, which I'll call the debenture.

12        The agreement, the debenture, and related documents

13  are governed by the law of the Virgin Islands.  Only Immune

14  Pharmaceuticals, Inc., which I'll call Immune, Inc., and

15  Defendant signed the security purchase agreement and related

16  documents.

17        Under those agreements, Discover agreed to purchase

18  the debenture with a base amount of $5.5 million for $5 million

19  with a 10 percent original issue discount by means of a $2

20  million cash payment and $3 million promissory note, subject t

21  the satisfaction of certain conditions.

22        The parties agree that Discover funded -- never

23  funded more than the $2 million.  The agreement, among other

24  things, granted Discover as a secured party a continuing first

25  position lien and security interest in all right titled

41

1  interest of the company, which defined as Immune, Inc., whether

2  now owned or hereafter -- now owned or existing or hereafter

3  created, acquired, arising in and to all of the collateral.

4  Collateral was defined to include all the assets of Immune,

5  Inc., but not the Ceplene assets if the debtor had closed on a

6  sale of other licensing for those assets.  By March 31st, 2019,

7  there was litigation on that issue in this court, and the Court

8  approved a licensing of the Ceplene assets, effective as of

9  March 30th, 2019, with the parties apparently continuing to

10  dispute whether that transaction removed the Ceplene assets

11  from the debtor's -- from Discover's collateral with various

12  arguments being asserted by both sides.

13        Discover perfected its first position security

14  interest by filing U.C.C. one financing settlements against

15  states in Delaware and New Jersey and then by the filing of an

16  intellectual property security agreement with the U.S. Patent

17  and Trademark Office.

18        In his declaration, Mr. Kirkland states that the

19  debtor met the conditions that triggered the debtor's

20  obligation to pay an additional $3 million, a fact which the

21  debtor does not really appear to dispute, although the debtor

22  argues that the defaults were caused -- were waived or

23  otherwise caused by Discover's alleged bad faith conduct.

24  That's not an issue on this motion.

25        That, in fact, the debtor indicated in its SEC filing

1  of February 6, 2019, that the failure to pay debenture owed to

2  another party when due resulted in the trigger event under the

3  October debenture, meaning that Discover is not obligated to

4  fund the remaining $3 million of its investment in the October

5  debenture until the period of common stock issue of the October

6  debentures and the October debenture warrants are registered

7  and the first anniversary of the issuance of the October

8  debentures and other conditions are satisfied.

9       I don't believe there's any dispute that those

10  conditions were not satisfied, and without it, they couldn't

11  convert, because there was no -- there was no stock to convert

12  it to, which was registered.

13       Also relevant to the Court's decision today, and as

14  it was before, October 10th, 2018, Form AK filed with the

15  Securities and Exchange Commission supports Discover's secured

16  status and first lien position.  There, the debtor said the

17  debentures are secured by a first priority security interest on

18  all of the company's assets, other than all tangible and

19  intangible assets associated with Ceplene, unless such assets

20  are not disposed of by March 31st, 2019.

21       On February 8th, Discover sent a notice of fraud and

22  notice of sale of collateral to the debtor.  Immune filed its

23  Chapter 11 position on February 17th.

24       Discover filed claim 37-1 on June 12, 2019, for

25  $14,848,569, on the $2 million that it paid under the

43

1  agreement, and plus the 34 percent interest for five years and

2  the $5.499 million face value of the -- of the debenture.

3         The trustee notes, as the Court did, that Discover

4  stated in its motion included additional claim for damages in

5  the amount of $324,468,730.  And that was in a certification of

6  Discover.

7         The adversary proceeding was filed -- this adversary

8  proceeding was filed on July 1st, 2019, and Discover answered

9  on August 2nd.  They have filed a first motion for partial

10 summary judgment on January 29th, 2020.  Discover filed its

11 objection.  The first summary judgment motion (indiscernible)

12 the declaration that Discover's lien was limited to $250,000

13 and that was subordinated.  The Court denied that motion on

14 various grounds, but including that the $250,000 limitation was

15 a representation by the debtor that there were no other liens

16 of $250,000 and that -- or that that's a reasonable limitation

17 and that the factual subordination argument required the Court

18 to look at the evidence because the words themselves, even

19 though both parties were represented by sophisticated counsel -

20 - Mr. Kirkland, I believe, as the attorney, has extensive

21 experience in these matters -- but the words were less than

22 clear and, in fact, inconsistent or contradictory.

23        MR. RABINOWITZ:  Your Honor, excuse me.  I'm having

24 difficulty hearing you.

25        THE COURT:  Oh, I'm sorry.

44

1          MR. RABINOWITZ:  That's much better.

2          THE COURT:  Okay.  You know what, I had actually

3    turned away to read my statement.

4          MR. RABINOWITZ:  Yeah, I figured.

5          THE COURT:  All right.  So the securities purchase

6    agreement provides for a grant of security interest and -- and

7    which is the senior -- you know, the senior secured status.

8          On this motion, the trustee supplemented the facts in

9    some respects with various -- various provisions of the STA,

10   which, you know, includes securities, include the debenture,

11   the warrant, the conversion shares, the conversion mechanism,

12   the conversion notice that was issued that throughout Discover

13   referred to and defined as investor 258 times.

14         In my mind, most of these arguments were made by the

15   debtor and the Creditors Committee, experience of the investor,

16   that he is sophisticated and can bear an economic risk of an

17   investment in the securities and able to avoid a complete loss

18   of such investment and that interest could be satisfied through

19   the issuance of conversion shares and that on the maturity date

20   all remaining outstanding debenture automatically converts into

21   shares of common stock.

22         That the parties addressed the failure to have

23   sufficient authorized common stock by adding a new provision to

24   the agreement that required the debtor to use best efforts to

25   increase the number of shares of common stock and commit full

45

1   conversion.  That that never happened, and now we have the

2   motion for reconsideration.

3          There is some argument over which standard applies.

4   I'm not going to get too deep into which standard applies,

5   because, as you -- as you, I'm sure, know by now, whatever

6   standard I apply, I'm not reconsidering my decision, because I

7   don't think I was brought anything that is really new.  I know

8   there's reference to a Supreme Court case that talks about

9   plain language in a different -- you know, under a different

10  statutory scheme where they determined that that language was

11  plain, but I don't think I really -- I have maybe new glosses

12  on the arguments, maybe new tenor of the arguments, but I don't

13  think I really have any arguments that are different or new

14  this time.

15         So I'm really denying the motion for the same reasons

16  I denied it before, and that's because I find that there are --

17  there are disputed issues of material fact and law, really,

18  disputed issues of law as to whether -- it's really a mixed

19  question as to some of these things as to fact and law as to

20  whether the note -- whether the debenture is a security as

21  denied in 101(49) and 510(b) and intended to reach that --

22  intended to reach this type of transaction where there is a

23  senior secured subordinated debenture.

24         Here, the Court notes that a note is also defined as

25  a security under 101(49).  A bond is also defined as a security

46

1  under 101(49).  And clearly there are cases going in both

2  directions as to whether a note is a security for purposes of

3  510(b).

4       There are factual issues as to whether this

5  instrument is a debt or a security, as contemplated by 510(b).

6  The first two transactions here were for straight equity or

7  preferred stock, and it were converted to stock.  The record

8  shows, according to Mr. Kirkland, that he wasn't willing to do

9  another equity deal and wanted to do a debt deal and that

10 that's why he got collateral and that's why there were note

11 terms, there were interest terms, and things like that.

12      Those -- those facts to me cut in favor of a

13 construction of this as a debt security or debt as opposed to a

14 security contemplated by 510(b).

15      The public reports by the debtor acknowledge the

16 security, the issuance of the secured -- senior secured

17 convertible debenture and the lien on all assets.  As we said

18 -- as was discussed during the oral argument, clearly a

19 security interest was intended to be granted, and I am unaware

20 of any case that found that there was a subordination under 510

21 when a security interest was granted for what was termed a debt

22 instrument.

23      The -- that Discover did not convert its debenture to

24 stock, except for a limited number of five hundred and

25 something shares.  And, also -- and, also, Discover argues that

1  its claim as filed is limited to default interest and early

2  redemption or make whole kind of premium that is not based on

3  -- not based on any equity type ticker or equity value.

4        Those facts and mixed questions of fact and law are

5  sufficient for me to deny the motion for reconsideration as not

6  presenting any new facts or law or being grounds for me to -- I

7  just don't think I -- I just don't think I was completely wrong

8  on that.  And in this regard, although there is perhaps no case

9  directly on point, there is cases like <u>Mobile Tool</u>

10 <u>International, Inc.</u>, 306 B.R. 778, decided after <u>Telegroup</u> by

11 the Bankruptcy Court for the District of Delaware, where the

12 Court found that the amounts owed to former shareholders who

13 were -- who in connection with a transaction got notes for

14 their shares, and, actually, the shares were held in escrow,

15 and the proceeds were held in escrow, were not in security for

16 -- for purposes of 510(b).

17       And that court distinguished <u>Telegroup</u> on the grounds

18 of whether a claim arises from the sale of securities and is

19 based on activities occurring after the stock sale was

20 concluded, because some were limited to (indiscernible) that

21 would be actual -- only at the actual sale of securities.

22       <u>Telegroup</u> said that a post-transaction activity could

23 also form the basis of the subordination claim and that

24 subordination under 510(b) (indiscernible) best efforts to

25 register the stock and ensure that the stock is really

48

1  tradeable.

2       So if the Mobile court found that the -- that

3  Telegroup (indiscernible) only the distinction, other courts

4  are drawn between actually determining at the time of the stock

5  sale and post-transaction -- and post-transaction activities,

6  but the standard definition still only applies to claims held

7  by shareholders and note held by note holders.  That's 782.

8  The Third Circuit did not alter the long-standing principle

9  that Section 510(b) does not apply to instances where separate

10 debt notes are actually issued in exchange for the stock.

11      And, moreover, Defendant's claims in this case do not

12 resemble the types of transactions that 510(b) seeks to

13 subordinate.  The -- you know, getting into the reasons for

14 510(b), and that court in turn relied on the Montgomery -- the

15 Montgomery Ward case, which also -- which also refused to

16 subordinate a note claim in a case that -- from a former

17 shareholder who filed a million dollar proof of claim based on

18 a promissory note for the stock.

19      To me, both -- both Montgomery Ward and Mobile are

20 cases that you could argue are much closer to a 510(b) case

21 than this one is, because of the original position of the

22 parties and shareholders.

23      But what I do want to emphasize here is that the

24 Court's rationale is that the subordination of this claim as

25 giving rise to damages under 510(b) could lead to the untenable

49

1  result that any claim produced out of the corporate bond or

2  debenture is automatically subordinated for the claims of other

3  unsecured creditors given their position of security.   In

4  101(49)(A).

5       I do not believe Congress intended this result.

6  That's 272 B.R. 836 at 844, 845, Bankruptcy District of

7  Delaware, 2001.

8       I don't -- I agree with that.  I don't think it's in

9  every case.  I think it could be the case, and it could be the

10  case here.  And there's cases, I recognize, that could argue

11  support the opposite result, like NAL Financial Group.  But in

12  NAL, the debentures were actually converted to stock, and there

13  was no security for the debenture.

14       And I acknowledge that the Court held in dicta that

15  it didn't matter whether they were converted, but I think it

16  matters whether they're converted, because there's different

17  rights that accrue.  Until they are converted, no one has the

18  right to share in the equity.  And that gets to all the policy

19  reasons that are advanced for the 510(b) subordination.

20       You know, there is the Tristar case, the

21  (indiscernible) case.  They're not -- they are all -- they were

22  all equity parties.  They were equity.  Here, this -- this

23  Discover was not equity at the time.  It was a debenture holder

24  that had converted a small number of debentures.

25       And so, notwithstanding that -- the invitation to

50

1  reconsider my decision and that -- that the plain language of

2  101(49) and 510(b) requires me to automatically subordinate the

3  claim of a convertible debenture holder, I -- I cannot so find,

4  I cannot so rule.  It doesn't -- frankly, it doesn't make any

5  sense to me.

6       And if you apply the test, you know, that -- that has

7  been advanced under the securities laws -- and I'm going to get

8  to that -- the -- under the -- the motivation of the parties.

9  This was clearly a commercial transaction which was between two

10  sophisticated parties, one represented by Lowenstein Sandler, I

11  believe, and the other by a sophisticated, experienced

12  investor, who is a lawyer himself, and here the -- the

13  motivation of the parties, you know, I could say is it looks

14  like it's equity, or it looks like it's debt.

15       The things like the senior status, secured status,

16  the prior transactions all make it look like debt.  Things like

17  very high multiples of recovery and the conversion features and

18  the other arguments made by debtor and creditor -- and

19  trustee's counsel, you know, all cut in favor of a finding the

20  other way.

21       The plan of distribution -- so that factor is mutual.

22  Plan of distribution, the trustee argues that it's an

23  instrument where there's a common trading for speculation and

24  investment.  But this was a -- this was a two-party

25  transaction.  It wasn't sold to anybody else.  The debenture

51

1 was purchased by Discover, and it was a transaction between

2 them.

3        Citing <u>The Equitable Life Assurance Society of the</u>

4 <u>United States v. Arthur Andersen</u>, 655 F.Supp. 1225 at 1243.

5 Note evidencing an isolated transaction and not designed for

6 public trading held not to be a security.  So that factor, I

7 think, cuts against a finding of a security.

8        Reasonable expectations of the investing public.

9 Here, the public expectations, to the extent there were any,

10 were that there was a senior secured convertible debenture and

11 that -- and that the investing public, if anybody made an

12 investment in this debtor, they knew that they had to look at

13 whether there was a -- if somebody wanted to make a secured

14 loan, in particular, they had to look to see whether there was

15 a secured party ahead of them, and they would have found,

16 according to the records, that there were.  So that cuts in

17 favor of finding a security -- a debt instrument.

18       And that the Federal Securities Law apply and the

19 alternative regulatory scheme, but this is -- the parties --

20 the parties took pains -- those investment representations were

21 so that they wouldn't have to comply with the securities laws

22 and so that they wouldn't -- they wouldn't have to do all the

23 things that they needed to do in just in connection with the

24 original issuance of the debenture, other than when the stock

25 needed to be converted, they issued enough and they registered

52

1  enough.

2          But those facts, they cut in favor of -- while that

3  -- the regulatory scheme is neutral or maybe slightly tipping

4  in favor of a debt, I just don't know enough yet on that, but I

5  think it could go either way on all these issues.

6          And, you know, the fact that they invested --

7  Discover only invested $2 million and is now seeking $15

8  million or $324 million, or whatever the number is, it's

9  multiples of what the transaction -- the initial advance was.

10 And that's a factor that cuts in favor of finding that it's a

11 security.  So those are factors that cut in favor of finding

12 security.

13         And even those articles and those -- the professors

14 and Telegroup, as I said, they didn't reach -- they didn't

15 reach this far.  None of that went this far.  And the Third

16 Circuit in Telegroup had a lot of trouble interpreting 510(b).

17 So I don't think it's so clear and unambiguous as it's been

18 made out to be.

19         So I am denying the motion for reconsideration.  And

20 I just need a simple order on that for the reasons set forth on

21 the record.  And, you know, if you want to make a motion under

22 8006, you can certainly make it, Mr. Rabinowitz, but I just

23 can't deal with that today.

24         MR. RABINOWITZ:  Understood, Your Honor.  I will

25 submit the order.

53

1          THE COURT:  Okay.  All right.  And now we go to the

2     stay relief.

3          MR. RABINOWITZ:  Yes.

4          THE COURT:  And, you know, on this one, I kind of

5     think I dealt with this, too, but let's -- we can proceed on

6     that.

7          MR. RABINOWITZ:  Judge, I think you dealt with it as

8     well in the -- in the 4/2 transcript, Your Honor at the end

9     essentially said there is -- the collateral consists of cash

10    that's being held by debtor's counsel and there's no decline

11    associated with that cash, and they are adequately protected.

12         But I -- this --

13         THE COURT:  Well, maybe -- I'm saying this, and I'm

14    just making a joke, because we've been on for so long, maybe

15    Mr. Barney is asking for reconsideration of that.

16         MR. BARNEY:  Well, Your Honor, I appreciate Mr.

17    Rabinowitz arguing the counter-position on my motion, but

18    things have changed, Your Honor.

19         Discover's minimum secured claim continues to accrue

20    and now exceeds $3.1 million.  I know the Court hasn't awarded

21    it fees as of yet, but that number continues to grow.  The only

22    collateral is -- that we have thus far is the $2.93 million and

23    whatever limited amount of money that the other assets that

24    fall into the collateral pool might generate at some point,

25    which so far has been zero.

54

1        And we've demonstrated, as we did when the motion was

2   argued the last time, that the -- that the value of the

3   collateral has declined from the petition date.  The trustee's

4   efforts to minimize the value of the collateral as only being

5   $1.5 million as of the petition date just begs credulity.  And

6   the -- the time -- like the motion to convert that Your Honor

7   granted two months ago, the motion for stay relief has grown

8   more appropriate with the passage of time and the continued

9   increase in Discover's claim and the lack of -- the lack of the

10  estate to provide adequate protection.

11       As I said earlier, we can fight -- there is a lot to

12  fight about there, but one thing that nobody disputes is that

13  Discover advanced $2 million and that the debenture says that

14  we get interest and fees.

15       And even if you only calculate interest and fees at

16  minimum amounts, it still exceeds the value of the collateral

17  that's available to provide Discover with adequate protection.

18       THE COURT:  But how do you square that with my

19  decision just now that -- and before where I just said I didn't

20  rule that -- that it couldn't be subordinated.  Maybe it all

21  gets subordinated.  Then what?

22       MR. BARNEY:  Well, Your Honor, I -- well, if it does

23  get -- I don't see a conceivable outcome here where the minimum

24  amount of this claim gets subordinated, because the money was

25  advanced, and it was never converted.  And, you know, it's not

1  the -- the trustee's suggestion that he's going to the Third

2  Circuit on that issue notwithstanding, I think any other court

3  is going to -- and I think Your Honor or the District Court, if

4  their reference gets withdrawn, is going to come to that

5  conclusion.

6          Discover has been -- Discover has been dragged

7  through this case as, you know, the bad guy, and nobody -- and

8  none of my adversaries have ever acknowledged that Discover put

9  the last money in in a positive light, anyway, and Discover is

10  entitled to get its money back.

11         THE COURT:  Well, maybe.  But it's maybe.  I'm saying

12  these are real claims.  I said this to you the other time, and

13  I think you acknowledged it, Mr. Barney.  In fact, my memory is

14  I noted that Mr. Barney didn't move for summary judgment

15  because it wouldn't be likely to be granted, and it wouldn't be

16  likely to be granted the other way, either.

17         Discover could lose.

18         MR. BARNEY:  I understand that, Your Honor.

19         THE COURT:  So why aren't they adequately protected

20  by $2.9 million sitting in escrow in somebody's account when

21  they entire amount is disputed and there is real bona fide

22  claims for it, number one.

23         Number two is, and this is not a reflection on you in

24  any way, but the way this case started, there was at least

25  $100,000 of fees that accrued during the first week opposing

1  extension of time to file schedules and filing a -- I have it

2  here, I pulled it out.  It's like -- it's hundreds of pages.

3  Yeah.  It's like 300 pages, the motion that they filed right

4  away to -- to get relief from stay.

5          And then it turns out that -- it turns out that

6  Discover didn't get -- didn't get Limited, which had the

7  license on the -- on the key bert assets, and that was in

8  Limited.  And it turned out that there was an issue as to the

9  Ceplene.

10         And so there's all kinds of issues here as to what

11 amount they may or may not be entitled to at the end of the

12 day.

13         MR. BARNEY:  Well, I guess, Your Honor --

14         THE COURT:  So I'm just not sure why they're not

15 adequately protected right now by the amount of money sitting

16 in the account.

17         MR. BARNEY:  Your Honor, if I win, and I've got a

18 claim for, you know, $3.2 million or some number, I'm certainly

19 not adequately protected.

20         So, you know, if you grant stay relief, presumably

21 Discover goes away.  And if we get paid --

22         THE COURT:  I'm glad you said presumably, because I

23 don't know if Discover is ever going away.  They've got suits

24 going on in District Court, and there's all kinds of things

25 going on.  I don't know.

57

1          MR. BARNEY:  Well, Your Honor, it's just -- as I said

2     earlier, it's our position that the time has come in this case

3     for Discover to have resort to its collateral, and I think I

4     know where you're going.  I've been asked to let you know that

5     Discover is going to take an appeal of the denial of this

6     motion, if that's where this ends up.

7          THE COURT:  Well, that's -- you know what, it looks

8     like there's going to be a couple of appeals or attempted

9     appeals, and that's fine.  That's totally fine.  That's what's

10    part of the thing.  You know, one person -- usually when I make

11    a decision, one person is happy and one person is not.  So what

12    am I going to do?

13         MR. RABINOWITZ:  Judge, if I might -- excuse me -- if

14    I might just be heard briefly.  The three of us have been doing

15    this for a long time, and we all understand that parties' pre-

16    bankruptcy rights get adjusted in some way under the Bankruptcy

17    Code.  Congress has set a bunch of rules, and we all try to

18    address those rules as best we can.

19         So I just want to say a couple of things that I just

20    don't understand.  If Discover's out of pocket investment is $2

21    million, and if the collateral, the known collateral -- and

22    Discover has taken the position everything else is worthless --

23    is $2,930,000, my understanding of Section 506(b) is the max

24    claim -- secured claim that Discover could ever have is

25    $2,930,000.  It can't have a $3.1 million claim, and it can't

58

1  continue to grow.  It stops.  You can only get -- 502(b)(2)

2  says you can't get unmatured interest post-petition, and 506(b)

3  says a secured creditor can get -- can get it to the extent of

4  its over security fees and interest.

5      And the failure to get that stuff, the failure is not

6  a lack of adequate protection.  That's what the Supreme Court

7  told us in <u>Timbers</u>.  So there is no continuing harm by virtue

8  of the increase in the size of Discover's secured debt that

9  forms a basis for claiming lack of adequate protection.

10      So the only issue is -- the only issue --

11      THE COURT:  Well, wouldn't they get -- wouldn't they

12  have an unsecured claim for the balance to the extent that they

13  --

14      MR. RABINOWITZ:  Absolutely.  But that's not lack of

15  adequate protection.

16      THE COURT:  No, but that means that they still have a

17  claim.

18      MR. RABINOWITZ:  I'm not in any way suggesting --

19  well, let me take a step back.  They have an unsecured claim

20  for the full amount of whatever the Court determines they are

21  owed.

22      What they can't get as part of their unsecured claim

23  is interest in attorney's fees that they were prohibited from

24  accruing under Section 506(b).  So -- but that's a different

25  issue.

59

1      All I'm addressing is the secured claim, because I
2  think, if I understand the argument correctly -- and many times
3  I don't -- is that the secured claim continues to grow and,
4  hence, that's a lack of adequate protection.  And all I'm
5  suggesting is the secured claim -- not the -- and even the
6  overall claim -- but the secured claim cannot continue to grow.
7  It's limited to the value of the collateral, and essentially
8  what we're fighting about at this point in time is $2,930,000.
9  So the question --

10      THE COURT:  But, I mean, he's arguing that he's worse
11  off because it's continuing to accrue, and then he's not going
12  to be able to recover in full from his collateral, where he
13  would have been before.  That's the argument, as I understand
14  it.

15      MR. RABINOWITZ:  Meaning -- let me see if I
16  understand the argument.  It's the -- first of all, _Timbers_
17  said that's not -- that's not so.  _Timbers_ said that you cannot
18  argue lack of adequate protection by the accrual of post-
19  petition interest beyond what the value of your secured claim
20  is.

21      You can make that argument presumably to the extent
22  there's over security, but there is no over security here.  So
23  I think _Timbers_ has rejected that argument.

24      And so all we're focusing on is adequate protection.
25  And, yes, there are cases that talk about -- under 361,

60

1   periodic payments, replacement lien, equity cushion, but the

2   cases we have cited -- and I don't think any courts have

3   rejected them -- is what is to be protected is the value of

4   your collateral and lien position.

5        And that's simply a comparison, not from the petition

6   date, but from the date you file the motion to the date of the

7   hearing, has there been a decline in that collateral.  And

8   there -- the only thing we're talking about at this point in

9   time, essentially, is $2,930,000, and by definition, it can't

10  decline in value over time.

11       So, for that reason alone, there's adequate

12  protection.  We've got additional arguments as to what the

13  collateral was worth in the early stages of the case and what

14  it's worth today.  I think as a result of the bert sale, there

15  was an improvement from what the initial offer was to what it

16  ultimately sold for.  That's not a decline.  That's an

17  increase, which is the opposite of a decline, so that's not

18  lack of adequate protection.

19       There's been no determination as to who owns the

20  proceeds in any event.  Even though there has been an

21  administrative allocation of $3 million to Israel and $3

22  million to the United States, there has been no determination

23  of a court of competent jurisdiction.  That's, in fact, what

24  each proceeding is entitled to.

25       And to the extent that it's ultimately determined --

61

1  I don't think this will happen for practical reasons, I'm not

2  suggesting it -- but if it's ultimately determined that the

3  Israeli Ltd. proceeding has all of the asset value and none of

4  it is in any of the debtors before this court, that their

5  collateral position can't decline, because it would have

6  started at zero and it remains at zero.

7          There's basically been no evidence of decline in

8  value, either as a matter of law or a matter of fact as to what

9  the collateral was worth at some earlier point in time and what

10 the collateral is worth today.

11         And that's the test here, not accrual of interest,

12 not accrual of attorney's fees, but simply decline in value of

13 that collateral.

14         The second point that Your Honor made is that one of

15 the pre-conditions for a determination for relief from the stay

16 is the validity of the secured creditor's lien.  And we do have

17 the pending adversary proceeding, which has yet to be resolved,

18 and may take some time to resolve.  And, putting aside all the

19 other -- I know that Mr. Barney has made a point, and I'm not

20 in any way minimizing the point, has made a point that there

21 were aspersions cast here by the debtors and the Committee,

22 okay.

23         I'm not -- I'm not here to address them in this -- in

24 this proceeding right now.  But the fact of the matter is that

25 I believe, especially as evidenced by Your Honor's opinion

62

1  right now, that there is a good faith basis under 510(b) alone

2  to subordinate their lien in claim.  And if that is successful,

3  there is no need to prevail on any of the other 13 counts of

4  the complaint.

5        It gets the same relief that many of the other counts

6  under alternate theories would have resulted in.  So Mr. Barney

7  can have his opinions as to the merits, and we don't need to

8  argue what the other counts -- the validity of the other

9  counts.  The reality is that if the trustee prevails under

10 510(b), their lien is subordinate and they wouldn't be entitled

11 to relief from the stay.

12       Another smaller issue has just recently arisen, and

13 by virtue of give and take between Mr. Barney and I, in an

14 effort to move this along, it's become apparent to the trustee

15 that there is a dispute between Discover and the debtor with

16 regard to the scope of the lien on at least one other category

17 of assets, and that's the estate's D and O claims.

18       And yesterday we filed an adversary proceeding

19 seeking a determination that their lien doesn't cover that, so

20 that if Your Honor were to grant relief from stay today, I

21 would make an argument that there is still an outstanding issue

22 as to the scope of that lien and whether it covers the estate's

23 D and O claims.  I think it doesn't under 9108(e), because it

24 requires specificity of description of collateral, it's a

25 commercial tort claim, and there is -- at best, the only thing

63

1  in the security agreement is general and tangible.

2         So there are disputes with regard to the scope and

3  the validity of Discover's lien which make it inappropriate at

4  this time to grant relief from the stay, and there has been no

5  demonstration of diminution of value of collateral.  In fact,

6  it's at least stable.  It could have gone up.  And the accrual

7  of post-petition interest and fees is not in accordance with

8  Timbers, a basis to claim lack of adequate protection.

9         So, for all those reasons, consistent with Your

10 Honor's prior ruling, I think on April 2, the trustee submits

11 that Discover is adequately protected and the 362(d) motion

12 should be denied.

13        THE COURT:  Okay.  Mr. Barney, do you want to

14 respond?

15        MR. BARNEY:  Your Honor, yeah, very briefly.

16        With respect to the issue diminution of value, it's

17 clear, based on the testimony of the debtor's principals and

18 professionals -- or not professionals, but their principals,

19 that the assets at the petition date were worth tens of

20 millions of dollars and that as a result of the pendency of

21 these cases, the assets net to the debtor, to the American --

22 to the U.S. debtor, are $3 million.

23        So, you know, Mr. Rabinowitz makes some clever

24 arguments about how you can -- you can recalculate the math,

25 but from a broad strokes perspective, the value of the

64

1  collateral is diminished, and for all the reasons that we've

2  said in our various pleadings on this motion, including the

3  passage of time.

4        And I think that's proven out by the fact that Mr.

5  Rabinowitz is now talking to potential buyers for the rest of

6  Immune Limited's -- I mean, Immune, Inc.'s assets for, you

7  know, a relative small, six-figure number.

8        I'm aware of what 506(b) says, and Your Honor I think

9  correctly interpreted our argument.  The argument is not that

10 we're entitled to collect on a secured basis more than what our

11 collateral is worth, but rather, that by denying stay relief,

12 we continue to accrue fees that, at least under the documents,

13 are entitled to secured status, that wouldn't accrue otherwise,

14 because we would be paid off.

15       And I think that's all I have to say in response to

16 what Mr. Rabinowitz said, Your Honor.

17       THE COURT:  All right.  This matter is before the

18 Court on the motion of Discover Growth Fund for relief from

19 stay so as to seek to obtain the entire $2.9 million that is

20 being held in escrow by debtor's counsel in connection with the

21 sale of the bert assets.

22       I'm going to deny the motion for relief from stay on

23 several grounds, and many of them were touched upon by Mr.

24 Rabinowitz.  You know, whether it's for cause or whether it's

25 for lack of equity and not necessary for reorganization, well,

65

1 you know, there is no reorganization here, so that doesn't

2 apply.

3      But whether there is -- whether there is equity in

4 this collateral presupposes where that Discover has a valid and

5 existing lien on all of those proceeds.  And for many reasons,

6 I am not prepared to find that.

7      I am not prepared to find that because, number one,

8 there is a viable 510(b), a subordination claim, and there's

9 viable claims -- there's other claims that haven't been subject

10 to summary judgment motions that are pending and that are on --

11 you know, on track to be tried at some point.  I don't know

12 exactly when but, hopefully, you will be doing trials again

13 soon, and if the -- if the 510(b) argument is successful, and

14 it's being argued to me very strongly by two sets of competent

15 counsel that -- that as a matter of law it needs to be, then

16 Discover has no claim to those proceeds at all, because it's

17 subordinated and the lien, it goes over to the estate.  That's

18 number one.

19      Number two is that the whole -- the amount of the

20 claim I'm just not sure about.  You know, I know that Discover

21 thinks it's been dragged through the coals or raked through the

22 coals, but the debtor -- the pressure on the debtor has been

23 relentless from the very get-go, as I indicated, including an

24 objection to a little bit more time to file schedules, the --

25 and a motion for relief from stay right out of the box when it

1  turns out that Discover didn't get Limited, the owner of the

2  license, to sign off on the pledge of the collateral.  That's a

3  big problem to me.

4       And related to that is that I don't know what the

5  allocation is between Limited and Inc.  And the Israeli people

6  say it should be all in Limited.  But it's very, very fuzzy,

7  and it's going to require, I think, some detailed testimony,

8  maybe experts and fact finding on all these various issues as

9  to the nature and extent of the lien.

10      I think there's a very good claim that -- there is

11 certainly a bona fide claim that the Discover lien doesn't

12 extend to the Ceplene assets, because under an circumstance it

13 would arise pre-petition -- it would arise post-petition, and

14 there was the licensing anyway.  So that is -- that's another r

15 I am -- I've just got to -- hold on one second.

16      (Pause)

17      THE COURT:  That's another reason I am denying the

18 stay relief, because I don't know what the -- what the extent

19 of Discover's collateral is at this point.

20      And I don't know that the amount of the fees is

21 reasonable at all.  I just don't know at this point.  My sense

22 is that a lot of the fees wouldn't be allowable anyway.

23      When -- there is also the issue that we have from the

24 get-go here about the -- about the other various claims that

25 are being made against Discover that are the subject of the

67

1   adversary proceeding and -- and whether, you know, Discover has

2   other assets that are subject to its lien as well, including

3   the D and O policy, as was mentioned by Mr. Rabinowitz.

4        So then I have the $2.9 million in escrow that's not

5   going anywhere until there is a final resolution.  And so, in

6   all those respects, I think that that I'm going to -- I'm going

7   to go with an argument that was advanced by the Creditors

8   Committee in terms of the -- in terms of the granting stay

9   relief when there is an adversary proceeding pending that

10  challenges the nature and extent and validity of the lien.

11       And the Court should determine whether there is a --

12  the party opposing the motion has a colorable claim pending.  I

13  already did.  That's In Re Wile, 310 B.R. 514 at 519,

14  Bankruptcy Court of Eastern District of Pennsylvania, and In Re

15  Robbins, 310 B.R. 626 at 630, Ninth Circuit BAP 2004, granting

16  or denying stay relief while an adversary proceeding is pending

17  is within the sound discretion of the bankruptcy court.  In its

18  discretion, the Court may consider evidence that the movant as

19  a secured party is potentially vulnerable.

20       I have determined that.  That's the In Re Montgomery

21  case, 262 B.R. 772 at 775.  And there, the Montgomery case

22  stated that where there is evidence that affects the validity

23  of the creditor's claim, the stay relief could be denied or

24  potentially a more congruent alternative would be a conditional

25  denial of relief from stay under the requirement that the

68

1 respondent commence and prosecute a separate litigation.

2        Here, that's already -- that's already -- that

3 litigation has already been commenced.  And just success on the

4 510(b) would be enough to deny the claim in its entirety.

5        So -- then there's also the <u>Poughkeepsie Hotel</u>

6 <u>Associates</u> case that allows you to consider defenses like that

7 in a relief from stay motion.  And it directly involves whether

8 the debtor -- you know, whether Discover has rights and the

9 extent of those rights in the collateral that's there.

10        And I think that the assets that are there provide

11 very, very good adequate protection to Discover because I think

12 the sale produced what it could in the Bankruptcy Court, the

13 best offer that was made, and resulted in arguably an increase

14 in the proceeds available to this estate, certainly than if the

15 relief from stay had been granted at the early stage and

16 Discover was allowed to foreclose on the collateral in the

17 Virgin Islands, where there was not going to be any real public

18 sale anyway, that the argument is that it's -- that the

19 position has approved -- has improved against, you know, as

20 against Discover, even though it fought it every step of the

21 way.

22        And, like I said, there is substance to the debtor,

23 the estate's claims, and I am going to deny -- I'm going to

24 deny the stay relief motion and the motion is denied pending

25 the outcome of the adversary proceeding.

1        And in closing, all I'll say is it was my fervent

2  hope that when the trustee got in this case some of the vitriol

3  and histrionics, as it's been described, between the parties

4  would subside, and they would be able to come to a rational

5  business solution of this.

6        I can think of one.  And it's so simple, it's -- but

7  I don't know, and I don't know what -- I don't know what the

8  discussions are.  And I know you were talking to Judge Kaplan,

9  but apparently those were not successful.

10        But if ever there were a case -- we've got motions to

11  withdraw the reference, we've got maybe one or two appeals,

12  we've got trials.  This is the time.  Get this case resolved so

13  that everybody gets something and nobody walks away with

14  nothing and the legal fees don't eat up the whole case.  That's

15  my strong encouragement.  Okay.

16        MR. BARNEY:  We appreciate that, Your Honor.

17        MR. RABINOWITZ:  We appreciate it, Judge.  I think

18  both of us share that view, and it's just a question of how

19  we're going to get from here to there, and we haven't been able

20  to do it yet, so...

21        THE COURT:  They're going to allow trials in Newark

22  soon.  So, you know, if we have to get to a trial, we'll get to

23  a trial.

24        MR. RABINOWITZ:  All right.  Judge, thank you very

25  much for your time today, and Your Honor has devoted several

70

1  hours to these issues, and I think we both appreciate it very

2  much.

3          THE COURT:  With all candor, Mr. Rabinowitz, it's

4  more than several at this point.  But you know what else?  We

5  have been talking so long that the recording is running out, so

6  we have to go.

7          MR. RABINOWITZ:  All right.  Thank you, Judge.

8          MR. BARNEY:  Thanks very much, Your Honor.

9          MR. RABINOWITZ:  Take it easy.  Stay safe and

10 healthy.

11         THE COURT:  Have a good one.  Thank you.

12         MR. RABINOWITZ:  All right.  Thanks.  Bye.

13         MR. BARNEY:  Bye.

14         THE COURT:  Bye.

15

16                    *  *  *  *  *

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

       I, LORI KNOLLMEYER, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Lori Knollmeyer

LORI KNOLLMEYER

J&J COURT TRANSCRIBERS, INC.   DATE:  July 6, 2020

**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)

**RABINOWITZ, LUBETKIN & TULLY, LLC**
293 Eisenhower Parkway, Suite 100
Livingston, New Jersey NJ 07039
(973) 597-9100
Jonathan I. Rabinowitz
John J. Harmon
*Counsel for Jeffrey A. Lester, Chapter 7 Trustee*



**Order Filed on July 10, 2020
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

| | |
|---|---|
| In re:<br><br>IMMUNE PHARMACEUTICALS, INC., et al.,<br><br>                  Debtors. | Case No. 19-13273 (VFP)<br><br>Chapter 7<br>(Jointly Administered<br><br>Hon. Vincent F. Papalia |
| IMMUNE PHARMACEUTICALS, INC.; IMMUNE PHARMACEUTICALS, LTD.; CYTOVIA, INC.; IMMUNE ONCOLOGY PHARMACEUTICALS, INC.; MAXIM PHARMACEUTICALS, INC.; IMMUNE PHARMACEUTICALS USA CORP.; and THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF IMMUNE PHARMACEUTICALS, INC., et al.,     Plaintiffs,<br><br>v.<br><br>DISCOVER GROWTH FUND, LLC,<br><br>                Defendant. | Adv. Proc. No.: 19-02033<br><br>Hearing Date and Time:<br>June 23, 2020 at 11:00 a.m. |

### ORDER DENYING TRUSTEE'S MOTION PURSUANT TO F.R.B.P. 9023 FOR RECONSIDERATION OF ORDER DENYING PARTIAL SUMMARY JUDGMENT UNDER 11 U.S.C. § 510(b)

the Relief set forth on the following page, numbered two (2), is hereby **ORDERED**.

**DATED July 10, 2020**

_____
**Honorable Vincent F. Papalia
United States Bankruptcy Judge**

**THIS MATTER** having been opened to the Court by Jeffrey A. Lester, Chapter 7 Trustee (the "Trustee") for Immune Pharmaceuticals, Inc. ("Immune Inc."), Immune Pharmaceuticals, Ltd. ("Immune Ltd."), Cytovia, Inc. ("Cytovia"), Immune Oncology Pharmaceuticals, Inc. ("Oncology"), Maxim Pharmaceuticals, Inc. ("Maxim"), and Immune Pharmaceuticals USA Corp. ("USA" and, collectively with the foregoing entities, the "Debtors"), by and through the Trustee's duly retained counsel, Rabinowitz, Lubetkin & Tully, LLC, upon the filing of a motion for reconsideration (the "Motion") pursuant to Federal Rule of Bankruptcy Procedure 9023 of the Court's Order entered on April 20, 2020 denying the second motion for partial summary judgment (the "Partial Summary Judgment Motion") filed by the Debtor and the Official Committee of Unsecured Creditors of the Debtor (the "Committee") against Discover Growth Fund, LLC ("Discover") seeking summary judgment on Count Eight of the Complaint in the above-captioned adversary proceeding (the "Adversary Proceeding"); and good and sufficient notice of the Motion having been provided; and the Court having considered the Motion, the opposition thereto and the arguments of counsel; and for the reasons set forth on the record on June 23, 2020 and in the Court's denial of the Partial Summary Judgment Motion;

**IT IS HEREBY ORDERED** that the Trustee's Motion be and is hereby denied; and it is further

**ORDERED** that the entry of this Order is without prejudice to any and all further rights the Trustee may have regarding the Adversary Proceeding and the Partial Summary Judgment Motion including, without limitation, any rights of appeal or to seek leave to appeal, to seek a stay pending appeal and to seek certification of a direct appeal to the Court of Appeals pursuant to Bankruptcy Rule 8006.